UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

v.                   Case No.: 8:17-cv-826-T26AEP

SAID RUM,

       Defendant.
_____/






DEPOSITION OF:
MARJORIE KERKADO

TAKEN BY:   Attorney for Defendant

DATE:      June 7, 2018

TIME:      9:17 a.m. - 12:38 p.m.

PLACE:     Internal Revenue Service
3848 West Columbus Drive
Tampa, Florida 33607




Examination of the witness taken before:

Jerry Lefler RPR CRR CM
CLARK REPORTING SERVICE
Joseph Garcia International Center, Suite 303
Tampa, Florida 33602
(813) 229-3332

1   APPEARANCES:

2

        MARY APOSTOLAKOS HERVEY, ESQ.
3       U.S. Department of Justice
        Tax Division
4       P.O. Box 14198
        Washington, DC 20044
5       Mary.apostolakos.hervey@usdoj.gov

6       Counsel for Plaintiff

7

        VENAR AYAR, ESQ.
8       3000 Town Center, Suite 2222
        Southfield, Michigan 48075
9       Venar@ayarlaw.com

10      Counsel for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                                              PAGE

3        Direct Examination by Mr. Ayar           5

4        Cross-Examination by Ms. Hervey        100

5        Redirect Examination by Mr. Ayar       118

6        Recross-Examination by Ms. Hervey      140

7        Certificate of Reporter Oath           142

8        Certificate of Court Reporter          143

9        Errata Sheet                           144

10       Read and Sign Letter                   145

11

12

13
                         E X H I B I T S
14
                                               MARK
15    Kerkado

16    1    Letter dated August 23, 2011           7

17    2    Examining Officer's Activity Record, August   10
           23, 2011
18
      3    Section 1 SEP Responsibilities and Case     13
19         Development

20    4    4.25.16.4                              18

21    5    Section 4.6.16.4.7                     24

22    6    Section 1.2.20.1.1                     26

23    7    Legal Information Institute - Civil penalty   29

24    8    Examination Request                    32

25

Page 4

1                    E X H I B I T S

2                                                    MARK
   Kerkado
3
      9   Email from Terry Davis, March 20, 2012      36
4
     10   Email string                               39
5
     11   FBAR Activity Record                        44
6
     12   Workload Review                             49
7
     13   Email string April 16, 2012                59
8
     14   Letter to Said and Asma Rum, May 4, 2012   67
9
     15   Letter from Mr. Rum, April 18, 2012        77
10
     16   Letter to Said and Asma Rum, June 11, 2012 80
11
     17   Form 870                                    92
12
     18   Examining Officer's Activity Record        95
13
     19   Frequently Asked Questions                118
14

15

16

17

18

19

20

21

22

23

24

25

1       THEREUPON,

2                       MARJORIE KERKADO

3       was adduced as the deponent herein, and being first

4       duly sworn upon oath, was questioned and testified

5       as follows:

6                       DIRECT EXAMINATION

7   BY MR. AYAR:

8       Q.   Hi.

9       A.   Hi.

10      Q.   So, state your name for the record, please.

11      A.   Marjorie Kerkado, K-E-R-K-A-D-O.

12      Q.   And do you understand that you're under oath

13  here today?

14      A.   Yes.

15      Q.   So, what's your job title?

16      A.   Internal revenue -- Right now, I'm the group

17  manager.  Normally I'm a revenue agent.

18      Q.   So back in 2011/2012, you were a revenue

19  agent --

20      A.   Yes.

21      Q.   -- with the Internal Revenue Service?

22      A.   Yes.

23      Q.   Does that mean you're an auditor?

24      A.   I'm an examiner.

25      Q.   Examiner.  Okay.

1              And you examined the defendant's income tax

2    returns in this case?

3       A.   Some years, yes.

4       Q.   Tell me about how that works.  In your capacity

5    as an examiner, what does that entail?  What do you

6    mean, an "exam"?

7              I presume you're looking at his tax returns for

8    accuracy and for -- Scratch that.

9              Do you keep a log of your activities?

10      A.   Yes.

11      Q.   What kind of information goes into that log?

12      A.   I would put on there if I worked on a case and

13   the time that I spent working on the case.

14      Q.   Communications with taxpayers?

15      A.   Yes.

16      Q.   Do you record the contents of those

17   communications generally in the log?

18      A.   I can tell you that I do now.

19      Q.   You do now.

20      A.   I don't know that I did then.

21      Q.   When did this whole examination begin?

22      A.   I don't remember.

23      Q.   You don't know.  I'll see if I can help you.

24           MR. AYAR:  I'm going to give this to be marked

25      as Exhibit 1.

```
 1              (Exhibit 1 was marked for identification.)

 2   BY MR. AYAR:

 3       Q.   This is the exam letter that you sent to Said.

 4            MS. HERVEY:  This is 1?  Is this our copy to

 5       keep?

 6            MR. AYAR:  Yeah.  I have three copies.

 7   BY MR. AYAR:

 8       Q.   What I have here is a document I got in my

 9   Freedom of Information Act request back when I was

10   working the case some years ago, and it's a letter from

11   you dated August 23rd to Said Rum and it says, "Your

12   2008 federal tax return has been assigned to me for

13   examination."

14            MS. HERVEY:  Okay.  Just let me object, to

15       the extent that she needs to authenticate the

16       document.

17            MR. AYAR:  Okay.

18            THE DEPONENT:  It's my signature.

19   BY MR. AYAR:

20       Q.   That is your signature?

21            MS. HERVEY:  Do you recognize the document?

22            THE DEPONENT:  Yes.  Well, I recognize this

23       as a document I would prepare.

24   BY MR. AYAR:

25       Q.   Okay.  Is this when the audit started?  Is
```

1   August 23rd, 2011, when the examination started?

2        A.   I'm going to have to say, based on the letter,

3   yes.  Really I don't have any recollection of when.

4        Q.   That's understood.  Generally speaking, when a

5   letter like this gets issued to a taxpayer, that

6   indicates the beginning of an examination, correct?

7        A.   It indicates the contact with the taxpayer, the

8   first contact.  This is the first contact.  Like we

9   could have already --

10       Q.   You could have started in the beginning and

11  prepared --

12       A.   Yes, a pre-plan.

13       Q.   Yes, I understand.  Okay.

14            So, this notice covers tax year 2008 Form 1040.

15  Does that mean that was the scope of the examination at

16  that time, was you were looking at his 2008 Form 1040

17  form?

18       A.   Yes, that's what was assigned to me.

19       Q.   You also conducted an FBAR examination,

20  correct?

21       A.   Yes.

22       Q.   Help me understand how that works.  Because you

23  did an income tax exam and you did an FBAR exam.  Was

24  that like a joint exam?  Were they two separate exams?

25            Where does one start and the other one begin --

1    end and the other one begin?  Just educate me how this

2    works.

3       A.   I can tell you from my knowledge now, but I

4    can't tell you this is what I understood then.  Because

5    this was like the first time we were working on these.

6       Q.   Was this your first FBAR examination case, this

7    group of cases, these UBS cases?

8       A.   This type of case, yes.  There were other FBAR

9    exams, but it wasn't like this.

10       Q.   Okay.  So, explain to me how that works.  So,

11    there's two examinations, or is it one examination?

12            Based on your understanding now.  I understand

13    that may not have been your understanding.

14       A.   There are two separate case files, so I guess

15    there are two separate examinations.

16       Q.   In this case, were there two separate case

17    files?

18       A.   Yes.  They go separately.

19       Q.   When this notice was issued, referring to the

20    2008 federal tax return -- assuming this was the initial

21    contact -- this was purely an income tax exam and there

22    was no FBAR exam yet.  Is that correct?

23       A.   Yes.

24       Q.   Okay.  We can move on.  I am going to give to

25    the reporter Exhibit Number 2.

1           (Defendant's Exhibit 2 was marked for

2       identification.)

3   BY MR. AYAR:

4       Q.   This is another document I received --

5           MS. HERVEY:   Ayar, I know you haven't taken

6       a deposition before.   I just want to -- I think

7       that the appropriate thing for you to do is to

8       proffer that this is where you got the document.

9               But you need to ask her if she can

10      authenticate it.   You need to say, "Have you seen

11      this document before?   Can you tell me what it

12      is?"

13          MR. AYAR:   Thank you.

14  BY MR. AYAR:

15      Q.   Have you seen this document before?

16      A.   Yes.

17      Q.   Can you tell me what it is?

18      A.   It's an Activity Record.

19      Q.   Is this the log that you told me you keep in

20  the course of an audit?

21      A.   Yes.

22      Q.   Yes.   So this document, you said you recognize

23  it.   Did you prepare this?

24          There's some handwriting on the last page.   Can

25  you tell me if that's your handwriting?

1    A.    No.

2    Q.    No?  Okay.

3    A.    No.  I can tell you it's not.

4    Q.    It's not your handwriting?

5    A.    Right.

6    Q.    On the first page, your name is on the top,

7    "Marjorie Kerkado," under "Examining Officer."

8    A.    Yes.

9    Q.    That seems to indicate this is your log.  Did

10   you in fact prepare this log?  Do you recognize it?

11         You can feel free to go through it and see.

12   A.    I mean, I would have to go through each one to

13   make sure.  I don't think I'd even know --

14   Q.    I understand.

15   A.    I want to say, "Yes," because I recognize it as

16   something that I would have.

17   Q.    There's nothing that indicates this is not

18   authentic, right?  You have no indication of that.

19   A.    I don't know what this "Uncoded" is on here.

20   Q.    That's a redaction under the Freedom of

21   Information Act request.  This is an explanation as to

22   why it's redacted.  CF79:  That refers to a code

23   section.

24   A.    Okay.  But everything else seems like something

25   I would have in my file, so I have no reason to think

Page 12

1    it's not mine.

2         Q.   Okay.  Let's put this aside.  We're going to

3    refer back to it later, but keep it handy.  We're going

4    to need it later.

5         A.   Okay.

6         Q.   Now I want to talk more about your roles and

7    responsibilities as a revenue agent.  I think I read

8    somewhere that you're part of the Special Enforcement

9    Group.

10        A.   Uh-huh.

11        Q.   Is that correct?

12        A.   Yes.

13        Q.   And you were back then, too?

14        A.   Yes.

15        Q.   Can you tell me what that means?

16        A.   I don't know what "Special Enforcement" means,

17   but basically we assist CI, Criminal Investigations, and

18   the AUSA office with criminal prosecutions.

19        Q.   So being part of the special enforcement

20   program means that you're not an ordinary examiner.

21   You're some kind of special, judging by the name, type

22   of examiner that --

23        A.   No.

24        Q.   -- primarily helps in criminal cases?

25        A.   I don't know that I would agree with that.

1       Q.    Okay.  Let's see if I can help you.

2             What I have here, I pulled -- this I'm going to

3    have marked as Exhibit 3.  It's a copy of the Internal

4    Revenue Manual.  I pulled it off the IRS website.

5             MS. HERVEY:  Again, that's your proffer.

6             MR. AYAR:  That's my proffer.

7             (Exhibit 3 was marked for identification.)

8    BY MR. AYAR:

9       Q.    Have you ever read this?  Do you recognize this

10   document or any of this language?

11            MS. HERVEY:  Is this -- this is Exhibit 3.

12            THE DEPONENT:  I remember when I started in

13        SEP way back in 2007 or '8, I looked at the SEP

14        manual, or the part of the IRM that refers to

15        SEP, but I can't say that I've looked at it

16        recently.

17   BY MR. AYAR:

18      Q.    That's okay.  Now, you say when you were

19   assigned to SEP.  How did you get assigned to SEP?  Was

20   it something you asked for?

21            I'm sorry.  I don't mean to ask so many

22   compound questions.

23            When did you get assigned to the SEP group,

24   approximately?

25      A.    Approximately?  Mid 2007, late 2007.

1       Q.   And prior to being assigned to the SEP group,

2   what were you doing?

3       A.   I was working general program cases.

4       Q.   So you were a revenue agent still?

5       A.   Yes.  Revenue agent, but not in SEP.

6       Q.   Do you know why you were selected for the SEP

7   program?

8       A.   No.  I can only speculate.

9       Q.   Is it because you were a really good auditor?

10      A.   No, not at all.  That wasn't the reason.

11      Q.   So, did you ask to become part of the SEP

12  program?

13      A.   Yes.

14      Q.   Yes?  Why?

15      A.   I liked the idea of making sure that we were

16  putting the right people behind bars.

17      Q.   That's a very honorable thing to do.  It must

18  feel really good to put bad guys away.

19      A.    It feels really good to make sure the wrong

20  people don't get put away.

21      Q.   So, back to this document.  Page 3 is Internal

22  Revenue Manual 4.16.1.1.  Again I proffer I pulled this

23  off of the IRS website sometime last week.

24           MS. HERVEY:  I'm going to object to

25           relevance, based on the date, but go ahead.

1           MR. AYAR:  Okay.  Well --

2           MS. HERVEY:  I'm just saying -- Well, I made

3      my objection.  Go ahead.

4           MR. AYAR:  Okay.

5           THE DEPONENT:  Should I be looking at a

6      certain page?

7           MR. AYAR:  I'm sorry.  I'm just trying to

8      gather my thoughts.  Okay.

9      Q.   Paragraph 1 provides an overview, and it's --

10     page 3, I'm sorry.  Page 3.  Top of the page.  It's

11     Internal Revenue Manual Section 416.1.1, and it was

12     enacted June 14th of 2011.  Do you see that?

13     A.   Uh-huh.

14     Q.   Okay.  And that was prior to the date that the

15     exam started.  Okay.

16          And this is the current version -- it's on the

17     top left.  It shows that I pulled it on June 1st, 2018.

18     So this is the provision that was in effect during the

19     entire time of the examination.

20          MS. HERVEY:  I'm going to object.  That's

21     your testimony.  You're having her look at it.

22     This is a proffer you've made, but she's unable

23     to verify that.

24     BY MR. AYAR:

25     Q.   Okay.  Now, Paragraph 1, it says "SEP is a

1   special compliance program within the Small

2   Business/Self-Employment Operating Division directed

3   towards that segment of the population that derives

4   substantial income from either legal or illegal

5   activities and intentionally understate their

6   liabilities."

7          So would you agree that this is a fair

8   characterization of what the SEP program is, and that

9   it's directed towards people with substantial legal or

10  illegal income who intentionally understate their tax

11  liabilities?

12         MS. HERVEY:  I'm going to object based on

13      the scope -- I think we're getting outside of --

14      if you look at the notice of deposition, what you

15      designated the topics that she should be prepared

16      to testify to were basically communications

17      between Mr. Gavel and the IRS, between the agent

18      and people within the Internal Revenue Service,

19      and between the IRS and the taxpayer, and then

20      also the documents reviewed in making the

21      assessment.

22         And there's been no, you know,

23      indication that she reviewed this document in

24      making the assessment or that it plays any role.

25      So I'm going to object on that basis.  But you

1        can go ahead and ask her.

2            MR. AYAR:  Thank you.

3    BY MR. AYAR:

4        Q.  Would you agree that as a member of the SEP

5    program you primarily directed towards people who

6    intentionally understate their tax liabilities?

7        A.  Yes.

8        Q.  Okay.  If --

9        A.  Based on the question that you just asked, yes.

10   But it's different from what it says here.

11       Q.  Only the question that I ask you, of course.

12           So, the next page.  Sorry.  We're going to get

13   done with this really quickly.

14           IRM Section, I proffer, was 4.16.1.2, which I

15   believe was in effect at the time of the examination.

16           You see Paragraph 1 describes your core roles

17   and responsibilities as a SEP agent?  Do you see Part A,

18   the first rule and responsibility, it says that your

19   core responsibility is to "Identify and develop issues

20   with significant fraud potential."

21           Would you agree that that's your core job?

22       A.  I didn't -- No.

23       Q.  No.  Okay.

24       A.  I think if you -- I know I'm talking more than

25   I should.  It says "through the examination of complex

1    financial transactions."  That's the key of what we do.

2        Q.   That's the key of what you do?

3        A.   Yes.

4        Q.   Based on complex financial transactions.  It's

5    not -- the key is not to chase people who commit tax

6    fraud.

7        A.   It's not -- No, the key is not to look for

8    fraud.

9        Q.   It's not.  Okay.

10            But most of the cases you work have significant

11   fraud potential.  Would you agree with that?

12       A.   Interestingly, no.

13       Q.   Interestingly, no.  I think I read somewhere

14   that that's how they pick which cases get assigned to

15   SEP, but it's okay.  We don't need to talk about that

16   anymore.

17            Let's move on to ask you some more about your

18   roles and responsibilities as an FBAR examiner.  Okay.

19            I'm going to hand Exhibit 4 to be marked.

20            (Defendant's Exhibit 4 was marked for

21       identification.)

22            MS. HERVEY:  I'm going to object.  It

23       exceeds the scope of the Notice of Deposition.

24       Go ahead and answer.

25            MR. AYAR:  Okay.

1    BY MR. AYAR:

2         Q.   Let me explain to you what this is and where I

3    got it, as a proffer.

4              First of all, have you ever read this before?

5    Do you recognize any of this language?

6         A.   Yes.

7         Q.   Yes.   What is it?

8         A.   This is the portion of the IRM that deals with

9    Title 31, the FBAR.

10        Q.   What is the "IRM"?

11        A.   The Internal Revenue Manual.

12        Q.   Why is that document important?   Scratch that.

13             Is the Internal Revenue -- can we call it --

14   are you -- Do you feel like you're required to follow

15   the Internal Revenue Manual in carrying out your duties?

16        A.   Yes.

17        Q.   It's kind of like an employee handbook?

18        A.   It's a guide.

19        Q.   It's a guide.   So the Internal Revenue Manual

20   is a guide that's issued to people who work at the IRS

21   that describes how they're supposed to carry out their

22   duties and responsibilities.

23        A.   Yes.

24        Q.   Yes.   Okay, good.

25             So you've read this before?

1      A.   Yes.

2      Q.   Had you read it prior to examining Mr. Rum for

3  his Title 31 violations?

4      A.   I don't recall having read it.  I don't recall

5  that it existed.

6      Q.   You don't recall that it existed.  You see

7  where it says "4.26.16.4"?

8      A.   Uh-huh.

9      Q.   Next to it, there's a date.  Okay.  That's as

10  it existed on the IRS website.

11      A.   Oh.

12           MS. HERVEY:  I'm going to object.  Again --

13           MR. AYAR:  I understand.

14           MS. HERVEY:  -- you can ask her a question,

15      but you can't tell her what she has to answer.

16           MR. AYAR:  That's okay.  I'm sorry.

17           MS. HERVEY:  That's okay.

18           MR. AYAR:  I'm sorry.

19  BY MR. AYAR:

20      Q.   So, do you recall when the first time you've

21  seen this was?

22      A.   No, I can't.  I can recall the last time I saw

23  it, and the time before that, but I can't remember the

24  first time.

25      Q.   Was the first time you saw it while you were

1    preparing for this case, like this litigation?  Not the

2    exam way back then.

3         A.   This version?  That's the first time I recall

4    seeing it.  That doesn't mean that's the first time I

5    saw it.

6         Q.   Okay.  Well, whether you saw it or not, I want

7    to go through some things and see if you understood

8    these things back at the time you conducted the exam.

9    Okay?

10        A.   Okay.

11        Q.   Let's go to Paragraph 3, and it says, "Whenever

12   there's an FBAR examination, the examiner will issue an

13   FBAR warning letter, Letter 3800, or determine a

14   penalty."

15             At the time you conducted the examination, did

16   you understand that those were the two possible

17   outcomes?

18        A.   No.

19        Q.   You did not.  Okay.

20        A.   Or I have to say I don't remember that that is

21   something that I was aware of.

22        Q.    Okay.  Now, Paragraph 4, "Penalties should be

23   asserted only to promote compliance with the FBAR

24   reporting and recordkeeping requirements.  In exercising

25   their discretion, examiners should consider whether the

Page 22

1   issuance of a warning letter and the securing of

2   delinquent FBARs, rather than the assertion of a

3   penalty, will achieve to the desired result of improving

4   compliance in the future."

5         So, at the time you conducted Mr. Rum's FBAR

6   examination, did you understand that you were expected

7   to consider issuing a warning letter in lieu of any

8   penalties?

9      A.   No.

10         MS. HERVEY:  I'm going -- All right.  I'm

11         going to object.  It's asked and answered.  She

12         said that she's not sure if this was applicable

13         at the time, so she could not have --

14         MR. AYAR:  I'm not asking her about the

15         document.  I'm just asking her about her

16         recollection of her duties and her

17         responsibilities.

18         MS. HERVEY:  Okay.

19         MR. AYAR:  Okay?

20         MS. HERVEY:  Okay.

21   BY MR. AYAR:

22      Q.   So, let's go to Paragraph 5.  Again, this is

23   not about the document.  This is about your

24   understanding of your job, but we're just going to use

25   this as a guide for my questions.  Okay?

1          "FBAR policies have varying upper limits but no

2     floor."

3          Did you understand that there's no minimum FBAR

4     penalty?

5     A.   No.

6     Q.   No.  And "The examiner has the discretion in

7     determining the amount of the penalty."  Did you

8     understand that?

9     A.   No.

10    Q.   No, you did not.

11    A.   Not that I didn't understand it.

12    Q.   You didn't believe you had discretion?

13    A.   Right.

14    Q.   Correct.  Okay.

15         Now, "Examiner discretion is necessary because

16    the total of the penalties can greatly exceed an amount

17    that would be appropriate in view of the violation."

18         You didn't understand that at the time, that

19    your discretion was necessary because the maximum

20    penalties were so great?

21    A.   No.

22    Q.   No.  Okay.

23         The next paragraph says, "Examiners are

24    expected to exercise discretion, taking into account the

25    facts and circumstances of each case."

1          Did you understand that not only were you

2     afforded the opportunity to exercise your discretion,

3     you were actually required to exercise your discretion

4     with respect to determining the appropriate penalty?

5          MS. HERVEY:  I'm going to object.  Again,

6        she's testified that she doesn't know that this

7        was in force, or what rules were in force at the

8        time.

9          MR. AYAR:  Okay.  We can move on.  We're

10        done with that.  I'm going to hand you Exhibit 5.

11          MS. HERVEY:  Okay.

12          (Exhibit 5 was marked for identification.)

13     BY MR. AYAR:

14        Q.   So, what I have here, I proffer, is a section

15     of the Internal Revenue Manual which I believe was in

16     effect at the time of the examination.

17          Again, I know you have no way to confirm that.

18     We can deal with that later.

19          Do you recognize any of this language?  Have

20     you read any of this before?

21        A.   Not this.

22        Q.   Not this.  Okay.

23        A.   This up here I've seen.

24        Q.   What up where?

25        A.   The part --

1    Q.   So the end where --

2    A.   Level IV Willful Violations.

3    Q.   Those are the mitigation guidelines.  I'm sure

4   you've seen those before.

5    A.   Okay.

6    Q.   The section in the middle, where it's titled

7   "FBAR Penalties - Examiner Discretion," you've never

8   seen that before?

9    A.   No.

10    Q.   No.  Okay.

11        So, we're not going to spend too much time on

12   this, but in Paragraph 3 there's a list of factors to be

13   considered in determining the appropriate amount of FBAR

14   penalties.

15        Did you understand that those were the things

16   that you were supposed to look at back when you

17   determined the appropriate amount of penalties in this

18   case?

19        MS. HERVEY:  I'm going to object on the

20      grounds of relevance, and also on the grounds

21      that you're seeking a legal determination.

22        MR. AYAR:  Okay.

23   BY MR. AYAR:

24    Q.   You can still answer the question.

25    A.   Can you repeat it?

1     Q.   Did you understand that these factors are some

2  of the things you were supposed to consider in

3  determining the appropriate penalty in Mr. Rum's case?

4          MS. HERVEY:  I'm going to object.  She's

5          testified that she doesn't know that this was

6          applicable to her during the relevant time frame.

7          THE DEPONENT:  No.

8          MR. AYAR:  Thank you.  We can move on.

9              I'm going to hand a copy of Exhibit 6 to

10         your attorney and to the court reporter to be

11         marked.

12             (Exhibit 6 was marked for identification.)

13  BY MR. AYAR:

14     Q.   Take your time, look this over.  Then I want

15  you to tell me if you recognize any of this language?

16     A.   Can I talk to Mary for a minute?

17         MR. AYAR:  Of course.  Do you guys want me

18         to step out so you can speak in private?  Or you

19         guys can step out.  Whatever you prefer.

20             (Recess held at this time.)

21         THE DEPONENT:  So, I have seen it.

22  BY MR. AYAR:

23     Q.   Okay.

24     A.   I'm guessing it was about a week or two ago

25  when Mary emailed it to me.

1      Q.   Okay.  So, since you haven't seen this

2  document, I'm not going to ask you about it until -- you

3  saw it a week or two ago, but you hadn't seen it prior

4  to that.

5      A.   Uh-uh.

6      Q.   So we're not going to ask you specifically

7  about the document, but I'm going to ask you about some

8  of the things that are in it.

9      A.   Okay.

10     Q.   Read Paragraph 9.  It says, "The Service will

11  demonstrate the fairness of the tax system to all

12  taxpayers."

13          Would you agree that all taxpayers are entitled

14  to a fair and just tax system?

15     A.   A hundred percent.

16     Q.   A hundred percent.  Good.  Let's go to the next

17  page.

18          See where it says "Note:  This means that

19  penalties are not a bargaining point in resolving the

20  taxpayer's other tax adjustments."

21          Would you agree that penalties are not supposed

22  to be imposed as a bargaining point in resolving tax

23  determinations?

24     A.   This is different from the one --

25          MS. HERVEY:  I'm going to object on outside

1       the scope.  I object on the relevance of the

2       document, authentication of the document.  But go

3       ahead.

4            THE DEPONENT:  So, this reads different --

5  BY MR. AYAR:

6       Q.   The question is, would you agree that you're

7  not supposed to use penalties as a bargaining point in

8  resolving tax determinations?

9       A.   Yes.

10      Q.   Thank you.  We can move on.

11           But you didn't understand that at the time you

12  conducted the exam, that penalties are not supposed to

13  be used as a bargaining point?

14           MS. HERVEY:  I'm going to object in terms of

15      lack of foundation for any "used as a bargaining

16      point."  There's no evidence that that happened

17      in this case.

18           MR. AYAR:  I'm just asking if she

19      understands.

20           MS. HERVEY:  I'm just objecting on the

21      grounds of lack of foundation.

22           MR. AYAR:  Okay.

23  BY MR. AYAR:

24      Q.   At the time you conducted the examination, did

25  you believe that penalties were not supposed to be used

1    as a bargaining point?

2        A.   Yes.

3        Q.   Yes.  Okay.  Thank you.

4             We're going to move on to Exhibit Number 7.

5             (Exhibit 7 was marked for identification.)

6    BY MR. AYAR:

7        Q.   Have you seen this before?

8        A.   No.

9        Q.   No.  Do you recognize what this is?  This is a

10   regulation.

11       A.   I see that it looks like it's from -- a

12   printout from the law site.

13            MS. HERVEY:  All right.  I'm going to

14        object, to the extent that you're calling for a

15        legal conclusion.  She's not a lawyer.  She --

16            MR. AYAR:  I understand.

17            MS. HERVEY:  She's not a lawyer.

18   BY MR. AYAR:

19       Q.   But you've never seen this before, correct?

20       A.   No, not that I recall.

21       Q.   So you did not take this into consideration at

22   the time that you conducted your FBAR examination.

23       A.   This document?

24       Q.   This specific regulation, this language.

25            If you'd like, I can show you the relevant

1   language and you can read it and think about it.

2       A.   Okay.

3       Q.   If you would turn your attention to Paragraph

4   F.  I'm sorry.  Hold on.  Paragraph -- I have to read

5   this.  I haven't read this in a long time.

6           The second page, Paragraph G.  It describes the

7   penalty for a willful violation of any requirements of

8   several sections.  I have a copy of one of them, but I'm

9   going to proffer that that refers to the failure to file

10  FBARs.  Okay.

11          And Paragraph 2, I'm going to proffer, states

12  that the maximum penalty is $100,000.

13          Did you understand that to be the case?

14          MS. HERVEY:  I'm going to object.  She's

15      already testified she's never seen this document

16      before.  She already testified she's not a

17      lawyer.

18          MR. AYAR:  Okay.  Thank you.  We'll move on.

19          MS. HERVEY:  Okay.

20  BY MR. AYAR:

21      Q.   So, let's go back to your timeline, which I

22  believe was Exhibit Number 2.  The Examiner's Activity

23  Log.  I'm going to refer back to that.

24          MS. HERVEY:  Which number are we on?

25          MR. AYAR:  Number 2.

1         MS. HERVEY:  Number 2.  Okay.

2         MR. AYAR:  Yes.  We're going to refer back

3     and forth to this.

4  BY MR. AYAR:

5     Q.   What I want to kind of do is, I you want to

6  walk me through what happened in this audit and the

7  timeline of everything that took place.  Okay?

8         My first question is, from looking at this

9  document, can you tell when the FBAR examination began?

10        You can take your time.  I know it's a lot of

11 stuff here, but feel free to read it over, because we're

12 going to dive through all of it, so it's okay if you

13 need as much time as you want.

14             (Recess held at this time.)

15 BY MR. AYAR:

16    Q.   After reviewing the document, can you tell me

17 if you can tell when the FBAR examination began?

18    A.   I cannot.

19    Q.   You cannot.  Can you tell me how an FBAR

20 examination begins?

21    A.   When we send a -- Yeah.  I can't tell you how

22 it began at this time.  I can tell you now.

23    Q.   Can you tell me now how it begins?

24    A.   Uh-huh.

25    Q.   Yes?

Page 32

1      A.   When we send a related statute memorandum to

2   the general manager.

3      Q.   Okay.

4      A.   I'm sorry.  To the group manager, who sends it

5   to the territory manager for approval.  If the territory

6   manager agrees, then we can open an FBAR exam.

7      Q.   To your knowledge, was that done in this case?

8           MS. HERVEY:  I'm going to object, because

9        she said this is what we do now, not the way it

10       was done at the time.

11          MR. AYAR:  Okay.

12          THE DEPONENT:  I don't remember.

13   BY MR. AYAR:

14      Q.   You don't remember.  That's okay.

15      A.   I'd have to look.

16      Q.   It's okay.  Prior to getting a territory

17   manager's signature, now are you allowed to investigate

18   FBAR violations?

19          MS. HERVEY:  I'm going to object on the

20       grounds of relevance.

21          THE DEPONENT:  I have no idea.

22          MR. AYAR:  You have no idea.  Let's get

23       another exhibit.  This is going to be Number 8.

24          (Exhibit 8 was marked for identification.)

25                   ///////////////

Page 33

1    BY MR. AYAR:

2        Q.   Have you ever seen this before?

3        A.   Uh-huh.

4        Q.   Can you tell me what this is?

5        A.   This is what's used to tell the secretary to

6    associate a record or an exam to an examiner on the --

7    the ERCS database.  But I don't know what "ERCS" stands

8    for.

9        Q.   Examination Returns Control System.

10       A.   Okay.  You're sharp.

11       Q.   So if I'm hearing you correctly, this is the

12   document that resulted in the FBAR examination case

13   being assigned to you.  Is that correct?

14       A.   No.

15       Q.   No.

16            MS. HERVEY:  That's inconsistent with her

17       testimony.

18   BY MR. AYAR:

19       Q.   Because I must have misunderstood what you

20   said.

21       A.   This is what's used for the secretary to input

22   the control on the system.

23       Q.   Okay.  Now, is this something that's usually

24   done early on in an examination?

25       A.   Early?

1      Q.   Like is this something that's done shortly

2    after you open a file, or is this something that's done

3    many, many months into working a case?

4      A.   It depends.

5      Q.   Okay.

6      A.   It can be done right away, or it could be done

7    later.  I don't know when this one was done.

8      Q.   Okay.  There's a date on the bottom.  It

9    appears to say 4/2/2012.  But I don't know.

10     A.   Okay.

11     Q.   Okay.  So, the exam may have begun a long time

12   before this.  We don't know that?

13     A.   The FBAR exam.

14     Q.   The FBAR exam, yes.

15     A.   I don't know that.  I want to say it's

16   possible.

17     Q.   It's possible.  Okay.

18     A.   Very likely.

19     Q.   Okay.  Forgive me, because I don't know how all

20   this works, so I'm just trying to understand it.  I'm

21   not trying to make any insinuations or anything.

22     A.   That's fine.  It does seem like you are.

23     Q.   I'm not.

24     A.   But I know you're not.  Back then, there was a

25   lot of confusion with the FBAR.  I seem to recall that

1    we didn't have them controlled.

2         Q.   Is this what it means to "control a case"?

3         A.   Yeah.  Like this C6, that came after we were

4    already working FBAR cases.

5         Q.   Okay.  So you were already working the cases

6    and then at some point you decided to control them.  And

7    by "control" --

8         A.   No.

9         Q.   -- you mean fill out this document?

10        A.   Not me.

11        Q.   Not you.

12        A.   Somebody decided this needed to be.

13        Q.   And this document is what you mean by, quote,

14   unquote, "controlling"?

15        A.   I would have been instructed to do this.

16        Q.   Okay.  So at some point somebody realized that

17   this hadn't been done before, and they instructed you to

18   do it if you hadn't already done so.

19        A.   They instructed everyone.

20        Q.   Everyone, yes.

21        A.   I think there's an email.

22        Q.   I have that email.  It's okay.  We don't need

23   to talk about it, because you've already explained what

24   it is.  Actually, we might as well get it in.

25        A.   Okay.

```
 1            MR. AYAR:  We'll go to Exhibit 9.
 2            (Exhibit 9 was marked for identification.)
 3   BY MR. AYAR:
 4       Q.   What I have here is another document I'm going
 5   to proffer I got from the Freedom of Information Act.
 6   It appears to be an email from Terry Davis, who was your
 7   manager, correct?
 8       A.   At the time.
 9       Q.   And it was to a bunch of people.  Are all these
10   people different agents in your group?  I see Kim
11   Rogers' name here.
12            MS. HERVEY:  Do you recognize this document?
13            THE DEPONENT:  Only because I saw it in the
14       case file.
15            MS. HERVEY:  Okay.  So it is in the case
16       file.
17            THE DEPONENT:  Yeah.
18            MS. HERVEY:  Okay.  Yes, those people were
19       in my group at the time.
20   BY MR. AYAR:
21       Q.   All right.  So is this the email you were
22   referring to that instructed you to fill out that form?
23       A.   Uh-uh.
24       Q.   Yes.  Okay, good.  That's all.
25            MS. HERVEY:  So it's the email that
```

1       instructed you to fill out Number 1.  I just

2       wanted --

3            THE DEPONENT:  It wasn't telling us, you

4       know --

5  BY MR. AYAR:

6       Q.   To "control your case," which you understood to

7  mean to fill out this --

8       A.   Control them on the system.

9       Q.   All right.

10      A.   You can see those who didn't -- who were

11 closing in the case didn't have to do so.

12      Q.   So "controlling" is referring to getting all

13 the paperwork into the computer?

14      A.   It was a way for Headquarters to --

15      Q.   To know who had which case?

16      A.   To know what FBARs were out there.  Because

17 before, it was very difficult for them to know.

18      Q.   Understood.  Thank you.

19           Does the name "Cassandra Sports" ring a bell?

20      A.   Yes.

21      Q.   Who is she?

22      A.   She was our subject matter expert for the UBS

23 Treaty case.

24      Q.   What matter was she -- What subject was she an

25 expert on?

1    A.   I can only tell you what -- what this "me"

2  stands for.  I know that I went to her for these cases

3  if I had a problem.

4        So if -- For example, I think somewhere on

5  there it says I can't open the disc from UBS.  I would

6  go to her to see if she had anything.

7        If I saw a transaction in the bank records that

8  I didn't understand, she's the person I would go to, to

9  explain it to me.  So she was more knowledgeable as far

10  as offshore cases.

11   Q.   When you say "offshore cases," are you

12  referring to offshore income tax cases or offshore FBAR

13  cases, or both?

14   A.   I'm referring to cases that had offshore

15  documents.

16   Q.   Again, cases -- because there's a Title 26 case

17  and there's a Title 31 case.  You're talking about both

18  of those, correct?

19   A.   I don't know.

20   Q.   You don't know?

21   A.   I don't know.  She was the FBAR SME.  She might

22  have been just Title 26.  I don't think -- I'm not sure.

23  I don't remember if we had a SME for FBAR.

24   Q.   Does the name "Lloyd Philpot" ring a bell?

25   A.   Yes.

Page 39

1      Q.   Who is he?

2      A.   Our fraud technical advisor.

3      Q.   Is that what "FTA" stands for?

4           So he's the Fraud Technical Advisor.  What is

5      his role?

6      A.   In these cases, his role was to approve -- or

7      to give his approval on fraud penalties and willful FBAR

8      penalties.

9      Q.   Okay.  So all the penalties had to be approved

10     by him?

11     A.   Uh-huh.

12     Q.   Yes?

13     A.   Yes.  I have to say, I don't know that that's

14     correct.

15     Q.   Okay.  But that's what you understood at the

16     time?

17     A.   That's the way we did it, yes.

18          MR. AYAR:  We're going to go -- What are we on?

19          We're going to go to Exhibit 10.  I'll give it to

20          the court reporter.

21          You can stop me if you need a break or

22          anything.

23          (Exhibit 10 was marked for identification.)

24     BY MR. AYAR:

25     Q.   Do you recognize this?

Page 40

1    A.    Yes.

2    Q.    This email is in your case files?

3    A.    Uh-huh.

4    Q.    I want to look at -- You see towards the bottom

5    of the first page there's an email that says it's from

6    you to Cassandra Sports and Lloyd Philpot?  It goes on

7    to continue to the next page; although there's some

8    redactions.

9          Can you just look that over for a few minutes

10   so we can ask a couple questions about that?

11   A.    The bottom?  Just this?

12   Q.    That, continuing on to the next page.  I'm not

13   going to ask you any detailed questions about that

14   timeline, so don't worry.

15   A.    Oh, good.  Okay.  I read this part.

16   Q.    So, at the bottom of this page, it says

17   "Reese," and then there's a section that's redacted.  Do

18   you know who "Reese" is?

19   A.    Lloyd Philpot.

20   Q.    Lloyd --

21   A.    The FTA.

22   Q.    -- Philpot.

23   A.    Because his name is Lloyd --

24   Q.    So the "R." stands for "Reese."

25   A.    We call him "Reese," yes.

Page 41

1      Q.   It makes sense now.  Do you remember writing
2   this email?
3      A.   No, I don't remember writing it.
4      Q.   Okay.  You didn't bring any records with you
5   today, did you?
6      A.   No.
7      Q.   I didn't think so.
8           So, let's -- I want to go through this email
9   and I want to see if it spurs any recollection of the
10  past in your mind.
11          So, this email was written on November 9th,
12  2011, at 1:15 in the afternoon.
13          MS. HERVEY:  Let me just object, in terms of
14      improper refreshing of recollection.  You can ask
15      her a question --
16          MR. AYAR:  Okay.
17          MS. HERVEY:  -- and if she doesn't know the
18      answer, you can ask her if there's something that
19      would refresh her recollection, and then you can
20      ask her to take a look.  That's how you do it.
21          MR. AYAR:  Good.
22          MS. HERVEY:  Okay?
23          MR. AYAR:  Okay.  Thank you.
24          MS. HERVEY:  You're welcome.
25                       ///////////////////

Page 42

1    BY MR. AYAR:

2        Q.   Do you remember sending this email?

3        A.   No.

4        Q.   And after looking at it, you still don't

5    remember?

6        A.   No.

7        Q.   Okay, good.

8             So, it says, "Cassandra, thank you so much for

9    the wealth of information you provided to me this

10   morning regarding the following case:  POA:  Gavel.

11   Taxpayer:  Rum."

12            Do you remember what information you were

13   talking about?

14       A.   Absolutely not.

15       Q.   Absolutely not.

16       A.   That doesn't mean it didn't happen.  I just

17   don't remember.

18       Q.   I understand.  I know this was a long time ago,

19   and you have many cases.  That's completely

20   understandable.

21       A.   Thank you.

22       Q.   It's okay.  Don't worry.  There's nothing wrong

23   with that.

24            Did Cassandra give you information about this

25   case, that you know of?  Is she the one that gave you

Page 43

1   that disk with the UBS information on it?

2        A.   I don't think Cassandra gave me that disk.   I

3   think it came with the case file.

4        Q.   Okay.   So we don't know what information is

5   referred to in this email.

6             I want to go down a little further and it says,

7   "Based on the not yet official information you gave me

8   today."  Do you know why that information would have not

9   been official?

10       A.   I can't speculate.

11       Q.   That's okay.

12       A.   But I can tell you that back then there wasn't

13  a lot of guidance.   There wasn't -- we didn't have go-by

14  papers.  We didn't have, "If this, then that," like we

15  do now.

16       Q.   This was all really new, huh?

17       A.   This was -- Yeah.   Like -- Certainly for me, it

18  was my first type of case.

19       Q.   Okay.   So, it appears that you got some

20  information from her in the morning, and in the

21  afternoon you responded by this email.  And at the

22  bottom of this email it says, "I," and then there's

23  something missing, and it says "considering a willful

24  penalty for the 2007 tax year.  And I am considering it

25  at 50 percent."

Page 44

1          Is this when you decided Mr. Rum was willful,

2    and is this when you decided that the appropriate

3    penalty was 50 percent?

4         A.   No.  I'm just considering it.

5         Q.   You're just considering it.  Okay.

6               Do you know when you decided that a willful

7    penalty was appropriate?

8         A.   Based on what I saw in the case file, it was

9    sometime in March of 2013.

10        Q.   That was when you made the decision that it was

11   willful, based on what you see here?

12        A.   That's when I proposed it.

13        Q.   That's when you proposed it.

14        A.   Ultimately it's not my decision.

15        Q.   Okay.

16        A.   And this isn't the FBAR Activity Record.

17        Q.   Is there an FBAR Activity Record?

18        A.   Yes.

19        Q.   There is.  Okay.

20               MR. AYAR:  I want to give you another exhibit.

21        This is going to be Number 11, I think.

22               (Exhibit 11 was marked for identification.)

23   BY MR. AYAR:

24        Q.   Is this the FBAR Activity Record?

25        A.   I don't think so.

Page 45

1      Q.   You don't think so.

2      A.   Because it says "872," and 872 doesn't apply to

3   an FBAR.

4      Q.   Do you know what this form is?  It has the same

5   title as the other one.  It just appears to be

6   handwritten.  Is this maybe a continuation of the other

7   one?

8      A.   So, it says "Received implantation technical

9   services."  So this must be a Tech Service Activity

10   Record.

11      Q.   Okay.  But this is not the FBAR Examiner

12   Activity Record.

13      A.   Just so we're clear, this isn't mine.  None of

14   this is mine.

15      Q.   Okay.

16      A.   Okay.

17      Q.   This all seems to have taken place after the

18   period we mainly want to talk about anyway.  So I wasn't

19   sure what this was, or who put it there.

20      A.   No, I don't know.

21      Q.   Do you recall ever -- So you did prepare an

22   FBAR Activity Report?

23      A.   So, what I've been able to piece together --

24      Q.   Okay.

25      A.   -- after looking at the emails and the

1    information that's available is that I put an Activity

2    Record together when I closed the case.

3         Q.   When you closed the case.

4         A.   Yes.

5              MR. AYAR:  Okay.  Can we go off the record for

6         a second?

7                   (Discussion held off the record.)

8    BY MR. AYAR:

9         Q.   Do you remember seeing your FBAR Examination

10   Report?

11        A.   Yes.

12        Q.   Yes.

13             MS. HERVEY:  Can you describe it so we know

14        what we're looking for?

15             THE DEPONENT:  I'm guessing you're talking

16        about the Activity Record, not the report.

17   BY MR. AYAR:

18        Q.   Yes, the Activity Record.  Can you describe it?

19        A.   It looks just like this, except it's got less

20   information.

21        Q.   Understood.

22        A.   It might be one or two pages.

23        Q.   We'll need a copy of that.

24             MS. HERVEY:  Okay.  Let me just make a note.

25        Let me just make a note of what you need.  Do you

1      know when it would be dated, or can you

2      identify -- we're off the record.

3              (Recess held at this time.)

4   BY MR. AYAR:

5      Q.   So, I want to ask you again back about Exhibit

6   2, which is the Examining Officer's Activity Record.

7              Based on your knowledge, do you believe that

8   all the activity relevant to the FBAR examination is

9   included in this report?

10     A.   There might be something missing.

11     Q.   There might be something missing.  But based on

12  all the information you have, is there another report

13  that has information in it which is not contained in

14  this Activity Report?

15     A.   Yes.

16     Q.   There is?

17     A.   Yes.

18     Q.   Okay.  Good.  So I'll get a copy of that and

19  then --

20     A.   Just so we're clear, when I closed the case,

21  when I closed the FBAR case, I closed it with this

22  Activity Record.  And it was returned to me.  I know

23  it's in an email.  And actually it's happened to me

24  recently.  We're not supposed to include Title 26

25  information --

1     Q.   I see.

2     A.   -- when we close a Title 31 case within the

3    Title 31 case.  So any information in here that's

4    related to the tax portion needed to be taken out.  So

5    basically I took this and, you know, removed all the

6    items that weren't relevant to FBAR.

7     Q.   Did you add any additional items?

8     A.   I would have added something in the end.

9    Because I think that's what's missing here is the --

10   because the FBAR case closed later.

11    Q.   I see.

12    A.   It closed in March.  So this case went to my

13   manager sometime in February.

14    Q.   I see.

15    A.   Or maybe March.  You know what?  I'm not sure.

16    Q.   I don't know if I asked you this already.  If I

17   did, I apologize.

18         Do you remember when you came to the conclusion

19   that Mr. Rum was willful?

20    A.   I felt --

21         MS. HERVEY:  Let me just object, to the

22         extent that she testified that she's not the

23         decision maker.  She's not the -- it's not her

24         decision.  So a "recommendation" I think is more

25         appropriate.

 1          THE DEPONENT:  Yeah.  And I don't

 2     remember -- I mean, I saw that email where I'm

 3     considering the 50 percent.  No.

 4          MR. AYAR:  Okay.  We're going to get another

 5     exhibit in front of you.  We're on 12.

 6          (Exhibit 12 was marked for identification.)

 7  BY MR. AYAR:

 8     Q.   Do you recognize this?

 9     A.   I believe this was in the case file.

10     Q.   Okay.  Do you recognize documents like a

11  Workload Review?  Is this something you would prepare as

12  part of an examination?

13     A.   No.  This would have been prepared by the

14  manager.

15     Q.   By a manager.

16          So you believe your manager is the one who

17  prepared this, and this was his instructions to you as

18  far as the case workload?

19          I'm sorry.  I really don't understand how these

20  work, so I'm hoping you can explain it to me.

21     A.   Right.  I'm trying to figure out which manager.

22  This would have been Terry.

23     Q.   Okay.

24     A.   So Terry would have prepared this after

25  speaking with me about the case.

1     Q.   And the date on the top right corner says

2   "4/4-5/2012."  It appears that means April 4th and

3   April 5th.  But I don't know.  I would have put "4/5"

4   and "4/4."

5     A.   I didn't write that date, but I would -- I

6   don't know.

7     Q.   Okay.

8     A.   I don't remember if we had, you know, a two-day

9   conversation.

10    Q.   Understood.  Now, you see under "Case Status

11   and Summary" it says "Non-willful FBAR penalty will be

12   pursued."

13        Do you remember there being a point in time

14   during this case, or around this point in time, where

15   you and/or your manager came to the conclusion or

16   recommendation that Mr. Rum was not in fact willful?

17    A.   I don't remember having that conversation.

18    Q.   You don't remember that conversation?

19    A.   No.  I can only tell you from what I read in

20   documents.

21    Q.   Understood.

22        On the bottom, it says, "Non-willful FBAR

23   penalty to be proposed.  During audit in 2008, tp

24   disclosed to revenue agent offshore bank account."

25        I don't want to ask you about this document,

1    but was there a prior revenue agent that audited Mr. Rum

2    or examined Mr. Rum's income tax returns before you came

3    along?  Do you remember that?

4         A.   Yes.

5         Q.   Was that Denise Ross?

6         A.   Yes.

7         Q.   Do you remember that he told her about his bank

8    accounts back then?

9              MS. HERVEY:  I'm going to object.  There's

10        been no testimony that that happened.  Go ahead.

11             THE DEPONENT:  Do I remember?

12   BY MR. AYAR:

13        Q.   Do you remember that the facts were that

14   Mr. Rum disclosed his bank accounts to Denise Ross?

15             MS. HERVEY:  Why don't you just ask her if

16        she knows whether or not that happened?

17   BY MR. AYAR:

18        Q.   Do you know whether or not Mr. Rum disclosed

19   his bank accounts to --

20        A.   Mr. Rum sent a UBS bank statement to Ms. Ross.

21        Q.   During his examination.  Okay.  Thank you.

22             Now, I have a couple more questions about your

23   Activity Log, if you don't mind.  I want to back up a

24   little bit.

25             You see the entry on 9/27/2011, it says "Meet

1  with rep to go over records available.  Turns out rep

2  not so knowledgeable."

3          Do you remember writing that?

4      A.   No, I don't remember writing that.

5      Q.   Did you feel like Mr. Gavel was not so

6  knowledgeable?

7          MS. HERVEY:  I'm going to object, in terms

8          of relevance.  The testimony is, from Mr. Rum's

9          deposition, that Gavel got involved in October of

10         2008, which would have been after the deadline

11         for the filing of the FBAR in question.  But go

12         ahead, you can answer the question.

13         THE DEPONENT:  So, do I remember if

14         Mr. Gavel was not so knowledgeable?

15  BY MR. AYAR:

16     Q.   Correct.

17     A.   No.  But --

18     Q.   You feel like maybe he didn't understand how

19  all these offshore taxes work?

20     A.   I don't think that's what this was.  It says

21  "On September 8th rep indicated that tp will not be at

22  the meeting.  RA okayed as long as the rep is

23  knowledgeable enough to answer the questions."  So ...

24     Q.   So you think that was referring back to this?

25     A.   Yeah.

1       Q.   You think maybe he was not so knowledgeable

2    about the facts of the case.  Is that what you're

3    saying?

4       A.   Right.  So I'm asking questions, and he

5    wouldn't -- I'm guessing that's what that is.  He

6    wouldn't answer the questions, because later on we ended

7    up having to meet with Mr. Rum so that he could answer

8    the questions.

9       Q.   That makes sense to me.  Thank you so much for

10   clearing that up.

11          So, I see a lot of activity here.  I don't want

12   to concern too much with the details, because we're

13   going to kind of fast forward in time a little bit.

14   Okay.

15      A.   Okay.

16      Q.   Let's go to page 2.

17          MS. HERVEY:  We're on Exhibit 2?

18          MR. AYAR:  Yes, Exhibit 2.

19   BY MR. AYAR:

20      Q.   Page 2, down towards the middle, there's an

21   entry from January 25th, 2012.  Can you please read

22   that, and let me know when you're done?

23      A.   Okay.

24      Q.   So, that entry -- I'm sorry.  Mary, you can

25   finish, too.

Page 54

1          MS. HERVEY:  I'm done.  Thank you.

2    BY MR. AYAR:

3       Q.   That entry refers to a number, 8621.  Do you

4    know what that is?

5       A.   Form 8621 is where a taxpayer reports on his

6    tax return the capital gain and the tax.

7       Q.   A passive foreign investment company income?

8       A.   Yes.  That has to be paid on the passive form

9    investment.

10      Q.   And the Form 8621 is the form on which you put

11   passive foreign investment income on?

12      A.   Uh-huh.

13      Q.   It appears from this entry that you provided a

14   completed 8621 to the taxpayer.  Do you remember doing

15   that?

16      A.   No, I don't remember.

17      Q.   You don't remember whether or not you filled

18   the 8621 out for them?

19      A.   No.

20      Q.   No?  Have you ever filled out an 8621 before?

21      A.   I think we have a software that kind of, like,

22   did it for us.

23      Q.   Yeah.  You know the first time I ever did one,

24   it took me like a week, and I had a headache for days

25   and days and days.  And then the next day I bought the

1    most expensive software I could find that would just do

2    it for me.

3         A.   I didn't know there was a software out there.

4         Q.   Pro System FX is the only tax program I found

5    that can --

6         A.   That's awesome.

7         Q.   It took me a lot of hours, and it was a real

8    big giant pain.

9         A.   That's interesting.  Has it been available for

10   a while?

11        Q.   Yeah.  It's a tax prep program.  It's not just

12   8621.  It's --

13        A.   So you have to get that.

14        Q.   You don't remember filling out the 8621?

15        A.   I don't.

16        Q.   But you've examined 8621s, and you've filled

17   them out in the past, right?

18        A.   No.

19        Q.   No.  Are they complicated forms?

20        A.   From what you're saying.

21        Q.   Okay.

22        A.   You know, like I said, we had a program --

23   Excel that would -- we would plug in the buys and sells

24   for the entire time that they had the account, and then

25   it had these tabs, and if I'm not mistaken, each tab had

Page 56

1    certain line items of the 8621 and it auto-populated the

2    amount that needed to be on those forms.

3        Q.   Section 1291 tags and --

4        A.   Yes.

5        Q.   -- how you have to allocate them backwards.  My

6    God, my eyes are hurting just talking about it.  Okay,

7    good.

8             So, let's keep going through.  I've got to

9    remember where I was.

10            MS. HERVEY:  We were on 1/25.

11   BY MR. AYAR:

12       Q.   1/25.  On 1/25, according to this, converted an

13   8621 and prepared a package to help them prepare his

14   amended returns and sent it to him requesting that he

15   prepare the amended returns.

16            Do you remember preparing the package to aid

17   him in preparation of his returns?

18       A.   No.

19       Q.   Do you have any reason to think that you did

20   not prepare it for him?

21       A.   No.

22       Q.   And that took place in January.  The next entry

23   I want to talk about is on March 5th.  It says "TC from

24   POA.  Took call from POA."

25       A.   Telephone call.

1     Q.   "He doesn't know if he can get the returns

2   finished before the end of the month."  Do you remember

3   getting that call?

4     A.   No.

5     Q.   No.  Of course not.  A thousand cases.  We

6   don't need to spend too much time on this.

7          But you don't have any reason to think that you

8   did not have a call with him --

9     A.   Oh, no.

10    Q.   So you gave him a package to help him with the

11  returns on January 25th, and what I proffer is by far

12  the most complicated part of his return.  Then on March

13  6th he tells you he still needs another month to do the

14  returns.  But you don't remember that, so we can't ask

15  you about that.

16          Then let's go down a couple more entries.  On

17  March 20th, it says "Email to POA requesting update."

18  The POA responds, "Plan to have all and send to you

19  tomorrow."

20          Do you know what this is referring to?

21    A.   I'm guessing he's talking about the amended

22  return that he said he was going to --

23    Q.   Okay.  So, in January you did the work for him,

24  and now we're on March 20th, and he still doesn't have

25  the returns and promises them to you the next day.

1          Do you see an entry the next day?

2      A.   Yes.  No.  The next day is the 23rd?

3      Q.   Yes.  The response is next.

4      A.   Yes.

5      Q.   Good.  Now, do you know when he actually sent

6  you the returns?

7      A.   Oh, no.

8      Q.   Let's go to the next page.  I want you to read

9  the top entry.

10     A.   There you go.  So it looks like on 4/16 I had

11  them -- or I received the amended returns that were

12  submitted.  That's what it says here.

13     Q.   Do you remember that?

14     A.   No.

15     Q.   Do you remember receiving incomplete returns

16  from him?

17     A.   No.

18     Q.   Do you remember sending him an email in

19  response?

20     A.   No.

21     Q.   But you have no reason to think you did not

22  send him an email on April 16th.  Is that correct?

23     A.   That's correct.

24          MR. AYAR:  We'll look at that email.  This is

25      going to be Exhibit 13.

1           (Exhibit 13 was marked for identification.)

2   BY MR. AYAR:

3       Q.   Have you had a chance to read it?

4       A.   I'm sorry.  I didn't know --

5       Q.   All my questions are about the first page.

6       A.   Okay.

7       Q.   Do you recognize this document?

8       A.   I've seen this document.

9       Q.   You've seen this document.  Do you remember

10  sending this email?

11      A.   No.

12      Q.   So, the first paragraph, "I received the

13  returns you sent.  I'm sorry to say, however, that they

14  are incomplete."

15           After reading this, now do you remember

16  receiving incomplete returns?

17      A.   No.

18      Q.   No?

19      A.   No.

20      Q.   I don't blame you.  It was just a 1040S.

21      A.   What?

22      Q.   He had a 1040S he sent you, and he didn't have

23  the attached corrected 1040.

24      A.   Okay.  That's what it says.  But I don't

25  remember.

Page 60

1    Q.   Now, the second paragraph.  "As a reminder, I

2    agreed to the 20% penalty as opposed to the 50%

3    penalty."  Do you remember agreeing to a 20% penalty?

4    A.   No.

5    Q.   Okay.

6    A.   Like I said, I remember when I received this

7    from Mary when I looked at the file, and I really tried.

8    You know, I can't.

9    Q.   It's okay.  I know you probably work really

10   hard.  I'm sure you've got a lot of cases.  I know I

11   wouldn't remember a case from six years ago in this kind

12   of detail.

13   A.   Well --

14   Q.   Let's continue and see if we can figure out

15   what all this means.

16        Now, when it says, "I agreed to the 20% penalty

17   as opposed to the 50% penalty," what do you think that's

18   referring to?  Is that the FBAR penalty?  Do you know?

19   A.   I would think -- you know what?  I don't know.

20   "as opposed to the 50%."  The only 50% is the FBAR.  We

21   don't have a 50% tax penalty, so deducing from that.

22   Q.   Okay.

23   A.   Yes.  It's referring to the FBAR.

24   Q.   It says, "I agreed because you and your client

25   were going to put right what you did wrong back when you

Page 61

1   made the voluntary disclosure to the IRS auditor in New

2   York."  Do you know what that's referring to?

3        A.   The bank statement that was sent to Denise.

4        Q.   Okay.  Do you know what you meant by "put right

5   what you did wrong"?  It's okay if you don't.

6        A.   Based on this here, the only thing I could

7   think of is they made the voluntary disclosure.  All

8   they did was send a bank statement, when what they

9   should have done was follow the rules.

10       Q.   And the rules were to provide complete and

11  correct amended returns?

12       A.   I don't remember what the rules were.

13       Q.   You don't remember what the rules were.  Okay.

14       A.   I mean, I seem to remember they had to make a

15  written statement and they had to file amended returns

16  for years that were barred, that were closed.

17       Q.   Yes.  Was it eight years?  I don't know what it

18  was back then, to be honest with you.  I wasn't even a

19  lawyer back then.

20       A.   I think maybe it was six.

21       Q.   I think it was six at first, and now it's

22  eight.  I don't know.  It's not so important.

23       A.   Okay.

24       Q.   We'll continue on in this paragraph.

25       A.   I'm getting the Activity Record printed out.

Page 62

1     Q.   That's awesome.

2     A.   Okay.

3     Q.   "Thus far, I've had to guide you in doing all

4  the things that you should have done voluntarily.  I've

5  also analyzed the information that you need to put in

6  the Form 8621 so as to make it easier and less expensive

7  for your client."

8          Do you remember trying to help them by

9  completing this 8621 form, now that you've read this?

10    A.   I have a faint recollection of having

11 prepared -- Actually, I saw all the information that

12 goes -- that gets prepared and put on the 8621, so I

13 must have.

14    Q.   Wasn't it frustrating that you did all that

15 work and they just wouldn't cooperate with you?

16    A.   No, that wasn't it at all.

17    Q.   Wasn't it at all.

18         Continuing on, "Full agreement and payment is

19 also required."  What did you mean by that?

20    A.   The only thing I can think of is, under that

21 program, they had to sign and pay.

22    Q.   By "that program," you're referring to the

23 voluntary disclosure program?

24    A.   Yes.

25    Q.   Do you know what that link is that you provided

1   to them?

2       A.   I don't anymore.

3       Q.   It's okay.  Now, the next paragraph goes on to

4   say -- Sorry.  You can finish what you're doing.

5       A.   No.

6       Q.   "Failure to comply with these requirements"  Do

7   you know which requirements you're referring to?  Was it

8   do the amended return, full agreement, and payment?

9       A.   I think it was the program requirements.

10      Q.   Okay.  Do you know what the program's major

11  requirements were?

12      A.   I knew then.

13      Q.   I'm sure.  Do you know if it required full

14  agreement and payment?

15      A.   Yes.

16      Q.   Did it require complete and correct amended

17  returns?

18      A.   Yes.

19      Q.   Okay.  But we don't know what else it required,

20  but we know it at least required those three things.

21      A.   Right.  It required more years, and it required

22  an explanation, and kind of like an acceptance of what

23  they had done.  And it required that they file the

24  FBARs.

25      Q.   I see.  So, why were you referring to the

1   program over and over again?  Was Said in the voluntary

2   disclosure program?

3        A.   He was not.

4        Q.   He was not.

5        A.   No.

6        Q.   So did you think that the rules and

7   requirements of the voluntary disclosure program applied

8   to him?

9        A.   I don't remember.

10       Q.   You don't remember.

11       A.   I want to say that I thought they should.

12       Q.   Okay.  Do you think maybe he tried to enter the

13  voluntary disclosure program but was not qualified?

14            MS. HERVEY:  I'm going to object.  That

15       calls for speculation.

16  BY MR. AYAR:

17       Q.   You can still answer.

18       A.   No.

19       Q.   No.  Based on this email, or not based on this

20  email, do you think you were trying to give him results

21  that were roughly equal to what he would have gotten in

22  the voluntary disclosure program?

23       A.   I think so.

24       Q.   You think so.  Do you know what the

25  accuracy-related penalties in the voluntary disclosure

1   program were?

2       A.   I don't remember.

3       Q.   Do you want to finish reading that paragraph

4   and tell me if you do remember?

5       A.   Okay.  Oh, 30 percent.

6       Q.   Now do you remember what the accuracy-related

7   penalties were in the voluntary disclosure program?

8       A.   Based on this.  If I try to remember, I can't.

9       Q.   I don't blame you.  So why did you charge him

10  75%?

11      A.   On the income tax?

12      Q.   On the income tax, yes.

13      A.   Ultimately all the facts led to 75.  They led

14  to fraud.  He wasn't in the program, and there wasn't

15  anything else we could do?

16      Q.    So you're not allowed to charge lower for

17  fraud penalties?

18      A.   I've never been allowed to charge lower fraud

19  penalties.  That doesn't mean that I'm not.  I don't

20  know that I am.

21      Q.   Okay.  I don't think you are either.

22      A.   I don't know.

23      Q.   I think only appeals can do that.  But that's

24  okay.  We don't have to worry about that.  We'll worry

25  about that another day.

1        You've never charged -- So the way it works, if

2   I understand this, is that you make a determination on

3   whether or not there's fraud with respect to the income

4   tax.

5        A.   Uh-huh.

6        Q.   Once you determine that fraud exists, the

7   penalty is automatically applied at 75%.  You don't pick

8   75%?

9        A.   Generally no.

10       Q.   You don't think you have the authority to

11  charge less than 75% fraud penalty?

12       A.   I don't have the authority to do anything.

13       Q.   Do you think you could have charged him a

14  negligence penalty?

15       A.   If I -- If the 75% penalty applied, the 20%

16  penalty would have also applied, would have also been

17  accepted.

18       Q.   No, I understand.  But the reason you chose 75%

19  as opposed to 20% was because you thought he was guilty

20  of fraud as opposed to negligence.

21       A.   Yes.

22       Q.   Yes.  Did you know that area counsel abandoned

23  the fraud penalty?

24            MS. HERVEY:  I'm going to object.  That's

25       not -- There's no evidence of that fact, and I

1      think, in fact --

2           THE DEPONENT:  That's incorrect.

3  BY MR. AYAR:

4      Q.   Okay.  Why was that incorrect?

5      A.   Wait.  I have to take that back.  Counsel --

6  Appeal.

7      Q.   Not appeals.  I'm talking about counsel.

8      A.   Counsel.  I have no idea what counsel did.

9      Q.   So you don't know that ultimately Mr. Rum was

10  charged with a negligence penalty instead of a fraud

11  penalty?

12           MS. HERVEY:  I'm going to object.  The Tax

13      Court settlement is not a compromise of the

14      government's position.

15           MR. AYAR:  Okay.

16           THE DEPONENT:  Was it counsel?  I don't

17      know.

18  BY MR. AYAR:

19      Q.   Okay.

20      A.   I know there's a Tax Court document that says

21  that.

22           MR. AYAR:  I'm going to give you Exhibit 14.

23           (Exhibit 14 was marked for identification.)

24  BY MR. AYAR:

25      Q.   Take your time and read this.

1     A.   Oh, yeah.

2     Q.   I'm sorry.  I may have brought the wrong one.

3  Never mind.  Scratch that.

4          MS. HERVEY:  Are we going to remove it as an

5     exhibit?.

6          MR. AYAR:  Yeah, let's remove this as an

7     exhibit.  I don't have an exhibit for this, so we

8     can just skip that line of questioning.

9  BY MR. AYAR:

10    Q.   We were on the April 16th email?

11         MS. HERVEY:  We're doing the 75% fraud

12    penalty stuff.

13         MR. AYAR:  Okay.  I'm done with that.

14         MS. HERVEY:  Okay.

15         MR. AYAR:  Let you off the hook on those.

16         MS. HERVEY:  She doesn't think so.

17  BY MR. AYAR:

18    Q.   So, I'm still trying to figure out at what

19  point you determined Mr. Rum was willful.

20         MS. HERVEY:  I'm going to object.  It would

21    be recommended.  I think her testimony is that

22    she never had the authority to make the decision.

23         MR. AYAR:  Oh, yeah.  I'm sorry.

24  BY MR. AYAR:

25    Q.   I'm trying to figure out when you determined --

Page 69

```
 1       A.   When I considered.

 2       Q.   Well, you determined that it was appropriate,

 3  and that's why you recommended it to your manager,

 4  right?  Because if you didn't think it was appropriate,

 5  you wouldn't have recommended it.

 6            So I'm trying to figure out when, in your mind,

 7  you figured out and concluded that the facts amount --

 8       A.   I don't know when I --

 9       Q.   That's okay.

10       A.   -- made the -- when I put all my facts together

11  and convinced myself that --

12       Q.   Okay.

13       A.   -- he was willful.

14       Q.   So, I want to go back to Exhibit 15 --

15  Exhibit 12 for a second.  I'm sorry.  Keep that

16  handy.  We're going to go back to Exhibit 2.  Go to the

17  bottom on 4/3.  It would be the page before this, the

18  very bottom entry.  "Phone call from TPH."  Who is TPH?

19       A.   Mr. Rum.

20       Q.   Mr. Rum.  Do you remember receiving that phone

21  call?

22       A.   No.

23       Q.   Okay.  So you had a call from him on April 3rd.

24  I want to see if I can -- you don't remember what the

25  call was about, obviously, right?  Because --
```

1     A.    I'm guessing it's what it says here.

2     Q.    About him being out of town?

3           Let's see if we can get some more specific

4    information.  I'm going to jump forward to Exhibit 14.

5           I don't mean to confuse you guys.

6           MS. HERVEY:  You are trying to confuse us.

7       You know it.  We're confused.

8           THE DEPONENT:  We're confused.

9           MS. HERVEY:  This is 14 now, right?

10          MR. AYAR:  This is 14.

11   BY MR. AYAR:

12    Q.    I want you to just read the first sentence.  It

13   says, "On April 3rd, we discussed the findings and the

14   enclosed report and you indicated agreement."

15    A.    Okay.

16    Q.    Do you think that that is referring to the

17   phone call on your Activity Log on April 3rd?

18    A.    Huh.

19    Q.    It's addressed to Mr. Rum.

20    A.    Yeah.

21    Q.    And it refers to a discussion that you had with

22   him.  In that discussion, he indicated agreement with

23   the enclosed report.  Do you know what report was

24   enclosed with this?

25    A.    I'm sorry.  It would have been the 4549 for

Page 71

1   2005, '7 and '8.

2        Q.   So the Income Tax Examination Report.

3        A.   Yes.

4        Q.   Okay.

5        A.   And it looks like it's for all the years.

6        Q.   I think that was a different note.  I stapled

7   them together.

8        A.   Okay.

9        Q.   Good.  So, back to Exhibit 2.

10            So on April 3rd, you had a call with Mr. Rum,

11   and based on what you wrote in this letter, it sounds

12   like in that call he indicated that he was going to

13   agree with you.

14            And then Exhibit 12, which is your Workload

15   Review dated April 4th, that your manager prepared.  So

16   the next day after that call, you guys were of the

17   opinion that non-willful penalties were appropriate.

18            Is that the meaning of what this is?

19        A.   You're associating one with the other, and

20   they're not.

21        Q.   I'm just trying to get timing.  You had a call

22   with Said on April 3rd, and on April 4th this document

23   was prepared.

24        A.   Yes.

25        Q.   Yes.  So on April 4th you or your manager

1    thought non-willful penalties were appropriate.

2            MS. HERVEY:  All right.  I'm going to

3        object.  I don't know that is her manager.

4    BY MR. AYAR:

5        Q.   She testified earlier that her manager is the

6    one who would have prepared the Work Order Review

7    document?

8            MS. HERVEY:  Right.  But I'm not sure that

9        means that that was her manager's decision at

10       that time.  I'm just saying I haven't heard that.

11           She prepared the document.  That doesn't

12       mean it says -- it says "Non-willful penalty will

13       be pursued."  "Pursued."

14           THE DEPONENT:  That's what we proposed.  And

15       it does indicate the reason.

16   BY MR. AYAR:

17       Q.   And it says -- on the bottom, it says,

18   "Non-willful penalty to be proposed."

19       A.   Uh-huh.  And it says the reason being that

20   there was a disclosure made to the prior agent.

21       Q.   Okay.

22       A.   So we felt we didn't have a leg to stand on.

23       Q.   On April 4th, the government believed that

24   non-willful penalties were appropriate, correct?

25       A.   No.

Page 73

1     Q.   No?

2     A.   On April 4th, we were going to propose -- we

3 decided to propose, or we talked about proposing

4 non-willful penalties, based on --

5     Q.   Okay.

6     A.   -- my understanding.

7     Q.   Can you tell me what the next thing to happen

8 in your case was?

9     A.   Per this Activity Record, it says that's when

10 we received amended returns.

11     Q.   Okay.  So there's no entries between when this

12 Workload Review was prepared and when Mr. Gavel sent you

13 the incomplete returns.

14     A.   Correct.

15     Q.   Okay.  But that is -- if anything of note would

16 have happened in that time frame, would you have

17 documented it in your Activity Log?

18     A.   I'm going to say that I should have.

19     Q.   All right.  So April 4th, non-willful

20 penalties.  April 16th, you get incomplete returns, and

21 then the same day you send back the email which we

22 talked about, I think it's Exhibit 13, and the email

23 talks about the 20% willful penalty.

24     MS. HERVEY:  What email are you talking

25    about?

1            MR. AYAR:  Exhibit 13.

2    BY MR. AYAR:

3        Q.   After that, let's see what happened.  It

4    appears that a week later, on April 23rd, you received a

5    call from Mr. Gavel.  Do you remember that?

6        A.   No.

7        Q.   And he indicated that he was going to complete

8    his amended returns and put them in the mail the next

9    day.

10            Do you know if he ever mailed you those

11    returns?

12        A.   I don't remember.  I don't see anything on

13    here.

14        Q.   Okay.  So on April 23rd, he tells you he's

15    going to put the returns in the mail tomorrow.  And then

16    the next entry is April 24th, it says "Work on RAR."

17    What's an RAR?

18        A.   Running Agent Report.

19        Q.   That's the 4549 that you mentioned earlier?

20        A.   Yes.

21        Q.   Okay.  So rather than wait for the amended

22    returns, you just decided to go ahead and make the

23    adjustment for him?

24        A.   No.  So, the RAR is in addition to the 4549,

25    all the sheets that go into it.  So it's not just

Page 75

1    inputting the adjustments.  It's everything.

2       Q.   All the support.  You might have just been

3    working on all the work papers and all the write-up and

4    all that stuff.

5       A.   Right.

6       Q.   I see.  It looks like you put quite a bit of

7    work in there.  There's four entries, four days in a

8    row, it looks like.  I'm sure it's not the only thing

9    you did those days, but a considerable amount of work

10   into it.  Good.

11           So now May 4th, "Complete report and send to

12   taxpayers with Pub 3498."

13           And that is talking about the Revenue Agent's

14   Report, I presume.

15      A.   Yes.

16      Q.   And this Exhibit 14?

17      A.   That ties into that exhibit, yeah.

18      Q.   Okay, good.  This was sent on May 4th, so that

19   was what you sent to him.

20           In that document you sent was the Revenue

21   Agent's Report, and at that time you expected him to

22   agree and sign it and send it back.  Is that correct?

23      A.   I don't remember that.

24      Q.   You don't remember that.  Let's read the letter

25   again.

1      A.   Okay.  So, there's no letter that says, "and

2  you indicated not agreeing."  This is the only letter we

3  can send.

4      Q.   And "you indicated agreement"?

5      A.   No.  There's no letter that says, "We discussed

6  it and you indicated you were not going to agree."

7      Q.   Yeah.  But is there a letter that says, "We

8  discussed it and that's it"?

9      A.   No.

10     Q.   How about when people don't indicate agreement?

11          MS. HERVEY:  Hold on a minute.  Can we go

12     off the record?

13          MR. AYAR:  Yeah.

14             (Discussion held off the record.)

15  BY MR. AYAR:

16     Q.   So are you trying to tell me that every time

17  you send a report, the letter says that you indicated

18  agreement?

19     A.   I don't know.

20     Q.   You don't know?

21     A.   No.

22     Q.   Okay.

23     A.   I know that recently, because of this issue,

24  I've learned to remove that --

25     Q.   I see.

1      A.   -- from this form letter.

2           MR. AYAR:  Let's see if we can find out if he

3      did in fact indicate agreement.  We're going to give

4      you Exhibit 15.

5           (Exhibit 15 was marked for identification.)

6  BY MR. AYAR:

7      Q.   Do you recognize this letter?

8      A.   No.

9      Q.   No.  I want to go back to Exhibit 13 for a

10 minute.  That was the email that you sent to Allen

11 Gavel.  Okay.

12          The second line of the second paragraph.

13          MS. HERVEY:  What exhibit are you on now?

14          MR. AYAR:  Exhibit 13.

15 BY MR. AYAR:

16     Q.   This was the email dated April 16th that you

17 sent to Mr. Gavel, and it says, "You and your client

18 were going to put right what you did wrong back when you

19 made the voluntary disclosure."

20          Do you recognize those words?  No?  Yes?

21     A.   I don't understand --

22     Q.   Let's go back to Exhibit 15.  I want you to

23 read it again.  This one.

24     A.   Oh.

25     Q.   Do you see how Said used the exact same words

1    that you used in your email?

2        A.   Yes, I do see that.

3        Q.   Do you think maybe this was him responding to

4    your April 16th email?

5        A.   I would have to speculate, but I don't know --

6        Q.   Now, you see the last sentence?  "I will fully

7    cooperate with you and my lawyer to come to full

8    agreement with payment of my back taxes."

9        A.   Uh-huh.

10       Q.   Did you expect him to agree with your report?

11       A.   Like I said, I don't --

12       Q.   You don't remember?

13       A.   Yeah.  Not only do I not have a recollection of

14   this, I haven't seen it.

15       Q.   Shouldn't this be in your Activity Log if you

16   received it?

17       A.   Right.  Yes.

18       Q.   Okay.

19       A.   But it's not.

20       Q.   It's not.  We'll have to find out -- I know I

21   got it from the Freedom of Information Act, but we'll

22   find another way to authenticate it.  It's okay.  We

23   don't have to worry about that too much.  It's not a big

24   deal.

25            Now let's fast forward a little bit more.  We

Page 79

1    were on May 4th -- we're back to Exhibit 2 now.

2        A.   Okay.  On May 4th, you sent the Revenue Agent's

3    Report, and then there's no entries for another month.

4            Do you know if anything occurred on this case

5    in that month where there's no entries?

6        A.   I'm sorry.  May 4th.

7        Q.   May 4th.  And then the next entry is June 5th.

8    Or June 3rd.  I'm sorry.  June 5th.  One of the two.

9        A.   No.

10       Q.   "No," nothing happened on the case?

11       A.   No, I don't know if anything did.

12       Q.   Okay.  If anything of note happened, it should

13   have been --

14       A.   It should have been recorded.

15       Q.   Okay, good.

16           May 4th, you send the report.  A month later

17   you get to work on your FBAR write-up.  What is that?

18       A.   It would be the 86a.

19       Q.   886a, which is your explanation of your reasons

20   for imposing the penalty.

21       A.   Yes.

22       Q.   So you worked on that for a couple days.  And

23   then we're going -- June 7th, it says "You received a

24   letter dated June 3rd from Mr. Gavel indicating that he

25   disagrees with your proposed adjustments and

Page 80

1    conclusions."  Do you remember receiving that letter?

2        A.   No.

3        Q.   Okay.  And then it says, "He requested the case

4    be forwarded to the Appeals Office."  So you don't

5    remember that letter?

6        A.   Uh-uh.

7        Q.   The next entry is June 11th.  "Prepared a

8    response to POA letter dated June 3rd, received on June

9    7th."

10            So it appears that you responded to that

11   letter.  Do you remember responding to that letter?

12       A.   No.

13            MR. AYAR:  Okay.  Let's see if we can help you

14       out.  16?

15            (Exhibit 16 was marked for identification.)

16   BY MR. AYAR:

17       Q.   You can take your time and glance it over.  It

18   has a lot to do with the income tax exam.  I'm not all

19   that concerned with most of it.  I really want to focus

20   on towards the end.

21            MS. HERVEY:  Do you want to ask her what it

22       is first?

23   BY MR. AYAR:

24       Q.   I'm sorry.  Do you recognize this document?

25       A.   Well, I'm assuming it's the response that's

1    indicated here in the Activity Record.

2         Q.   There's no signature, so we can't check to see

3    if that's your signature.  But your name is on it, and

4    it's dated June 11th, and it corresponds with the

5    Activity Log.

6              Do you have any reason to think that it's

7    not -- that you did not write this letter?

8         A.   No.

9         Q.   Okay.  You can go ahead and skim it over and

10   get through the first three pages.  I don't have that

11   much to ask you about that.

12            MS. HERVEY:  Can we take a break?

13            MR. AYAR:  Of course.

14              (Recess held at this time.)

15   BY MR. AYAR:

16        Q.   So you have in front of you Exhibit 13?

17            MS. HERVEY:  16.

18   BY MR. AYAR:

19        Q.   16.  It's a letter dated June 11th addressed

20   from you to Said and Asma Rum.  Have you had a chance to

21   review it?

22        A.   Yes.

23        Q.   Do you believe that this was written by you in

24   response to the June 3rd letter that you received?

25        A.   I'm assuming.

Page 82

1    Q.   Okay.  And the first several paragraphs of the

2    letter seem to address specific items on the income tax

3    return that you're responding to in this letter.  I'm

4    not worried about the details, but this does appear to

5    be in support of your examination report?

6    A.   It appears to be in response to a letter.

7    Q.   In response to a letter.  Okay.  Regarding the

8    changes you made on the exam.

9    A.   Yeah.

10   Q.   Let's go to Paragraph 7.  I want you to read

11   that very carefully.  Okay.

12        So, the first sentence.  "I also take this

13   opportunity to point out that we had come to an agreed

14   lower FBAR penalty based on a completely agreed case."

15        First of all, who is "we"?  Is that you and the

16   taxpayer?

17   A.   I can only say that, yes.

18   Q.   Because this is a letter from you to him, so

19   probably.  "And we had come to an agreed lower FBAR

20   penalty."

21        Do you remember agreeing to a lower FBAR

22   penalty?

23   A.   I don't.

24   Q.   Based on this, it appears that you did agree to

25   a lower FBAR penalty.

Page 83

1     A.   I don't -- I can see how I wrote that.  I just

2  don't see how ever I would say, "This is what I'm

3  agreeing to."

4     Q.   Okay.  It says, "Based on a completely agreed

5  case."  What does that mean, a "completely agreed case"?

6     A.   Yeah, I know.  I read this the other day and I

7  tried to figure it out.  I don't know.  This is

8  completed --

9     Q.   Do you think maybe you wanted him to agree to

10  everything, the income tax and the FBAR examination?

11     A.   I don't know.  Because it could be so many

12  different things.  Because of the 20%, it could be, you

13  know, based on the OBDI program.

14     Q.   I see.  Right.  Because the OBDI required a 906

15  to be signed --

16     A.   Yes.

17     Q.   -- right?  A complete agreement in payment?

18     A.   Yes.

19     Q.   I've done a lot of those.  More streamlined

20  than the OBDI.

21     A.   That's what I wish would have happened.

22     Q.   So the FBAR penalty was going to be limited to

23  only one year, and at only 20%.  But you don't remember

24  that?

25     A.   No.

1      Q.   Okay.  "Unfortunately, an unagreed income tax

2   case" -- Now, when you say "unagreed income tax," you

3   specifically refer to the income tax, not the FBAR case,

4   correct?

5      A.   Yeah.

6      Q.   Okay.

7      A.   Yes.

8      Q.   It says, -- "Will bar me from anything less

9   than a 50% FBAR penalty."

10          What was your basis for telling him that you

11   were barred from charging less than 50%?

12      A.   The only thing I can think of is the 20%

13   penalty applied to the OBDI program, which required all

14   of these things.

15      Q.   Okay.  So, do you remember thinking maybe at

16   that time, or maybe some other time, that you were

17   actually required to charge 50% in some cases?

18      A.   Do I remember thinking that I was required to

19   charge 50%?

20      Q.   In some cases.

21      A.   I don't remember what I was thinking then.

22      Q.   Okay.

23      A.   I can tell you what I remember from now.

24      Q.   Okay.

25      A.   That we are -- we were required to -- we

1    couldn't do anything less than 50%.

2        Q.   Who told you that?

3        A.   There was no guidance as to anything less than

4    50%.

5        Q.   Okay.

6        A.   So everything was 50%.

7        Q.   Everything was 50%.  Do you remember how you

8    came to the conclusion that you were required -- just

9    because there was no guidance, you assumed that --

10       A.   There was nothing that said "less than 50%."

11       Q.   There was nothing that said less than -- Did

12   you actually read the Internal Revenue Manual on the

13   assessment of FBAR penalties back when you were working

14   this case?

15       A.   I don't remember.  I didn't.

16       Q.   You did not read it?

17       A.   I don't remember having read the manual, no.

18       Q.   Did anybody specifically tell you to charge 50%

19   in this case?

20       A.   Yes.

21       Q.   Who?

22       A.   My manager.

23       Q.   That was Terry Davis?

24       A.   Yes.

25       Q.   Okay.  And that was verbally or was that in

1   writing?

2       A.   It must have been verbally.  Because I -- You

3   know what?  I don't remember, other than her saying,

4   "They can't get a better deal," because the people that

5   did the OBDI.

6       Q.   Your manager felt like it was inappropriate to

7   give a better deal?

8       A.   I can't tell you that it was my manager.

9   Because these cases, even though we were working them,

10  it was like we were puppets.  Somebody else was telling

11  us how to work them.

12      Q.   Okay.  So you weren't really given any

13  discretion?

14      A.   I wasn't.

15      Q.   Okay.

16      A.   No.  The opposite is true.

17      Q.   The opposite is true.

18           Have you seen any written guidance that

19  suggested that that was appropriate in any way, shape,

20  or form?

21      A.   That what was appropriate?

22      Q.   You not having any discretion.

23      A.   No.  I haven't seen any written guidance.

24      Q.   No.  Now do you understand that examiners are

25  given broad discretion in determining the appropriate

1    manner of the FBAR penalty?

2          MS. HERVEY:  I'm going to object.  It's not

3    relevant what the current state of the affairs

4    is.  You can answer.

5          THE DEPONENT:  Do I now understand that we

6    had --

7  BY MR. AYAR:

8    Q.   That you have --

9    A.   -- discretion?

10   Q.   Yes.

11   A.   Nope.

12   Q.   No?  You still don't have discretion, huh?

13   A.   I do not believe we do with these cases.

14   Q.   What do you follow?  The mitigation guidelines?

15   A.   Nope.  We follow -- there's -- With these

16  cases, there was a -- When I say "these cases," offshore

17  cases -- there's a freeze code on the case.  And we

18  can't close the case -- which means it's frozen from

19  closing -- unless Headquarters is in agreement that we

20  have done everything that we can do to get every last

21  dollar.

22   Q.   Every last dollar from who?

23   A.   From people that were trying to hide their

24  income.

25   Q.   Okay.  So the central case, Washington, D.C., I

 1   presume.

 2       A.   Headquarters.

 3       Q.   Has instructed you guys to get every penny you

 4   can from these people?

 5       A.   That's how -- There's nothing in writing.

 6   That's how it's perceived.

 7       Q.   Nobody ever told you to consider the facts and

 8   circumstances and determine if a lesser penalty would be

 9   appropriate.

10       A.   All we can do is put the facts and

11   circumstances together and propose what we think.  But

12   it doesn't matter.

13       Q.   Have you ever proposed less than 50% in a

14   willful case?

15       A.   No.

16       Q.   No.

17       A.   No.

18       Q.   Have you ever felt --

19       A.   I don't think we can.

20       Q.   Did you think Said, based on your intuition and

21   principles of fairness and equity, do you think he

22   deserved to be penalized $700,000 for what he did?

23            MS. HERVEY:  I'm going to object, because

24       what she thinks is not appropriate.  It's what

25       she is authorized as an agent to do.  But you can

1      answer the question.

2          THE DEPONENT:  No.

3  BY MR. AYAR:

4      Q.   No.  Okay.

5          Do you know if anybody ever specifically

6  explained to Said how you came -- how the government

7  determined the amount of the penalty?

8          MS. HERVEY:  I'm going to object, calls for

9      speculation.

10          THE DEPONENT:  That would have been in the

11      write-up.

12  BY MR. AYAR:

13      Q.   In the write-up.  So in this -- I forgot the

14  name of the form.

15      A.   The 86a.

16      Q.   886a.  There would have been an explanation as

17  to why the penalties were applied, and why they were

18  applied in the amount that they were.  That's what you

19  believe?

20      A.   Yes.

21      Q.   Yes.

22      A.   It listed all the facts that were gathered and

23  the conclusion, and it -- if I'm not mistaken, it also

24  shows how we computed the amount.

25      Q.   Okay.  Did you ever consider just giving him a

Page 90

1    warning letter?

2        A.   No.

3        Q.   No?  Okay.

4        A.   I don't think the facts steer to that.  But at

5    the time, I didn't even know that warning letters were

6    available.

7        Q.   Okay.

8        A.   I mean, I feel like I need to explain.  I do

9    understand him to be willful, but I really thought the

10   50% was a lot.

11       Q.   A lot.

12       A.   And there were other cases -- I can't talk

13   about other cases.  But there should have been a 50% on

14   every year.

15       Q.   I see.  Says who?

16       A.   50% penalty on every FBAR.

17       Q.   Who said that there should have been a 50%

18   penalty every year?

19       A.   That's what I've done in other cases.

20       Q.   Okay.

21       A.   So if it's willful, we open up all the FBAR

22   years that are available.

23       Q.   And you get them six times 50%, so like 300

24   percent of their compounds.

25       A.   Right.

Page 91

1      Q.   Sorry.  We're almost done.  I promise.  I

2  know --

3           MS. HERVEY:  We don't believe you anymore.

4           THE DEPONENT:  I know.  And I don't think

5      you're sorry for anything.

6           MS. HERVEY:  Yes, he is.

7  BY MR. AYAR:

8      Q.   So, the last sentence of Paragraph 7, "I

9  believe, based on past experience, that I can still

10  limit this willful FBAR penalty to just one year as

11  opposed to every year."

12          At the time you wrote this letter, did you feel

13  like you were giving Mr. Rum the very best deal you

14  absolutely had the power to give him?

15     A.   I don't remember.

16     Q.   You don't remember.  But it seem like that's

17  what you're saying, right, that, "This is the best deal

18  I'm allowed to give you"?

19     A.   Yeah.

20     Q.   Yeah.  Okay.  Now I want to go back to the

21  issue of the unagreed income tax case.

22          Do you remember ultimately what it is he

23  disagreed with you about?

24     A.   When you say "Ultimately," you mean --

25     Q.   I mean when he filed his final appeals protest

Page 92

1    before he went to appeals.

2        A.   I believe the only thing he was appealing was

3    the fraud penalties.  That I remember.

4        Q.   Let's see if we can confirm that.  This is 17.

5             (Exhibit 17 was marked for identification.)

6    BY MR. AYAR:

7        Q.   Have you seen this before?

8        A.   I don't recall seeing it.

9        Q.   Do you recognize documents that look like this?

10       A.   Yes.

11       Q.   And you see the stamp that says, "Received

12   December 1st, 2012 Maitland, Florida"?

13       A.   Yes.  And that looks like my handwriting.

14       Q.   Now that you've seen this, do you remember that

15   he agreed to your changes on the income tax exam?

16       A.   I'm seeing that he did.

17       Q.   Yeah.  Okay.  And the only thing he didn't

18   agree with you about was the FBAR penalty -- I'm

19   sorry -- was the civil fraud penalty?

20       A.   Yeah.  They're not listed on here as being

21   agreed.

22       Q.   Right.  And based on everything you've seen

23   today, and everything you remember, do you believe that

24   if he had agreed completely to your income tax exam,

25   that he would have gotten a 20% penalty?

1          MS. HERVEY:  Calls for speculation.

2          THE DEPONENT:  Am I answering?

3    BY MR. AYAR:

4      Q.   Yes.

5      A.   I don't know.

6      Q.   You don't know?

7      A.   I don't know.  Again, I have to say I didn't

8    have control over these cases.  I don't know anymore

9    what would have happened or would have helped.

10     Q.   There's so little control.  And this was based

11   on verbal instructions that were given to you?

12     A.   No.

13     Q.   Is there any document?

14     A.   No.

15     Q.   Somebody put a freeze code on the file.  I

16   don't know how -- I have never --

17     A.   That was new for us also.  We never had a

18   freeze code before.

19     Q.   Tell me what that was.

20     A.   I take that back.  We had a freeze code on

21   other cases.

22     Q.   Okay.

23     A.   This one in particular, basically, unless if it

24   was removed by Headquarters, we couldn't close it.

25     Q.   So there was an indication on the file that you

1   weren't allowed to close it unless Headquarters said it

2   was okay?

3       A.   Said it was okay.

4       Q.   What would cause them to remove the freeze

5   code; do you know?

6       A.   No.

7       Q.   No?

8       A.   No.

9       Q.   Okay.

10      A.   That's all on them.

11      Q.   Okay.

12      A.   I know what I have to do.  I'd have to give

13   them a check sheet, a report.  I have to give them all

14   the information they're asking for.

15           But ultimately how they make that decision, it

16   seems to me -- but that's just what it seems to me.  I

17   don't know.

18      Q.   Okay.  Can I see the Activity Report?  I just

19   want to look at that.  If we can all take a couple

20   minutes.

21           MS. HERVEY:  Yeah.  Are we going to mark

22      this?  Can we mark it?

23           MR. AYAR:  Yeah, we can mark it.

24           MS. HERVEY:  So you don't need this one now.

25      I just want to make sure.  This is the FBAR

1       Activity Log.

2             THE DEPONENT:  Yeah.

3             MS. HERVEY:  You just need the FBAR

4       write-up, Form 886a and the Form 1348 now, right?

5             MR. AYAR:  Yes.

6             MS. HERVEY:  Let's go off the record a

7       minute.

8                  (Discussion held off the record.)

9                  (Exhibit 18 was marked for identification.)

10  BY MR. AYAR:

11      Q.   I just want to ask you about the last two

12  entries.

13      A.   Okay.

14      Q.   Who is Debbie --

15            MS. HERVEY:  Can you just get her to say

16      what this is?

17  BY MR. AYAR:

18      Q.   I'm sorry.  Do you recognize this document?

19      A.   Yes.

20      Q.   Is this the Activity Record for your FBAR

21  audit?

22      A.   Yes.

23      Q.   And you prepared this --

24      A.   Yes.

25      Q.   -- after the audit was completed.

Page 96

1      A.   Yes.

2      Q.   Yes.  So, who is Debbie Separata?

3      A.   Currently she is the FBAR Coordinator.

4      Q.   So all FBAR penalty cases were going through

5  her?

6      A.   No, not then.

7      Q.   Not then?

8      A.   I'm sorry.  In the beginning, they weren't.  So

9  at some point, they were.  Yes.  So this would have gone

10 to her.

11     Q.   Okay.  Do you know what her job is as an FBAR

12 Coordinator?  I don't know what that means.

13     A.   I don't know for sure.  I know that she would

14 have had to make sure that the case -- based on the

15 experience I had, is that she had to make sure that all

16 the documents that were needed in the file were there.

17     Q.   Okay.  So she just goes and double-checks and

18 makes sure everything is there and packages it all up

19 and sends it where it needs to go.  That's your

20 understanding of what was going on there?

21     A.   Yes.

22          MS. HERVEY:  I'm sorry.  How do you spell

23     her name?

24          THE DEPONENT:  Debbie Saparata,

25     S-A-P-A-R-A-T-A.

Page 97

1   BY MR. AYAR:

2       Q.   Okay.  So the next entry.  7/22/2013.  What

3   does "F4318" refer to?  Do you know?

4       A.   44318.  So that's kind of like the index of the

5   case file.

6       Q.   Okay.  So it's like a cover sheet of some kind

7   that says what everything is there?

8       A.   Right.

9       Q.   I see.  And, "Also missing Activity Record,"

10  that's this Activity Record?

11      A.   Yes.

12      Q.   Okay.  The reason you had to prepare this

13  separate Activity Record is because somebody told you

14  that it shouldn't contain any information from the

15  Title 26 case?

16      A.   Yeah.

17      Q.   Why shouldn't it?

18      A.   Debbie told me.

19      Q.   Debbie told you?

20      A.   Yeah.  I don't know why.  I don't know if it

21  was the first time, but it's happened again.  So I keep

22  forgetting.

23      Q.   You think it's maybe because you didn't have a

24  related statute memorandum?

25      A.   No.

1      Q.    Had nothing to do with that.  I thought I saw

2  something in the IRM you're not entitled to use Title 26

3  information in Title 31 cases.  Until we have that.  I

4  could be mistaken.  You don't really have that with you,

5  so I can't ask you about that.

6           What is a related statute memorandum again?

7      A.    That's funny, because for the longest time I

8  was doing them without knowing exactly what they were.

9           So, basically it's the form where we're asking

10 our territory manager -- Back then it was the CM.  Now

11 it's a general.  We were asking if it was okay to open

12 the Title 31 exam based on whatever evidence we had.

13     Q.    Have you ever had to do those in any other

14 cases besides the Title 31 case?

15     A.    Yes.

16     Q.    What other types of cases?

17     A.    Oh, I'm sorry.  No.  Other than Title 31, no.

18     Q.    Other than Title 31.

19     A.    No.

20     Q.    You don't know why you had to do those?

21     A.    Apparently it's -- No, I don't.  I'd be

22 guessing.

23     Q.    Okay.  But it was something new to you at the

24 time.  You had never heard of it before, and all of a

25 sudden with the FBAR cases --

1     A.   New for Mr. Rum, no.  New for the OBDI cases.

2     Q.   You mean FBAR cases, or OBDI?  He wasn't in

3  OBDI.

4     A.   No.  But the OBDI cases had FBARs.

5     Q.   Did you work OBDI cases?

6     A.   Yes.  That's what my main thing was right

7  before this.

8     Q.   Oh.  So people that were in the program, you

9  worked the file and --

10     A.   Which is why I --

11     Q.   I've had a couple --

12     A.   -- thought this was going to happen.

13     Q.   I'm sorry.  You said what?

14     A.   That's why I thought it was going to happen

15  that way.

16     Q.   What's "this"?

17     A.   That Rum would have gone through OBDI.  Just

18  because that's all I was doing.

19     Q.   That was the only option back then.  People

20  didn't have a streamline for non-willful people?

21     A.   Yeah.  I don't know what that is.  You

22  mentioned that.  I was like, "Okay.  He knows more than

23  I do."

24     Q.   It's a new thing.  We don't need to talk about

25  all that on the record.

1          Let me just think.  I think I might be all

2    done.  If there's any more exhibits, I want to ask you

3    about them.  No, that will do.

4          MS. HERVEY:  Okay.  I'm going to do some

5       cross.

6          MR. AYAR:  Do I get to ask questions again

7       after you're done?

8          MS. HERVEY:  Let's go off the record.

9             (Discussion held off the record.)

10                CROSS-EXAMINATION

11   BY MS. HERVEY:

12        Q.   So, who is the person in the Internal Revenue

13   Service -- And not necessarily by name, but by title --

14   who has the authority to make decisions about an FBAR

15   penalty at the time in question?

16        A.   Definitely it wasn't me.  It could have been

17   somebody above my manager, but I understood it to be my

18   manager.

19        Q.   Okay.  So did you have the ability, with

20   respect to the 2007 FBAR in question with respect to

21   Mr. Rum, did you have the ability to make the

22   determination as to the amount of the penalty that

23   Mr. Rum --

24        A.   No.

25        Q.   -- would pay?

1      A.   No.

2      Q.   Okay.  All right.

3           And I understand your testimony is that you did

4  not want Mr. Rum to pay a 50% penalty:  Your personal

5  view.

6      A.   Uh-huh.

7      Q.   Can you explain why, in your personal view,

8  that was the case?

9      A.   So, I had two reasons:  First of all, I thought

10  that was a lot of money.  And second, I felt that the

11  IRS should have caught on to the offshore activity when

12  he submitted the bank statement to Denise Ross.

13     Q.   Okay.  So the bank statement to Denise Ross was

14  submitted.  Do you know when that was submitted?

15     A.   I believe it was 2008.

16     Q.   Okay.  Do you know whether it was before or

17  after his FBAR report was due?

18     A.   I don't know.  I don't remember.  The 2007 FBAR

19  would have been due in 6/30 of 2008.

20     Q.   And Mr. Rum testified at his deposition that

21  Mr. Gavel didn't come in until the fall, October, of

22  2008.

23          So since Mr. Gavel submitted the report, we

24  would know that it couldn't have happened before the

25  June filing deadline, correct?

Page 102

1      A.   Right.

2      Q.   Okay.

3      A.   Right.

4      Q.   All right.  Did the fact that your personal

5  beliefs were favorable to Mr. Rum, did that give you any

6  ability to give him a lower penalty?

7      A.   No.

8      Q.   Okay.  And can you describe what was commonly

9  happening in the OBDI program?

10     A.   So, the OBDI program, the taxpayers would come

11  forward with all of the information and full payment and

12  the amended returns.  I don't remember how many years.

13  And then we would prepare reports based on that, and we

14  would have penalties that I'm almost certain were 20%,

15  and they would have to agree to all of that on a Closing

16  Agreement.

17     Q.   They would have to agree to the penalties on

18  both the income and the --

19     A.   And the -- and they were called "international

20  penalties."

21     Q.   Would it be also on the income tax due on the

22  foreign accounts?

23     A.   They would have to pay penalties on the income

24  tax, yes.

25     Q.   In your experience in the OBDI program,

1    agreement to the income tax penalties would be part of

2    that.

3         A.   Yes.

4         Q.   Okay.  And so when Mr. Rum didn't agree to the

5    income tax penalties in this case, in your view, that

6    had an impact on the FBAR penalty?

7         A.   No, I don't --

8         Q.   All right.  Well, maybe I didn't understand

9    your testimony.

10        A.   Okay.

11        Q.   When Mr. Ayar was going through the timeline,

12   all right, he's indicating that you made the decision to

13   go for the willful penalty after Mr. Rum indicated that

14   he would not agree to the income tax penalty --

15        A.   Right.

16        Q.   -- correct?

17        A.   At that point, there wasn't anything -- there

18   was no way that we could do the 20% or anything.

19        Q.   But my question to you is, isn't that exactly

20   what was your experience with the OBDI program?

21        A.   That they had to include all the tax and

22   penalties and the agreement.  Is that what you're asking

23   me?

24        Q.   Yes.

25        A.   Yes.

1      Q.   So Mr. Rum wouldn't have gotten the deal, had

2  he been in the OBDI program, because he didn't agree to

3  the income tax penalties.

4      A.   Right.

5      Q.   Okay.

6      A.   Yes.

7      Q.   All right.  Was Mr. Rum eligible for OBDI

8  program?

9      A.   No.

10     Q.   Can you explain why he was not eligible?

11     A.   Because he was under exam when the program

12  became available.

13     Q.   All right.  Did anybody from the IRS ever tell

14  Mr. Rum that he was eligible for the OBDI program?

15     A.   I don't know.

16     Q.   But did you ever tell him that?

17     A.   No.

18     Q.   Are you aware that he was ever advised that by

19  anybody in the Internal Revenue Service?

20     A.   No.

21     Q.   Okay.  And -- Okay.  Have you ever treated a

22  taxpayer unfairly in your work as a revenue agent?

23     A.   I hope not.

24     Q.   Okay.  Have you ever retaliated against --

25     A.   No.

Page 105

1    Q.   -- a taxpayer?

2    A.   No.

3    Q.   Did you treat Mr. Rum unfairly in this case?

4    A.   No.

5    Q.   Did you retaliate against Mr. Rum for his

6    failure to agree to the income tax changes you had

7    proposed?

8    A.   No.

9    Q.   All right.  Are you aware --

10   A.   No.

11   Q.   Do you know whether or not the Internal Revenue

12   Manual is binding as a matter of law?

13   A.   I don't know.  I don't think so.

14   Q.   Okay.  I think your testimony was there was a

15   lot of confusion about the FBAR penalty at the time of

16   the examination in question.

17        Can you give us more detail about what you mean

18   by that?  I don't really understand what you mean by

19   "confusion."

20   A.   So, there was a lot of confusion as to what

21   exactly we were doing.

22   Q.   When you say "we," who --

23   A.   The examiners that were assigned these cases.

24   We had very little guidance.  At some point, it became

25   clear to me that I had no authority or no discretion or

1   anything.  I just had to follow what I was being told.

2           And I guess that comes from the fact that this

3   was all new, so somebody else had to come up with the

4   rules.

5      Q.   All right.  Did your kind of discovery about

6   your lack of authority, did that come during the

7   examination of Mr. Rum or at some other point in time?

8      A.   I don't remember exactly when.  I'm going to

9   say it came at some point during the exam.

10     Q.   Do you remember the circumstances under which

11  you became aware of what you perceived to be your lack

12  of authority with respect to the amount of the penalty?

13     A.   No.  When?  Is that what you're asking?  When I

14  thought I became aware?

15     Q.   The circumstances under which.

16     A.   I seem to recall a conversation with Terry

17  where she indicated to me what I had indicated before,

18  that we weren't -- we weren't allowed to give quiet

19  disclosure taxpayers any deal that was equal to or

20  better than the people that came in under OBDI, no

21  matter what I thought.

22     Q.   Okay.  So, when you say "Terry," you're talking

23  about your manager, Terry Davis?

24     A.   Yes.

25     Q.   And you used the term "quiet disclosure."  Can

1   you tell me what that is?

2       A.   That's what this case was referred to, as a

3   "quiet disclosure," because they filed amended returns

4   in which Schedule B indicated some type of interest from

5   the UBS account or an offshore account, as opposed to --

6   and it was an amended return, as opposed to the original

7   return having been filed with all the information on

8   there.

9           So they're disclosing that they have this

10  offshore account and this offshore income that they

11  previously didn't report, and they're doing it through

12  an amended return.  They're just filing it without going

13  through the normal process, going to CI and saying,

14  "Here's my amended returns.  This is what I did."

15      Q.   Did Mr. Rum make a full disclosure or a quiet

16  disclosure?

17      A.   Quiet.

18      Q.   All right.  So your manager indicated that due

19  to the existence of the quiet disclosure, Mr. Rum could

20  not get less than a 50% penalty?

21      A.   Right.

22      Q.   And was there any other reason why Mr. Rum was

23  assessed a 50% penalty as opposed to a 20% penalty?

24      A.   Well, that's what the guidelines called for:

25  50% if the facts supported it.

1    Q.   All right.  I believe your testimony was that

2    you do believe the facts exist --

3    A.   Yes.

4    Q.   -- to support the imposition of a 50% penalty.

5    Can you explain -- That's correct?

6    A.   Yes.

7    Q.   Can you explain what some of those facts are?

8    A.   Well, the fact that he had this account

9    offshore, didn't report the income.  When he became

10   aware of this, because UBS sent him all this

11   information, he still didn't file the FBARs.  He still

12   didn't report the income.  He still put "No" on Schedule

13   B as far as having an account offshore.

14        When I asked him if he had reported this to

15   the -- Because he told me he had a lot of kids and they

16   all go to college, went to private school and all this.

17   But I asked him how he afforded college, and he said,

18   "Grants and whatnot."

19        And I asked him if he reported -- because my

20   kids were going through that -- if he had reported the

21   offshore account in the funds that he had in the FSA

22   application.  I don't remember.

23   Q.   FISA?

24   A.   Is that what it's called?

25   Q.   For college?

Page 109

1     A.   Yes, for college.  Parents have to go in and

2   put their information in there.

3          And he said, "No."

4          And I asked him, "Why?"

5          And he said, "because I wanted to have a

6   stronger position to get the grants, the funds."

7          So it seemed obvious that he was concealing the

8   assets.  He certainly concealed the assets on those

9   applications, and then he concealed income on the 1040.

10    Q.   So did Mr. Rum ever explain what his belief was

11  in terms of when the income had to be reported?  The

12  income from the FBAR.

13    A.   In my write-up, I do say that he or Mr. Gavel

14  explained that they thought, or Mr. Rum thought he

15  didn't have to report that income until he brought it

16  back.

17    Q.   Okay.  So with respect to the repatriation of

18  the funds in 2009, do you know what the gain was on the

19  FBAR account during the time that Mr. Rum had it from

20  1998 until the funds were repatriated in 2009?

21    A.   So, the write-up indicates that there was over

22  $400,000 of increase.  And it wasn't from deposits.  It

23  was from income that was earned.

24    Q.   So on Mr. Rum's 2009 return, did he report the

25  increase of that gain?

1      A.    No.  He reported about 40 or 39,000.

2      Q.    Which was the gain from the year that the funds

3  were in an Arab bank, correct?

4      A.    That I don't know.

5      Q.    All right.  So, do you know whether Mr. Gavel,

6  when he disclosed the UBS account to Denise Ross, do you

7  know whether he disclosed at that time that Mr. Rum had

8  moved his funds to a separate bank account in

9  Switzerland?

10     A.    No, he didn't.

11     Q.    He did not?

12     A.    No.

13     Q.    Was that significant in terms of willfulness?

14     A.    Yes.

15     Q.    Okay.  Can you explain why?

16     A.    Well, here he becomes aware that the IRS and

17 UBS have this negotiation where they're going to be

18 getting information, and yet rather than bringing the

19 money back and coming up front with Denise and letting

20 her know what was happening and, "We want to put things

21 right," instead he takes the money and he puts it in

22 another offshore account.

23     Q.    In Switzerland.

24     A.    I don't remember where it was.

25     Q.    All right.  Let me ask you this.  UBS, as part

Page 111

1    of its agreement with the government, was making certain

2    John Doe summons disclosures to taxpayers with foreign

3    accounts, did they not?

4        A.   I don't know.

5        Q.   All right.  Do you know whether, in terms of

6    timing, there was a period of time when a lot of people

7    were closing their UBS accounts?

8        A.   Yes.

9        Q.   Can you tell me when that was?

10       A.   That was towards the end of 2008.

11       Q.   Was that about the time that Mr. Rum closed his

12   account at UBS?

13       A.   Yes.

14       Q.   Instead of repatriating the funds at that time

15   and bringing them to the United States, he did what with

16   them?

17       A.   He took them to another offshore account.

18       Q.   Which was additional evidence of his

19   willfulness, correct?

20       A.   It seemed to me he's still hiding the money.

21       Q.   Okay.  I'm a little bit confused by your

22   testimony about how many FBAR cases you had worked on.

23   You indicated it's kind of your first case, and it's not

24   your first case.

25            Is this the first case that you had that wasn't

Page 112

1    in the OBDI program?

2        A.   This was the second case.

3        Q.   So when you're talking about the FBAR was new

4    and not new, you had mostly worked OBDI cases.

5        A.   Right.

6        Q.   In your experience, most of the taxpayers that

7    you had worked with weren't getting a 50% penalty,

8    correct?

9        A.   Right.  No.  And they weren't getting any of

10   this.  I don't think we even had a Title 31 separate

11   file.

12       Q.   So a 50% penalty would have seemed extreme to

13   you just in terms of the timing of your working on this

14   case, correct?

15       A.   Yes.  It still is.

16       Q.   Do you have any idea what kind of problems the

17   existence of foreign bank accounts provides for the IRS

18   in terms of being able to ensure voluntary compliance?

19       A.   Well, it's impossible for us to have any

20   knowledge as to their bank accounts.

21       Q.   All right.  So do you know whether or not, in

22   2007, Mr. Rum disclosed his foreign bank account on the

23   tax return he filed?

24       A.   On the original return, no, he didn't.

25       Q.   And there's an actual -- there's a line on

1    Form 7, Schedule B, Form 7, for that information, is

2    there not?

3         A.    Schedule B, line 7, yes, there is.

4         Q.    And it asks whether or not you have a foreign

5    account, correct?

6         A.    Yes.

7         Q.    And how was that checked on the 2007 return?

8         A.    On both the original and the amended, it was

9    checked "No."

10        Q.    Does it also provide instructions to the full

11   reporting requirements with respect to the FBAR report?

12        A.    Yes.

13        Q.    So anybody who reviewed that return would know

14   that the government wanted information about the filing

15   of the return, correct?

16        A.    Yes.

17        Q.    So was the failure to check that box, was that

18   evidence of willfulness?

19        A.    Yes.

20        Q.    All right.  And to your knowledge, did Mr. Rum

21   file a Schedule B admitting the existence of the foreign

22   account for any of the years that he had the account

23   from 1998 through 2009?

24        A.    From what I've seen, no, he didn't.

25        Q.    All right.  So, in terms of your experience in

1    primarily issues involving kind of offshore activity,

2    does multiple years of a violation have some evidentiary

3    value with respect to willfulness?

4        A.   Well, yeah.  It shows that, you know, this

5    wasn't an accident.

6        Q.   Okay.

7        A.   It wasn't an oversight.

8        Q.   I think you also indicated that in the OBDI

9    program, had Mr. Rum been eligible, he would have been

10   potentially liable for a penalty of $20,000 for each of

11   the years in which he didn't file a report, correct?

12       A.   I don't know that it was 20,000.

13       Q.   Or whatever the number was.  Whatever the

14   number was.

15       A.   Right.  Twenty percent.

16       Q.   Okay.  A 20% penalty.  But if Mr. Rum had the

17   account from 1998 through 2009, he faced substantial

18   liability even if he had been under the OBDI program,

19   correct?

20       A.   So, it would have only have been for the years

21   where we had an open statute.

22       Q.   Okay.  So what years would that have been with

23   respect to Mr. Rum?  If you don't know, that's all

24   right.

25       A.   It would have been six years before that, so

1   what is that?  '4, '5, '6, '7, '8, '9, '10, '11.  But we

2   wouldn't have picked up '4.  We probably would have gone

3   with -- I don't know -- '5 or '6.  I don't remember what

4   we were doing.

5       Q.   Had Mr. Rum been eligible for the OBDI program,

6   he would have been potentially liable for a 20% penalty,

7   or whatever the number was, for five years or six years

8   for the period -- for five or six years in which he had

9   the UBS account and didn't report it?

10      A.   I don't remember if it was for every year or if

11  we just looked at the highest year.

12      Q.   Okay.

13      A.   But it would have been 20%, and it would have

14  been obviously not the 50%.  I think there was another

15  OBDI thing that came out after.

16          MR. AYAR:  I think there were six of them.

17          THE DEPONENT:  Okay.  There you go.  And

18      they always increased the penalty amount, right?

19          MR. AYAR:  Yeah.  It's 27 and a half percent

20      now.  It's closing in September.

21          THE DEPONENT:  What did it --

22          MS. HERVEY:  All right.  Let's just wait.

23      Let me finish and we can let him --

24          MR. AYAR:  I'm sorry.

25                   ////////////////////

1    BY MS. HERVEY:

2        Q.   So, Mr. Ayar asked you about the communication

3    you had with the taxpayer with respect to agreeing to

4    make things right, and Mr. Rum's response was that he

5    wanted to make things right.  Did Mr. Rum ever make

6    things right?

7        A.   So, he didn't make things right fully, no.

8        Q.   Okay.  Let's go to Exhibit Number 14.  I know

9    it's here.

10            I'm not sure I understood what you were saying

11   about -- This is the letter dated May 4th, 2012, with

12   respect to the report that you sent Mr. Rum with respect

13   to his potential future liability.

14            Is this a form document?

15       A.   Yes.

16       Q.   And so at the time that you prepared this

17   letter, this was just the standard form that was sent

18   out?

19       A.   Yes.

20       Q.   Okay.  Regardless of whatever agreement was

21   reached?

22       A.   This was the letter that was sent out when a

23   report is ready to be given to the taxpayer.

24       Q.   Okay.  Did you alter the report based on the

25   particular facts of the case, or no?

1      A.   I don't --

2      Q.   I'm just confused, because you talked about the

3  findings in the closed report and you indicated

4  agreement, whether or not the fact that this says that

5  means that Mr. Rum actually indicated agreement or

6  whether this was just a form that you would have sent

7  whether he indicated agreement or not.

8          I wasn't -- That was left unclear in my mind.

9      A.   I know.  It's my recollection that at this time

10  I didn't know how to remove this part over here where it

11  says "indicated agreement."  This is the only report we

12  could sign.  I don't remember if he agreed or not.  This

13  was all we could send when we were sending the report.

14     Q.   So, in any event, did the fact that you imposed

15  or recommended the imposition of a 50% penalty, did that

16  stem in any regard from Mr. -- you punishing Mr. Rum for

17  his failure to agree?

18     A.   No.

19     Q.   Okay.  Do you know whether or not Terry Davis

20  ever authorized a non-willful penalty in this case?

21     A.   She never signed off on one, no.

22     Q.   Okay.  In the absence of her signing off on

23  one, could you have given Mr. Rum anything less than a

24  50% penalty?

25     A.   Nope.  Not that I'm aware of, no.

Page 118

1              MS. HERVEY:  That's it for me.

2              MR. AYAR:  Okay.

3                    REDIRECT EXAMINATION

4    BY MR. AYAR:

5        Q.   First I want to clear up -- Hopefully we can

6    refresh your memory -- of how the penalty worked in the

7    OBDI program.

8              What I have here is an excerpt, what I proffer,

9    from the Internal Revenue -- I'm sorry.  This is an OBDI

10   Frequently Asked Questions document that I believe was

11   the URL that you referred to in your email?

12       A.   Okay.

13             MR. AYAR:  He's going to mark it and you're

14       going to have a chance to read it.  I want you to

15       pay particular attention to Question Number 12.

16             MS. HERVEY:  So -- All right.

17             (Exhibit 19 was marked for identification.)

18             MS. HERVEY:  Let's just take a few-second

19       break.

20             MR. AYAR:  All right.

21             (Recess held at this time.)

22   BY MR. AYAR:

23       Q.   Do you recognize this language?

24       A.   See, that's why -- Recognize it?

25             MS. HERVEY:  Do you know what this document

1      is?

2   BY MR. AYAR:

3      Q.   Do you know what it is?

4      A.   I seem to recall seeing this, or something

5   similar to that, on the web page.

6      Q.   Let's go back to Exhibit 13 for a moment.

7           MS. HERVEY:  Okay.  When?

8           THE DEPONENT:  It would have been -- I can't

9        remember the year.  I guess whenever it came out.

10  BY MR. AYAR:

11     Q.   Can I make a proffer?  I got this document from

12  a website called "The Way Back Machine."  It's the

13  Internet archives.

14          You see on the top right corner where it says

15  "April 15th, 2012"?  What that means is according to

16  this website, this is the version that was on the

17  Internet on that date.

18          MS. HERVEY:  Okay.  This is an IRS website?

19          MR. AYAR:  Yes.

20  BY MR. AYAR:

21     Q.   You see up top where it has a URL?  I'm going

22  to refer you back to Exhibit 13.

23          MS. HERVEY:  Let me just object to the

24        grounds of authenticity and relevance.  But you

25        can go ahead and answer.

1    BY MR. AYAR:

2        Q.   So, let's go back to Exhibit 13.

3        A.   That's the letter --

4        Q.   The email that you sent to --

5            MS. HERVEY:  You proffer that this is what?

6            MR. AYAR:  This is what she was referring

7        him to, and this is the version that existed on

8        the Internet on this day.

9            MS. HERVEY:  Okay.  So, it's the version in

10       what email?

11           MR. AYAR:  Exhibit 13.

12           MS. HERVEY:  Okay.  This is the link.

13           MR. AYAR:  Yes.

14           MS. HERVEY:  Your proffer this is the link.

15           MR. AYAR:  The link in the email.

16           MS. HERVEY:  The link in -- Okay.  Referred

17       to by the agent --

18           MR. AYAR:  Yes.

19           MS. HERVEY:  -- in Exhibit 13.

20           MR. AYAR:  Yes.

21           MS. HERVEY:  Okay.  Do you know whether

22       that's the case?

23           THE DEPONENT:  I'd have to take his word for

24       it.

25           MS. HERVEY:  So you do not know.

Page 121

1            THE DEPONENT:  No.

2            MS. HERVEY:  So you can ask the question.

3    BY MR. AYAR:

4        Q.   Can you look at this URL, and then look at the

5    URL in your email in Exhibit 13, and tell me if they're

6    the same.

7        A.   Yes.

8        Q.   They are the same?

9        A.   Yes.

10       Q.   Now, I don't want to hang ourselves up too much

11   on this document.  I just want you to flip to Q12,

12   please.  Take your time and read over that entire

13   example.

14       A.   Okay.

15       Q.   Now that you've read that, now do you remember

16   whether or not the OBDI and the offshore penalty applied

17   to each year or just one year?

18       A.   It appears to have been just the one year, the

19   highest balance.

20       Q.   That question also talks about the accuracy

21   penalty.  Can you tell how much it is in this example?

22       A.   Ten percent.

23       Q.   Based on your recollection, at that time, the

24   accuracy-related penalty for people in the OBDI program

25   was 20%.

1      A.   Yes.  Yeah it looks like 20% across the board.

2  I don't know if it was just for one year.  I'm guessing

3  for every year, but I don't know.

4      Q.   It was for every year.

5      A.   It was?

6      Q.   Okay.  So, in your testimony to Ms. Hervey, you

7  said that because Mr. Rum did not agree to the

8  penalties, the income tax penalties, then had he been in

9  OBDI, he would not have qualified for the 20% FBAR

10  penalty.  Is that right?

11       You said that because he didn't agree to the

12  penalty, and because the OBDI program requires full

13  agreement, then if he was in the OBDI program, he would

14  not have qualified because he refused to agree with you

15  on the income tax penalties.  Was that your testimony?

16       MS. HERVEY:  Okay.  I'm going to object.

17    It's a little complex, but you can go ahead and

18    answer it.

19       MR. AYAR:  We can have him read it back,

20    too.

21       MS. HERVEY:  You might want to ask the

22    question differently.  But go ahead and try and

23    see if she can --

24       THE DEPONENT:  So, if he would have been in

25    the OBDI program, he would have been at 20%.

1   BY MR. AYAR:

2       Q.   And he would have been required to agree to the

3   income tax penalties --

4       A.   Yes.

5       Q.   -- in order to stay in the OBDI program?

6       A.   Yes.

7       Q.   Okay.  If he refused to agree to the income tax

8   exam changes and the accuracy penalty and the offshore

9   penalty, he would have been removed from the program.

10  Is that correct?

11      A.   I didn't have any cases like that, but I

12  believe that's correct.

13      Q.   But the accuracy penalty was 20% in the OBDI

14  program.

15      A.   Yes.

16      Q.   Okay.  But the penalty that you applied to

17  Mr. Rum's case, and which he did not agree to, was 75%;

18  is that correct?

19      A.   Yes.

20      Q.   Okay.  I want to just make sure that we're a

21  hundred percent clear on what everybody's roles and

22  responsibilities were.

23      A.   Okay.

24      Q.   You testified that only your manager, who I

25  believe was Terry Davis at the time, had the authority

Page 124

1    to make a determination with respect to FBAR penalties,

2    correct?

3         A.   I can tell you that it wasn't me.

4         Q.   But you did have the authority to make a

5    recommendation; is that correct?

6         A.   Yes.

7         Q.   Did you make a recommendation?

8         A.   Yes.

9         Q.   And what was that recommendation that you made?

10        A.   The willful.

11        Q.   And how much?

12        A.   Fifty percent.

13        Q.   Why 50%?

14        A.   Because that's what the lead sheet said.

15        Q.   What is the "lead sheet"?  I'm sorry.  I don't

16   understand.

17        A.   It's actually what the statute says.

18        Q.   What statute?  I'm sorry.

19        A.   The Title 31.

20        Q.   Okay.  So because -- The Title 31 you're

21   referring to is the statute that establishes the FBAR

22   penalties, I presume.

23        A.   Yes.

24        Q.   And that statute, do you understand -- I'm

25   sorry.  I know you're not a lawyer.  But do you believe

1    that that statute provides for a fixed penalty amount?

2        A.   I did.

3        Q.   You did.  Okay.

4             You did not believe that it was a maximum and

5    no minimum.  You thought that it was a fixed penalty.

6        A.   It was either 50% or 100,000.

7        Q.   Okay.  So the recommendation you made to your

8    manager with respect to the amount of the penalty was

9    based on your understanding that you had to recommend

10   50%.

11       A.   My write-up was on 50%, because that's what I

12   understood had to happen.

13       Q.   I know.

14       A.   I have to say at this point I'm not

15   recommending anything to her anymore.  She's telling me

16   what to do.

17       Q.   Okay.  Who ran things, you or your manager?

18       A.   I guess I did things based on what I was told

19   to do.

20       Q.   Who examined the evidence?

21       A.   I did.

22       Q.   You did.  Who talked to the taxpayer?

23       A.   Both Terry and I did.

24       Q.   Was Terry present every time you talked to

25   Mr. Rum?

1      A.    No.

2      Q.    Would you say you were in a much better

3   position to determine the facts and circumstances than

4   Terry was, to assess the facts and circumstances?

5      A.    No.  I would say I was in a much better

6   position to gather them and put them down on paper.

7      Q.    I see.

8      A.    She and Headquarters, Counsel, whoever makes

9   the recommendation, would be actually the best people to

10  know if we had sufficient facts for a willful or not.

11     Q.    I see.

12     A.    Based on the law.

13     Q.    But you were the examiner.

14     A.    Yes.

15     Q.    But somebody other than the examiner was making

16  the determination as to what the appropriate amount of

17  the penalties were.

18     A.    Yes.  All I could do was gather the facts and

19  provide them and ask if this was sufficient for willful.

20     Q.    Was sufficient for willful.  And that was the

21  only thing you asked them?

22     A.    Towards the end, that was the only thing I

23  asked for.

24     Q.    Once the determination was made that it was

25  sufficient for willful, then the penalty was

1   automatically 50%.

2       A.   Yeah.  The willful penalty couldn't be anything

3   else in his case, because he had over a million dollars

4   in the account.

5       Q.   You're referring to the mitigation guidelines?

6       A.   No.  So, if --

7       Q.   And the IRM.

8       A.   Yes.

9       Q.   The mitigation guidelines are based on the

10  amount of, and it gives you a recommended penalty.  For

11  people over a million dollars, it's 50%.  And that was

12  the top of that one thing you said you recognized.

13          Is that what you're referring to?  Does that

14  ring a bell?

15      A.   Yes.

16      Q.   Yes, it does.  And you understood those to be

17  binding on you?

18      A.   I didn't think I could do anything else.

19      Q.   Okay.  There was several mentions made in your

20  testimony that this was all, quote, unquote, "new."  Can

21  you tell me what that means?  What was new about it?

22      A.   It was -- The FBAR case file was new.  We

23  hadn't done that before.  The actual gathering of

24  evidence regarding offshore activity was new.

25      Q.   Do you know when the first year people were

 1   required to file FBARs was?

 2      A.   Uh-uh.

 3      Q.   Do you know whether it was a long time ago,

 4   like decades ago?

 5      A.   No.

 6      Q.   You don't know?

 7      A.   No.

 8      Q.   Okay.  So you don't know if it was part of the

 9   Bank Secrecy Act passed in the '70s?

10      A.   No, I don't.

11      Q.   I'm trying to understand how this is all new.

12   Because my understanding is FBARs have been around for a

13   long time.  But that's okay.

14      A.   So, not for me.

15      Q.   New to you?

16           MS. HERVEY:  Can I?

17           MR. AYAR:  Yes.

18           MS. HERVEY:  Because you did this in my

19      deposition.  I think the reason it's new is

20      because of the treaty with the UBS.

21           MR. AYAR:  I see.

22           MS. HERVEY:  The IRS was getting all this

23      information.

24           MR. AYAR:  I see.

25           MS. HERVEY:  The thing is, the Bank Secrecy

1        Act had been around a long time, all right.

2             MR. AYAR:  Yes.

3             MS. HERVEY:  You're right, since the '70s.

4        But it was only after the litigation with UBS

5        where there was information coming.

6             MR. AYAR:  I see.

7             MS. HERVEY:  Just like I'm just getting my

8        first -- it's not a question of we didn't want to

9        enforce it.  The question is, we didn't have the

10       information.

11            MR. AYAR:  I understand.

12            MS. HERVEY:   So that's, I think, why it was

13       new.

14            MR. AYAR:  It was very difficult to enforce

15       before, because the information was not available

16       with respect to people that had foreign bank

17       accounts.

18            MS. HERVEY:  Yeah.

19            MR. AYAR:  Okay, good.

20  BY MR. AYAR:

21       Q.   I want to go back.  You said Terry indicated

22  that you are not allowed to give quiet disclosure people

23  less than 50%, or a better deal than what's in OBDI.  I

24  want to understand what you mean by "quiet disclosure."

25            I know you said that it refers to people who

Page 130

1   amend their returns and add the interest income and do

2   it outside of the OBDI program.  Right?

3       A.   Yes.

4       Q.   Do you know why they call it "quiet

5   disclosures"?

6       A.   Because they didn't come forward the way that a

7   program -- they didn't do a voluntary disclosure.

8       Q.   They didn't do a voluntary.  Do you know why

9   the service takes an aggressive position with those

10  taxpayers?

11      A.   I feel like I should know.  No.

12      Q.   Do you think that by using the word "quiet

13  disclosure" what they're really referring to is

14  taxpayers who try to do things sneaky and not draw

15  attention to themselves?

16      A.   Hum.

17           MS. HERVEY:  I'm going to say it calls for

18      speculation.

19           THE DEPONENT:  I think I can say, "Yes" but

20      also "No."  I don't know.

21  BY MR. AYAR:

22      Q.   Said handed, told his agent about the bank

23  account.  What was quiet about that?

24      A.   He didn't tell her about the other account.

25      Q.   I see.  Was that other account open in any of

1    the years that she was examining?

2        A.    No.

3        Q.    No.  Because she didn't examine the 2008 year.

4        A.    That's true.

5        Q.    Right.  Do you think it was relevant to her

6    exam whether or not he opened another account?

7        A.    Relevant to that exam?  To that year?  No,

8    except that when we're examining a taxpayer, we look for

9    full compliance.

10       Q.    I see.

11       A.    You have to ask her, but ...

12       Q.    Yeah.  Now, you said that -- you testified that

13   when you got the 2009 return, rather than the -- The

14   amended return I'm referring to.  I'm sorry -- rather

15   than claim all the money that he made in the UBS

16   account, he only claimed a small portion of it.

17       A.    I don't know if that was amended.  I think -- I

18   think maybe the 2009.

19       Q.    It might have been the original return.

20       A.    I think so.

21       Q.    It might have been.  Okay.

22       A.    I don't remember.

23       Q.    You say that he only claimed a small portion of

24   all the money he made offshore.  Do you know who

25   prepared that return?

1        A.    Mr. Gavel.

2        Q.    Mr. Gavel.  Do you know if Mr. Gavel held

3   himself out as an expert on these matters?

4        A.    I have no idea.

5        Q.    Do you know if Mr. Gavel had the information

6   necessary to determine the appropriate amount of taxes

7   for 2009?

8        A.    Yes.

9        Q.    He did?

10       A.    Yes.

11       Q.    All right.  So Mr. Gavel, who --

12       A.    Let me go back.  I have to say "No."  I don't

13   know.

14       Q.    You don't know?

15       A.    Based on the fact that he had a beginning and

16   an ending, he would have had the bank statements to come

17   up with the amount.

18       Q.    But he would have had the information and know

19   that it was more than 34,000.

20       A.    Here's the thing, though.  You're saying that

21   in 2009 it was more than 34,000.  What I said was over

22   the course of the years.

23       Q.    Oh, yeah.  That's what I mean.  Over the course

24   of the years, it was much more than --

25       A.    I don't remember what the right amount was for

Page 133

1    2009.

2        Q.   Now --

3        A.   It could have been less than that.

4        Q.   But you are somewhat of an expert on income tax

5    laws, right?

6            MS. HERVEY:  I'm going to object, because

7        she's not a lawyer.

8            THE DEPONENT:  I'm not, actually.  I'm not

9        at all.

10   BY MR. AYAR:

11       Q.   Based on your understanding of how income taxes

12   work, when a taxpayer files a return for a year, say

13   2009, are they supposed to report just the income they

14   earned in that year or the accumulation of income from

15   prior years as well?

16       A.   PFIC has me a little confused.

17       Q.   With PFIC, it's reported on the current-year

18   return and there's a throwback tax and the income --

19       A.   Right, whether they sell it or not.

20       Q.   But the capital gain occurs in the year of the

21   taxable, but then the taxes are attributed to prior

22   years.  It's very --

23       A.   Aside from PFIC?

24       Q.   Yes.

25       A.   Aside from PFIC.  Aside from that, I'm going to

1    say you're right.

2        Q.   So when Said said that, or Mr. Gavel or

3    somebody said that Said's understanding was that he was

4    supposed to pay taxes on all his income when he brought

5    the money back, his understanding was wrong; is that

6    correct?

7        A.   So, when he said he was to pay tax on all the

8    earnings --

9        Q.   Yes

10       A.   -- in that account, yeah, that would have been

11   incorrect.

12       Q.   That would have been incorrect.  And the

13   correct way to report the earnings would have been in

14   the year?

15       A.   Each year.

16       Q.   Each year.  And Mr. Gavel would have probably

17   known that, right?

18       A.   I don't know if his card says "Tax Attorney" on

19   it.

20       Q.   It does.  He's actually a professor in a law

21   school that teaches tax.  But -- Okay.

22            So, Mr. Rum's position, or somebody's position

23   was, "we thought that we had to pay all the taxes at

24   once."  Okay.

25            But then when you got the return, they didn't

Page 135

1   pay all the tax, right?

2           But the person who prepared the return is a tax

3   expert who would have known that he's not supposed to

4   report all the tax.

5           MS. HERVEY:  I'm going to object.  There's

6       no evidence that Mr. Gavel was a tax expert.

7       There's really no evidence as to his

8       qualifications.  His deposition is upcoming.

9           MR. AYAR:  Okay, that's fine.

10  BY MR. AYAR:

11      Q.  So --

12      A.  Here's the thing, though.

13      Q.  Yes.

14      A.  Ultimately Mr. Rum would have looked at the

15  return and signed it, and there's a big difference

16  between 40,000 and 400,000.

17      Q.  Right.  Assuming 40,000 was the actual income

18  earned in 2009, 40,000 would have been the right number.

19      A.  But that's not what he had said he did.

20      Q.  Did he tell you that before the return was

21  filed, what he understood?  When did he tell you what he

22  understood?

23      A.  It would have been after.  Yeah, it would have

24  been after.

25      Q.  And he told you that he still understood that,

Page 136

1    or that's what he thought back then?

2        A.    That that's what he was told originally.

3        Q.    Originally.  Okay.

4              But it's possible that maybe Mr. Gavel

5    corrected him at the time that they were preparing the

6    2009 return.

7              MS. HERVEY:  Objection, calls for

8         speculation.

9              THE DEPONENT:  I don't know about that.

10        Because I seem to remember reading somewhere

11        where I asked Mr. Gavel where he came up with

12        those numbers, and he said he had no clue.

13             MS. HERVEY:  Great.

14             MR. AYAR:  Okay.

15   BY MR. AYAR:

16        Q.    You also testified that Mr. Rum did not make

17   things right, quote, unquote, "fully."  What do you mean

18   by that, "fully make things right"?

19        A.    He didn't go back and pay the tax on all those

20   years.  He didn't pay the tax on that $400,000, and he

21   didn't file the FBARs that he was required to file.

22             Still hasn't.  When I closed the case, he still

23   hadn't.  Sorry.

24        Q.    So he didn't pay the tax on that $400,000.  But

25   you made the changes to the return, so you verified that

1    he paid the correct amount of tax for the years that you

2    examined.  Is that correct?

3         A.   Yes.

4         Q.   Yes.

5         A.   Yes.

6         Q.   You also testified that your 50% recommendation

7    was not punishment for his failure to agree.  Okay.  You

8    don't strike me as a vindictive person.  You don't

9    strike me as somebody who would punish Mr. Rum that way.

10   So I'll take your word for that.  But I do want to

11   understand exactly what you were thinking.  So if we can

12   go back to that letter.

13             MS. HERVEY:  Which one?

14             MR. AYAR:  I think it's -- Let me find it.

15        It was the letter dated June 13th.

16             MS. HERVEY:  It's her letter?

17             MR. AYAR:  Yes, it's her letter.

18             MS. HERVEY:  Do you have a number on it?  I

19        have a June 11th letter.

20             MR. AYAR:  Yeah, that one.

21             MS. HERVEY:  Number 16.

22             MR. AYAR:  Thank you.

23   BY MR. AYAR:

24        Q.   Let's go back to Paragraph 7.  So, your

25   testimony was that you did not punish him for failing to

1  agree.  How would you characterize your reasoning for

2  changing your mind from 20% to 50%?

3          MS. HERVEY:  I'm going to object, asked and

4      answered.  But go ahead.

5          THE DEPONENT:  It really -- It didn't have

6      anything to do with him not agreeing to the fraud

7      penalty.

8              I couldn't -- I couldn't have ever

9      applied a 20%.

10  BY MR. AYAR:

11      Q.   You couldn't have.  Based on your letter, you

12  represented to him that it did have something to do with

13  his failure to agree, correct?

14      A.   Yes.

15      Q.   So you were lying to him?

16      A.   No.  No.  Because when it says, "Unfortunately

17  an unagreed income tax case will bar me from anything

18  less than 50%."

19      Q.   So the unagreed income tax case did have

20  something to do with the 50% penalty.

21          MS. HERVEY:  I'm going to object again.  I

22      think she answered that question before.  But go

23      ahead.

24          THE DEPONENT:  I can't tell you what I was

25      thinking at the time.  I mean, I can agree with

1      what your interpretation is based on looking at

2      it, but I guess it could be a different

3      interpretation.

4            But I have to go back and say there's

5      nothing else I could have done.

6   BY MR. AYAR:

7      Q.   I understand.  I'm not suggesting you could

8   have.  I understand that you were just doing your job.

9   I'm not suggesting anything otherwise.

10     A.   You know what?  I think I looked at it and I'm

11  trying to remember.  All I can do is say, "Well, maybe

12  this happened," and then I read something else and I

13  say, "Well, no, maybe this happened."  And then I

14  realize I don't remember.

15     Q.   Okay.

16     A.   I'm just -- And I'm doing it even with you, you

17  know.  You're asking me this and, "Oh, that could have

18  been it."  I don't know.

19     Q.   Do you ever remember giving Mr. Rum an

20  explanation, besides the 886 we referred to?  Because I

21  want to look at that.  I want to see what's in that.

22           Without referring to the 886, do you remember

23  ever giving him an explanation as to how the penalty was

24  calculated, other than the explanation that's in that

25  letter, and other than the 886?

Page 140

1      A.   No, I don't recall doing that.

2      Q.   Okay.  So if you ever did explain to him why

3  the penalty was applied at 50% as opposed to some other

4  number, it would be in the 886?

5      A.   Yes.

6      Q.   Okay.

7      A.   Yes, the conclusion would be.

8      Q.   Right.  We'll have to look at that.  And I

9  don't need to look at it now.

10          MR. AYAR:  I think that about wraps up my

11      questions.

12          MS. HERVEY:  Okay.  I just have one.

13                  RECROSS-EXAMINATION

14  BY MS. HERVEY:

15      Q.   I want to just go back to -- You testified

16  about the fact that the Arab bank wasn't disclosed to --

17      A.   Denise.

18      Q.   -- Denise.  Do you recall the year that she had

19  under exam?

20      A.   2006.

21      Q.   So Mr. Rum's bank statement for 2008 with

22  respect to the Chase bank account and the UBS bank

23  account would not have been relevant to 2006, correct?

24      A.   Correct.

25      Q.   So the absence of the Arab bank return for that

1    same year --

2        A.    That's right.

3        Q.    -- is evidence that Mr. Rum continued to be

4    willful, correct?

5        A.    Yes.

6        Q.    Yes?

7        A.    Yes.

8            MS. HERVEY:   That's it.   We're done.   Are

9        you going to order it?

10           MR. AYAR:   I don't know what you mean.   Yes,

11       we need the transcript.

12           MS. HERVEY:   And I will have a copy.

13           (Said deponent wished to read and sign the

14       deposition, and the taking of this deposition was

15       concluded at 12:38 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 142

1                    CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4

5    COUNTY OF PINELLAS

6

7

8               I, the undersigned authority, certify that

9    MARJORIE KERKADO personally appeared before me on June

10   7, 2018, at 9:17 a.m., and was duly sworn.

11              WITNESS my hand and official seal this

12   7th day of June, 2018.

13

14

15

16

17

18              Jerry P. Lefler RPR CRR CM
                Notary expires May 17, 2022
19

20

21

22

23

24

25

Clark Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    5dd9fa86-0ee0-428a-b1ca-00e32689ea85

Page 143

1                CERTIFICATE OF COURT REPORTER

2

3     STATE OF FLORIDA

4

5     COUNTY OF PINELLAS

6

7         I, Jerry P. Lefler, Court Reporter, certify that I
      was authorized to and did stenographically report the
8     deposition of MARJORIE KERKADO; that a review of the
      transcript was requested; and that the transcript is a
9     true and correct record of my stenographic notes.

10        I FURTHER CERTIFY that I am not a relative,
      employee, or attorney, or counsel of the parties, nor am
11    I a relative or employee of any of the parties'
      attorneys or counsel connected with the action, nor am I
12    financially interested in the action.

13        DATED this 7th day of June, 2018.

14

15

16

17

18

19

20       _____

21       Jerry P. Lefler RPR CRR CM

22

23

24

25

Clark Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    5dd9fa86-0ee0-428a-b1ca-00e32689ea85

Page 144

1    PLEASE ATTACH TO THE DEPOSITION OF: MARJORIE
     KERKADO TAKEN ON JUNE 7TH, 2018, IN THE CASE OF UNITED
2    STATES OF AMERICA VS SAID RUM

3                        ERRATA SHEET

4

          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
5    _____

     Page No.    Line No.    Change            Reason
6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

     Under penalties of perjury, I declare that I have
19   read the foregoing document and that the facts
     stated therein are true.
20

     _____
21   DATE                              MARJORIE KERKADO
                                        (060732018mk)
22

23

24

25

Page 145

1                    CLARK REPORTING SERVICE
         Joseph Garcia International Center, Suite 303
2                    1101 Channelside Drive
                     Tampa, Florida 33602
3                    (813) 229-3332

4                                        June 15, 2018

5   MARY APOSTOLAKOS HERVEY, ESQ.
    U.S. Department of Justice
6   Tax Division
    P.O. Box 14198
7   Washington, DC 20044
    Mary.apostolakos.hervey@usdoj.gov
8
    RE:  United States of America v. Said Rum
9
    Dear Ms. Hervey:
10
    Please be advised that the transcript of the
11  above-referenced deposition has been completed and is
    available for reading and signing.  Please contact our
12  office at (813) 229-3332 to make arrangements to do so.

13  You need to respond within 30 days of your receipt of
    this notice or prior to any trial or final hearing date.
14
    The original of this transcript has been forwarded to
15  the ordering attorney, and your executed errata sheet or
    waiver, once received, will be forwarded to all ordering
16  parties.

17                            Thank you,
                              Clark Reporting Service
18                            Production@clarkreporting.com

19

20

21

22

23  _____      _____

      Marjorie Kerkado                        Date
24

**A**

a.m 1:16 142:10
abandoned
66:22
ability 100:19
100:21 102:6
able 45:23
112:18
above-referen...
145:11
absence 117:22
140:25
absolutely 42:14
42:15 91:14
acceptance
63:22
accepted 66:17
accident 114:5
account 23:24
50:24 55:24
107:5,5,10
108:8,13,21
109:19 110:6,8
110:22 111:12
111:17 112:22
113:5,22,22
114:17 115:9
127:4 130:23
130:24,25
131:6,16
134:10 140:22
140:23
accounts 51:8
51:14,19
102:22 111:3,7
112:17,20
129:17
accumulation
133:14
accuracy 6:8
121:20 123:8
123:13
accuracy-rela...
64:25 65:6
121:24
achieve 22:3
Act 7:9 11:21
36:5 78:21

128:9 129:1
action 143:11,12
activities 6:9
16:5
activity 3:17 4:5
4:12 10:18
30:22 44:16,17
44:24 45:9,12
45:22 46:1,16
46:18 47:6,8
47:14,22 51:23
53:11 61:25
70:17 73:9,17
78:15 81:1,5
94:18 95:1,20
97:9,10,13
101:11 114:1
127:24
actual 112:25
127:23 135:17
add 48:7 130:1
added 48:8
addition 74:24
additional 48:7
111:18
address 82:2
addressed 70:19
81:19
adduced 5:3
adjustment
74:23
adjustments
27:20 75:1
79:25
admitting
113:21
advised 104:18
145:10
advisor 39:2,4
affairs 87:3
afforded 24:2
108:17
afternoon 41:12
43:21
agent 5:17,19
12:7 14:4,5
16:17 17:17
50:24 51:1

72:20 74:18
88:25 104:22
120:17 130:22
Agent's 75:13
75:21 79:2
agents 36:10
aggressive 130:9
ago 7:10 26:24
27:3 42:18
60:11 128:3,4
agree 12:25 16:7
17:4,21 18:11
27:13,21 28:6
71:13 75:22
76:6 78:10
82:24 83:9
92:18 102:15
102:17 103:4
103:14 104:2
105:6 117:17
122:7,11,14
123:2,7,17
137:7 138:1,13
138:25
agreed 60:2,16
60:24 82:13,14
82:19 83:4,5
92:15,21,24
117:12
agreeing 60:3
76:2 82:21
83:3 116:3
138:6
agreement
62:18 63:8,14
70:14,22 76:4
76:10,18 77:3
78:8 83:17
87:19 102:16
103:1,22 111:1
116:20 117:4,5
117:7,11
122:13
agrees 32:6
ahead 14:25
15:3 17:1
18:24 28:3
51:10 52:12

74:22 81:9
119:25 122:17
122:22 138:4
138:23
aid 56:16
Allen 77:10
allocate 56:5
allowed 32:17
65:16,18 91:18
94:1 106:18
129:22
alter 116:24
amend 130:1
amended 56:14
56:15 57:21
58:11 61:11,15
63:8,16 73:10
74:8,21 102:12
107:3,6,12,14
113:8 131:14
131:17
America 1:3
144:2 145:8
amount 23:7,16
25:13,17 56:2
69:7 75:9 89:7
89:18,24
100:22 106:12
115:18 125:1,8
126:16 127:10
132:6,17,25
137:1
analyzed 62:5
and/or 50:15
answer 18:24
20:15 25:24
41:18 52:12,23
53:6,7 64:17
87:4 89:1
119:25 122:18
answered 22:11
138:4,22
answering 93:2
anybody 85:18
89:5 104:13,19
113:13
anymore 18:16
63:2 91:3 93:8

125:15
anyway 45:18
apologize 48:17
APOSTOLA...
2:2 145:5
Apparently
98:21
Appeal 67:6
appealing 92:2
appeals 65:23
67:7 80:4
91:25 92:1
appear 82:4
APPEARAN...
2:1
appeared 142:9
appears 34:9
36:6 43:19
45:5 50:2
54:13 74:4
80:10 82:6,24
121:18
applicable 22:12
26:6
application
108:22
applications
109:9
applied 64:7
66:7,15,16
84:13 89:17,18
121:16 123:16
138:9 140:3
apply 45:2
appropriate
10:7 23:17
24:4 25:13,17
26:3 44:2,7
48:25 69:2,4
71:17 72:1,24
86:19,21,25
88:9,24 126:16
132:6
approval 32:5
39:7
approve 39:6
approved 39:9
approximately

13:24,25
**April** 4:7,9 50:2
  50:3 58:22
  68:10 69:23
  70:13,17 71:10
  71:15,22,22,25
  72:23 73:2,19
  73:20 74:4,14
  74:16 77:16
  78:4 119:15
**Arab** 110:3
  140:16,25
**archives** 119:13
**area** 66:22
**arrangements**
  145:12
**aside** 12:2
  133:23,25,25
**asked** 4:13
  13:20 17:9
  22:11 48:16
  108:14,17,19
  109:4 116:2
  118:10 126:21
  126:23 136:11
  138:3
**asking** 22:14,15
  28:18 53:4
  94:14 98:9,11
  103:22 106:13
  139:17
**asks** 113:4
**Asma** 4:8,10
  81:20
**asserted** 21:23
**assertion** 22:2
**assess** 126:4
**assessed** 107:23
**assessment**
  16:21,24 85:13
**assets** 109:8,8
**assigned** 7:12
  8:18 13:19,19
  13:23 14:1
  18:14 33:13
  105:23
**assist** 12:17
**associate** 33:6

**associating**
  71:19
**assumed** 85:9
**assuming** 9:20
  80:25 81:25
  135:17
**ATTACH** 144:1
**attached** 59:23
**attention** 30:3
  118:15 130:15
**attorney** 1:14
  26:10 134:18
  143:10 145:15
**attorneys**
  143:11
**attributed**
  133:21
**audit** 7:25 10:20
  31:6 50:23
  95:21,25
**audited** 51:1
**auditor** 5:23
  14:9 61:1
**August** 3:16,17
  7:11 8:1
**AUSA** 12:18
**authentic** 11:18
**authenticate**
  7:15 10:10
  78:22
**authentication**
  28:2
**authenticity**
  119:24
**authority** 66:10
  66:12 68:22
  100:14 105:25
  106:6,12
  123:25 124:4
  142:8
**authorized**
  88:25 117:20
  143:7
**auto-populated**
  56:1
**automatically**
  66:7 127:1
**available** 46:1

52:1 55:9 90:6
90:22 104:12
129:15 145:11
**aware** 21:21
  104:18 105:9
  106:11,14
  108:10 110:16
  117:25
**awesome** 55:6
  62:1
**Ayar** 2:7 3:3,5
  5:7 6:24 7:2,6
  7:7,17,19,24
  10:3,5,13,14
  13:6,8,17 15:1
  15:4,7,24 17:2
  17:3 18:25
  19:1 20:13,16
  20:18,19 22:14
  22:19,21 24:9
  24:13 25:22,23
  26:8,13,17,22
  28:5,18,22,23
  29:6,16,18
  30:18,20,25
  31:2,4,15
  32:11,13,22
  33:1,18 36:1,3
  36:20 37:5
  39:18,24 41:16
  41:21,23 42:1
  44:20,23 46:5
  46:8,17 47:4
  49:4,7 51:12
  51:17 52:15
  53:18,19 54:2
  56:11 58:24
  59:2 64:16
  67:3,15,18,22
  67:24 68:6,9
  68:13,15,17,23
  68:24 70:10,11
  72:4,16 74:1,2
  76:13,15 77:2
  77:6,14,15
  80:13,16,23
  81:13,15,18
  87:7 89:3,12

91:7 92:6 93:3
94:23 95:5,10
95:17 97:1
100:6 103:11
115:16,19,24
116:2 118:2,4
118:13,20,22
119:2,10,19,20
120:1,6,11,13
120:15,18,20
121:3 122:19
123:1 128:17
128:21,24
129:2,6,11,14
129:19,20
130:21 133:10
135:9,10
136:14,15
137:14,17,20
137:22,23
138:10 139:6
140:10 141:10

━━━━━━━ **B** ━━━━━━━

**B** 3:13 4:1 107:4
  108:13 113:1,3
  113:21
**back** 5:18 7:9
  12:3,13 13:13
  14:21 21:2,8
  25:16 30:21,23
  31:2 34:24
  43:12 47:5
  51:8,23 52:24
  60:25 61:18,19
  67:5 69:14,16
  71:9 73:21
  75:22 77:9,18
  77:22 78:8
  79:1 85:13
  91:20 93:20
  98:10 99:19
  109:16 110:19
  119:6,12,22
  120:2 122:19
  129:21 132:12
  134:5 136:1,19
  137:12,24

**139**:4 140:15
**backwards** 56:5
**bad** 14:18
**balance** 121:19
**bank** 38:7 50:24
  51:7,14,19,20
  61:3,8 101:12
  101:13 110:3,8
  112:17,20,22
  128:9,25
  129:16 130:22
  132:16 140:16
  140:21,22,22
  140:25
**bar** 84:8 138:17
**bargaining**
  27:19,22 28:7
  28:13,15 29:1
**barred** 61:16
  84:11
**bars** 14:16
**based** 8:2 9:12
  14:25 16:12
  17:9 18:4 43:7
  44:8,11 47:7
  47:11 61:6
  64:19,19 65:8
  71:11 73:4
  82:14,24 83:4
  83:13 88:20
  91:9 92:22
  93:10 96:14
  98:12 102:13
  116:24 121:23
  125:9,18
  126:12 127:9
  132:15 133:11
  138:11 139:1
**basically** 12:17
  16:16 48:5
  93:23 98:9
**basis** 16:25
  84:10
**began** 31:9,17
  31:22
**beginning** 8:6
  8:10 96:8
  132:15

begins 31:20,23
begun 34:11
belief 109:10
beliefs 102:5
believe 17:15
  23:12 24:15
  28:25 30:22
  47:7 49:9,16
  81:23 87:13
  89:19 91:3,9
  92:2,23 101:15
  108:1,2 118:10
  123:12,25
  124:25 125:4
believed 72:23
bell 37:19 38:24
  127:14
best 91:13,17
  126:9
better 86:4,7
  106:20 126:2,5
  129:23
big 55:8 78:23
  135:15
binding 105:12
  127:17
bit 51:24 53:13
  75:6 78:25
  111:21
blame 59:20
  65:9
board 122:1
bottom 34:8
  40:4,11,16
  43:22 50:22
  69:17,18 72:17
bought 54:25
box 2:4 113:17
  145:6
break 39:21
  81:12 118:19
bring 41:4
bringing 110:18
  111:15
broad 86:25
brought 68:2
  109:15 134:4
bunch 36:9

Business/Self-...
  16:2
buys 55:23

**C**

C6 35:3
calculated
  139:24
call 19:13 40:25
  56:24,25 57:3
  57:8 69:18,21
  69:23,25 70:17
  71:10,12,16,21
  74:5 130:4
called 102:19
  107:24 108:24
  119:12
calling 29:14
calls 64:15 89:8
  93:1 130:17
  136:7
capacity 6:4
capital 54:6
  133:20
card 134:18
carefully 82:11
carry 19:21
carrying 19:15
case 1:5 3:18 6:2
  6:12,13 7:10
  9:6,8,14,16,16
  21:1 23:25
  25:18 26:3
  28:17 30:13
  32:7 33:12
  34:3 35:2
  36:14,15 37:6
  37:11,15,23
  38:16,17 40:2
  42:10,25 43:3
  43:18 44:8
  46:2,3 47:20
  47:21 48:2,3
  48:10,12 49:9
  49:18,25 50:10
  50:14 53:2
  60:11 73:8
  79:4,10 80:3

82:14 83:5,5
  84:2,3 85:14
  85:19 87:17,18
  87:25 88:14
  91:21 96:14
  97:5,15 98:14
  101:8 103:5
  105:3 107:2
  111:23,24,25
  112:2,14
  116:25 117:20
  120:22 123:17
  127:3,22
  136:22 138:17
  138:19 144:1
cases 9:7,7
  12:24 14:3
  18:10,14 35:4
  35:5 38:2,10
  38:11,12,13,14
  38:16 39:6
  42:19 57:5
  60:10 84:17,20
  86:9 87:13,16
  87:16,17 90:12
  90:13,19 93:8
  93:21 96:4
  98:3,14,16,25
  99:1,2,4,5
  105:23 111:22
  112:4 123:11
Cassandra
  37:19 40:6
  42:8,24 43:2
caught 101:11
cause 94:4
Center 1:23 2:8
  145:1
central 87:25
certain 15:6
  56:1 102:14
  111:1
certainly 43:17
  109:8
Certificate 3:7,8
  142:1 143:1
certify 142:8
  143:7,10

CF79 11:22
chance 59:3
  81:20 118:14
Change 144:5
changes 82:8
  92:15 105:6
  123:8 136:25
  144:4
changing 138:2
Channelside
  145:2
characterizati...
  16:8
characterize
  138:1
charge 65:9,16
  65:18 66:11
  84:17,19 85:18
charged 66:1,13
  67:10
charging 84:11
chase 18:5
  140:22
check 81:2
  94:13 113:17
checked 113:7,9
chose 66:18
CI 12:17 107:13
circumstances
  23:25 88:8,11
  106:10,15
  126:3,4
civil 3:23 92:19
claim 131:15
claimed 131:16
  131:23
Clark 1:23
  145:1,17
clear 45:13
  47:20 105:25
  118:5 123:21
clearing 53:10
client 60:24 62:7
  77:17
close 48:2 87:18
  93:24 94:1
closed 46:2,3
  47:20,21,21

48:10,12 61:16
  111:11 117:3
  136:22
closing 37:11
  87:19 102:15
  111:7 115:20
clue 136:12
CM 1:22 98:10
  142:18 143:20
code 11:22
  87:17 93:15,18
  93:20 94:5
college 108:16
  108:17,25
  109:1
Columbus 1:17
come 78:7 82:13
  82:19 101:21
  102:10 106:3,6
  130:6 132:16
comes 106:2
coming 110:19
  129:5
commit 18:5
commonly
  102:8
communication
  116:2
communicatio...
  6:14,17 16:16
company 54:7
complete 61:10
  63:16 74:7
  75:11 83:17
completed 54:14
  83:8 95:25
  145:11
completely
  42:19 82:14
  83:4,5 92:24
completing 62:9
complex 17:25
  18:4 122:17
compliance 16:1
  21:23 22:4
  112:18 131:9
complicated
  55:19 57:12

comply 63:6
compound
  13:22
compounds
  90:24
compromise
  67:13
computed 89:24
computer 37:13
concealed 109:8
  109:9
concealing
  109:7
concern 53:12
concerned 80:19
concluded 69:7
  141:15
conclusion
  29:15 48:18
  50:15 85:8
  89:23 140:7
conclusions 80:1
conducted 8:19
  21:8,15 22:5
  28:12,24 29:22
confirm 24:17
  92:4
confuse 70:5,6
confused 70:7,8
  111:21 117:2
  133:16
confusion 34:25
  105:15,19,20
connected
  143:11
consider 21:25
  22:7 26:2 88:7
  89:25
considerable
  75:9
consideration
  29:21
considered
  25:13 69:1
considering
  43:23,24 44:4
  44:5 49:3
contact 8:7,8,8

9:21 145:11
contain 97:14
contained 47:13
contents 6:16
continuation
  45:6
continue 40:7
  60:14 61:24
continued 141:3
continuing
  40:12 62:18
control 33:9,22
  35:2,6,7 37:6,8
  93:8,10
controlled 35:1
controlling
  35:14 37:12
conversation
  50:9,17,18
  106:16
converted 56:12
convinced 69:11
cooperate 62:15
  78:7
Coordinator
  96:3,12
copies 7:6
copy 7:4 13:3
  26:9 30:8
  46:23 47:18
  141:12
core 17:16,19,21
corner 50:1
  119:14
correct 8:6,20
  9:22 12:11
  23:14 29:19
  33:13 36:7
  38:18 39:14
  52:16 58:22,23
  61:11 63:16
  72:24 73:14
  75:22 84:4
  101:25 103:16
  108:5 110:3
  111:19 112:8
  112:14 113:5
  113:15 114:11

114:19 123:10
  123:12,18
  124:2,5 134:6
  134:13 137:1,2
  138:13 140:23
  140:24 141:4
  143:9
corrected 59:23
  136:5
correctly 33:11
corresponds
  81:4
counsel 2:6,10
  66:22 67:5,7,8
  67:8,16 126:8
  143:10,11
COUNTY 142:5
  143:5
couple 40:10
  51:22 57:16
  79:22 94:19
  99:11
course 10:20
  17:11 26:17
  57:5 81:13
  132:22,23
court 1:1 3:8
  26:10 39:20
  67:13,20 143:1
  143:7
cover 97:6
covers 8:14
criminal 12:17
  12:18,24
cross 100:5
Cross-Examin...
  3:4 100:10
CRR 1:22
  142:18 143:20
current 15:16
  87:3
current-year
  133:17
Currently 96:3

_____ D _____

D 3:1
D.C 87:25

database 33:7
date 1:15 14:25
  15:14 20:9
  34:8 50:1,5
  119:17 144:21
  145:13,23
dated 3:16 7:11
  47:1 71:15
  77:16 79:24
  80:8 81:4,19
  116:11 137:15
  143:13
Davis 4:3 36:6
  85:23 106:23
  117:19 123:25
day 54:25 57:25
  58:1,2 65:25
  71:16 73:21
  74:9 83:6
  120:8 142:12
  143:13
days 54:24,25
  54:25 75:7,9
  79:22 145:13
DC 2:4 145:7
deadline 52:10
  101:25
deal 24:18 78:24
  86:4,7 91:13
  91:17 104:1
  106:19 129:23
deals 19:8
Dear 145:9
Debbie 95:14
  96:2,24 97:18
  97:19
decades 128:4
December 92:12
decided 35:6,12
  44:1,2,6 73:3
  74:22
decision 44:10
  44:14 48:23,24
  68:22 72:9
  94:15 103:12
decisions 100:14
declare 144:18
deducing 60:21

Defendant 1:7
  1:14 2:10
defendant's 6:1
  10:1 18:20
Definitely
  100:16
delinquent 22:2
demonstrate
  27:11
Denise 51:5,14
  61:3 101:12,13
  110:6,19
  140:17,18
Department 2:3
  145:5
depends 34:4
deponent 5:3
  7:18,22 13:12
  15:5 26:7,21
  28:4 32:12,21
  36:13,17 37:3
  46:15 49:1
  51:11 52:13
  67:2,16 70:8
  72:14 87:5
  89:2,10 91:4
  93:2 95:2
  96:24 115:17
  115:21 119:8
  120:23 121:1
  122:24 130:19
  133:8 136:9
  138:5,24
  141:13
deposition 1:12
  10:6 16:14
  18:23 52:9
  101:20 128:19
  135:8 141:14
  141:14 143:8
  144:1 145:11
deposits 109:22
derives 16:3
describe 46:13
  46:18 102:8
describes 17:16
  19:21 30:6
deserved 88:22

**designated**
16:15
**desired** 22:3
**detail** 60:12
105:17
**detailed** 40:13
**details** 53:12
82:4
**determination**
25:21 66:2
100:22 124:1
126:16,24
**determinations**
27:23 28:8
**determine** 21:13
66:6 88:8
126:3 132:6
**determined**
25:17 68:19,25
69:2 89:7
**determining**
23:7 24:4
25:13 26:3
86:25
**develop** 17:19
**Development**
3:19
**difference**
135:15
**different** 17:10
27:24 28:4
36:10 71:6
83:12 139:2
**differently**
122:22
**difficult** 37:17
129:14
**Direct** 3:3 5:6
**directed** 16:2,9
17:5
**disagreed** 91:23
**disagrees** 79:25
**disc** 38:5
**disclosed** 50:24
51:14,18 110:6
110:7 112:22
140:16
**disclosing** 107:9

**disclosure** 61:1
61:7 62:23
64:2,7,13,22
64:25 65:7
72:20 77:19
106:19,25
107:3,15,16,19
129:22,24
130:7,13
**disclosures**
111:2 130:5
**discovery** 106:5
**discretion** 21:25
23:6,12,15,19
23:24 24:2,3
25:7 86:13,22
86:25 87:9,12
105:25
**discussed** 70:13
76:5,8
**discussion** 46:7
70:21,22 76:14
95:8 100:9
**disk** 43:1,2
**DISTRICT** 1:1
1:1
**dive** 31:12
**Division** 1:2 2:3
16:2 145:6
**document** 7:8
7:16,21,23
10:4,8,11,15
10:22 13:10
14:21 16:23
19:12 22:15,23
27:2,7 28:2,2
29:23 30:15
31:9,16 33:12
35:9,13 36:4
36:12 50:25
59:7,8,9 67:20
71:22 72:7,11
75:20 80:24
93:13 95:18
116:14 118:10
118:25 119:11
121:11 144:19
**documented**

73:17
**documents**
16:20 38:15
49:10 50:20
92:9 96:16
**Doe** 111:2
**doing** 14:2 54:14
62:3 63:4
68:11 98:8
99:18 105:21
107:11 115:4
139:8,16 140:1
**dollar** 87:21,22
**dollars** 127:3,11
**double-checks**
96:17
**draw** 130:14
**Drive** 1:17 145:2
**due** 101:17,19
102:21 107:18
**duly** 5:4 142:10
**duties** 19:15,22
22:16

---

**E**

**E** 3:1,13 4:1
**earlier** 72:5
74:19
**early** 33:24,25
**earned** 109:23
133:14 135:18
**earnings** 134:8
134:13
**easier** 62:6
**educate** 9:1
**effect** 15:18
17:15 24:16
**eight** 61:17,22
**either** 16:4
65:21 125:6
**eligible** 104:7,10
104:14 114:9
115:5
**email** 4:3,4,7
35:21,22 36:6
36:21,25 40:2
40:5 41:2,8,11
42:2 43:5,21

43:22 47:23
49:2 57:17
58:18,22,24
59:10 64:19,20
68:10 73:21,22
73:24 77:10,16
78:1,4 118:11
120:4,10,15
121:5
**emailed** 26:25
**emails** 45:25
**employee** 19:17
143:10,11
**enacted** 15:12
**enclosed** 70:14
70:23,24
**ended** 53:6
**enforce** 129:9,14
**enforcement**
12:8,16,19
**ensure** 112:18
**entail** 6:5
**enter** 64:12
144:4
**entire** 15:19
55:24 121:12
**entitled** 27:13
98:2
**entries** 57:16
73:11 75:7
79:3,5 95:12
**entry** 51:25
53:21,24 54:3
54:13 56:22
58:1,9 69:18
74:16 79:7
80:7 97:2
**equal** 64:21
106:19
**equity** 88:21
**ERCS** 33:7,7
**errata** 3:9 144:3
145:15
**ESQ** 2:2,7 145:5
**establishes**
124:21
**event** 117:14
**everybody's**

123:21
**evidence** 28:16
66:25 98:12
111:18 113:18
125:20 127:24
135:6,7 141:3
**evidentiary**
114:2
**exact** 77:25
**exactly** 98:8
103:19 105:21
106:8 137:11
**exam** 6:6 7:3
8:23,23,24
9:21,22 15:15
21:2,8 28:12
32:6 33:6
34:11,13,14
80:18 82:8
92:15,24 98:12
104:11 106:9
123:8 131:6,7
140:19
**examination**
1:21 3:3,5,24
5:6 6:21 7:13
8:1,6,15,19 9:6
9:11 15:19
17:15,25 21:12
21:15 22:6
24:16 28:24
29:22 31:9,17
31:20 33:9,12
33:24 46:9
47:8 49:12
51:21 71:2
82:5 83:10
105:16 106:7
118:3
**examinations**
9:11,15
**examine** 131:3
**examined** 6:1
51:2 55:16
125:20 137:2
**examiner** 5:24
5:25 6:5 12:20
12:22 18:18

21:12 23:6,15
25:7 33:6
45:11 126:13
126:15
**Examiner's**
30:22
**examiners** 21:25
23:23 86:24
105:23
**examining** 3:17
4:12 11:7 20:2
47:6 131:1,8
**example** 38:4
121:13,21
**exams** 8:24 9:9
**exceed** 23:16
**exceeds** 18:23
**Excel** 55:23
**excerpt** 118:8
**executed** 145:15
**exercise** 23:24
24:2,3
**exercising** 21:24
**exhibit** 6:25 7:1
9:25 10:1 13:3
13:7,11 18:19
18:20 24:10,12
26:9,12 29:4,5
30:22 32:23,24
36:1,2 39:19
39:23 44:20,22
47:5 49:5,6
53:17,18 58:25
59:1 67:22,23
68:5,7,7 69:14
69:15,16 70:4
71:9,14 73:22
74:1 75:16,17
77:4,5,9,13,14
77:22 79:1
80:15 81:16
92:5 95:9
116:8 118:17
119:6,22 120:2
120:11,19
121:5
**exhibits** 100:2
**exist** 108:2

**existed** 20:5,6
20:10 120:7
**existence** 107:19
112:17 113:21
**exists** 66:6
**expect** 78:10
**expected** 22:6
23:24 75:21
**expensive** 55:1
62:6
**experience** 91:9
96:15 102:25
103:20 112:6
113:25
**expert** 37:22,25
132:3 133:4
135:3,6
**expires** 142:18
**explain** 9:10
19:2 38:9
49:20 90:8
101:7 104:10
108:5,7 109:10
110:15 140:2
**explained** 35:23
89:6 109:14
**explanation**
11:21 63:22
79:19 89:16
139:20,23,24
**extent** 7:15
29:14 48:22
**extreme** 112:12
**eyes** 56:6

---

**F**

**F** 30:4
**F4318** 97:3
**faced** 114:17
**fact** 11:10 50:16
66:25 67:1
77:3 102:4
106:2 108:8
117:4,14
132:15 140:16
**factors** 25:12
26:1
**facts** 23:25

51:13 53:2
65:13 69:7,10
88:7,10 89:22
90:4 107:25
108:2,7 116:25
126:3,4,10,18
144:19
**failing** 137:25
**failure** 30:9 63:6
105:6 113:17
117:17 137:7
138:13
**faint** 62:10
**fair** 16:7 27:14
**fairness** 27:11
88:21
**fall** 101:21
**far** 38:9 49:18
57:11 62:3
108:13
**fast** 53:13 78:25
**favorable** 102:5
**FBAR** 4:5 8:19
8:23 9:6,8,22
18:18 19:9
21:12,13,23
22:5 23:1,3
25:7,13 29:22
31:9,17,19
32:6,18 33:12
34:13,14,25
35:4 38:12,21
38:23 39:7
44:16,17,24
45:3,11,22
46:9 47:8,21
48:6,10 50:11
50:22 52:11
60:18,20,23
79:17 82:14,19
82:21,25 83:10
83:22 84:3,9
85:13 87:1
90:16,21 91:10
92:18 94:25
95:3,20 96:3,4
96:11 98:25
99:2 100:14,20

101:17,18
103:6 105:15
109:12,19
111:22 112:3
113:11 122:9
124:1,21
127:22
**FBARs** 22:2
30:10 37:16
63:24 99:4
108:11 128:1
128:12 136:21
**February** 48:13
**federal** 7:12
9:20
**feel** 11:11 14:18
19:14 31:11
52:5,18 90:8
91:12 130:11
**feels** 14:19
**felt** 48:20 72:22
86:6 88:18
101:10
**few-second**
118:18
**Fifty** 124:12
**figure** 49:21
60:14 68:18,25
69:6 83:7
**figured** 69:7
**file** 11:25 30:9
34:2 36:14,16
43:3 44:8 49:9
60:7 61:15
63:23 93:15,25
96:16 97:5
99:9 108:11
112:11 113:21
114:11 127:22
128:1 136:21
**filed** 91:25 107:3
107:7 112:23
135:21
**files** 9:14,17
40:2 133:12
**filing** 52:11
101:25 107:12

113:14
**fill** 35:9 36:22
37:1,7
**filled** 54:17,20
55:16
**filling** 55:14
**final** 91:25
145:13
**financial** 18:1,4
**financially**
143:12
**find** 55:1 77:2
78:20,22
137:14
**findings** 70:13
117:3
**fine** 34:22 135:9
**finish** 53:25 63:4
65:3 115:23
**finished** 57:2
**first** 5:3 8:8,8
9:5,6 11:6
17:18 19:4
20:20,24,25
21:3,4 31:8
40:5 43:18
54:23 59:5,12
61:21 70:12
80:22 81:10
82:1,12,15
97:21 101:9
111:23,24,25
118:5 127:25
129:8
**FISA** 108:23
**five** 115:7,8
**fixed** 125:1,5
**flip** 121:11
**floor** 23:2
**Florida** 1:1,18
1:24 92:12
142:3 143:3
145:2
**focus** 80:19
**follow** 19:14
61:9 87:14,15
106:1
**following** 42:10

follows 5:5
force 24:7,7
foregoing
  144:19
foreign 54:7,11
  102:22 111:2
  112:17,22
  113:4,21
  129:16
forgetting 97:22
Forgive 34:19
forgot 89:13
form 4:11 8:14
  8:16,17 36:22
  45:4 54:5,8,10
  54:10 62:6,9
  77:1 86:20
  89:14 95:4,4
  98:9 113:1,1
  116:14,17
  117:6
forms 55:19
  56:2
forth 31:3
forward 53:13
  70:4 78:25
  102:11 130:6
forwarded 80:4
  145:14,15
found 55:4
foundation
  28:15,21
four 75:7,7
frame 26:6
  73:16
fraud 17:20 18:6
  18:8,11 39:2,4
  39:7 65:14,17
  65:18 66:3,6
  66:11,20,23
  67:10 68:11
  92:3,19 138:6
free 11:11 31:11
Freedom 7:9
  11:20 36:5
  78:21
freeze 87:17
  93:15,18,20

94:4
Frequently 4:13
  118:10
front 49:5 81:16
  110:19
frozen 87:18
frustrating
  62:14
FSA 108:21
FTA 39:3 40:21
full 62:18 63:8
  63:13 78:7
  102:11 107:15
  113:10 122:12
  131:9
fully 78:6 116:7
  136:17,18
funds 108:21
  109:6,18,20
  110:2,8 111:14
funny 98:7
further 43:6
  143:10
future 22:4
  116:13
FX 55:4

## G

G 30:6
gain 54:6 109:18
  109:25 110:2
  133:20
Garcia 1:23
  145:1
gather 15:8
  126:6,18
gathered 89:22
gathering
  127:23
Gavel 16:17
  42:10 52:5,9
  52:14 73:12
  74:5 77:11,17
  79:24 101:21
  101:23 109:13
  110:5 132:1,2
  132:2,5,11
  134:2,16 135:6

136:4,11
general 14:3
  32:2 98:11
generally 6:17
  8:4 66:9
getting 16:13
  32:16 37:12
  57:3 61:25
  110:18 112:7,9
  128:22 129:7
giant 55:8
give 6:24 9:24
  39:7,19 42:24
  44:20 64:20
  67:22 77:3
  86:7 91:14,18
  94:12,13 102:5
  102:6 105:17
  106:18 129:22
given 86:12,25
  93:11 116:23
  117:23
gives 127:10
giving 89:25
  91:13 139:19
  139:23
glance 80:17
go 9:18 11:11,12
  14:25 15:3
  17:1 18:24
  21:7,11 22:22
  27:16 28:2
  30:21 36:1
  38:6,8 39:18
  39:19 41:8
  43:6 46:5
  51:10 52:1,11
  53:16 57:16
  58:8,10 69:14
  69:16,16 74:22
  74:25 76:11
  77:9,22 81:9
  82:10 91:20
  95:6 96:19
  100:8 103:13
  108:16 109:1
  115:17 116:8
  119:6,25 120:2

122:17,22
  129:21 132:12
  136:19 137:12
  137:24 138:4
  138:22 139:4
  140:15
go-by 43:13
God 56:6
goes 6:11 40:6
  62:12 63:3
  96:17
going 6:24 8:2
  9:24 12:2,3
  13:2 14:24
  15:20 16:12,25
  17:12 18:19,22
  20:12 22:10,11
  22:24 24:5,10
  25:11,19 26:4
  26:9 27:2,6,7
  27:25 28:14
  29:4,13 30:9
  30:11,14,23
  31:2,12 32:8
  32:19,23 36:4
  39:18,19 40:13
  44:21 49:4
  51:9 52:7
  53:13 56:8
  57:22 58:25
  60:25 64:14
  66:24 67:12,22
  68:4,20 69:16
  70:4 71:12
  72:2 73:2,18
  74:7,15 76:6
  77:3,18 79:23
  83:22 87:2
  88:23 89:8
  94:21 96:4,20
  99:12,14 100:4
  103:11 106:8
  107:12,13
  108:20 110:17
  118:13,14
  119:21 122:16
  130:17 133:6
  133:25 135:5

138:3,21 141:9
good 14:9,18,19
  19:24 27:16
  36:24 40:15
  41:21 42:7
  47:18 56:7
  58:5 71:9
  75:10,18 79:15
  129:19
gotten 64:21
  92:25 104:1
government
  72:23 89:6
  111:1 113:14
government's
  67:14
grants 108:18
  109:6
great 23:20
  136:13
greatly 23:16
grounds 25:20
  25:20 28:21
  32:20 119:24
group 5:16 9:7
  12:9 13:23
  14:1 32:4
  36:10,19
guess 9:14 106:2
  119:9 125:18
  139:2
guessing 26:24
  46:15 53:5
  57:21 70:1
  98:22 122:2
guidance 43:13
  85:3,9 86:18
  86:23 105:24
guide 19:18,19
  19:20 22:25
  62:3
guidelines 25:3
  87:14 107:24
  127:5,9
guilty 66:19
guys 14:18
  26:17,19 70:5
  71:16 88:3

**H**

**H** 3:13 4:1
**half** 115:19
**hand** 18:19
  24:10 26:9
  142:11
**handbook** 19:17
**handed** 130:22
**handwriting**
  10:24,25 11:4
  92:13
**handwritten**
  45:6
**handy** 12:3
  69:16
**hang** 121:10
**happen** 42:16
  73:7 99:12,14
  125:12
**happened** 28:16
  31:6 47:23
  51:10,16 73:16
  74:3 79:10,12
  83:21 93:9
  97:21 101:24
  139:12,13
**happening**
  102:9 110:20
**hard** 60:10
**headache** 54:24
**Headquarters**
  37:14 87:19
  88:2 93:24
  94:1 126:8
**heard** 72:10
  98:24
**hearing** 33:11
  145:13
**held** 26:20 31:14
  46:7 47:3
  76:14 81:14
  95:8 100:9
  118:21 132:2
**help** 6:23 8:22
  13:1 56:13
  57:10 62:8
  80:13
**helped** 93:9

**helps** 12:24
**Hervey** 2:2 3:4,6
  7:4,14,21 10:5
  13:5,11 14:24
  15:2,20 16:12
  18:22 20:12,14
  20:17 22:10,18
  22:20 24:5,11
  25:19 26:4
  27:25 28:14,20
  29:13,17 30:14
  30:19,24 31:1
  32:8,19 33:16
  36:12,15,18,25
  41:13,17,22,24
  46:13,24 48:21
  51:9,15 52:7
  53:17 54:1
  56:10 64:14
  66:24 67:12
  68:4,11,14,16
  68:20 70:6,9
  72:2,8 73:24
  76:11 77:13
  80:21 81:12,17
  87:2 88:23
  89:8 91:3,6
  93:1 94:21,24
  95:3,6,15
  96:22 100:4,8
  100:11 115:22
  116:1 118:1,16
  118:18,25
  119:7,18,23
  120:5,9,12,14
  120:16,19,21
  120:25 121:2
  122:6,16,21
  128:16,18,22
  128:25 129:3,7
  129:12,18
  130:17 133:6
  135:5 136:7,13
  137:13,16,18
  137:21 138:3
  138:21 140:12
  140:14 141:8
  141:12 145:5,9

**Hi** 5:8,9
**hide** 87:23
**hiding** 111:20
**highest** 115:11
  121:19
**Hold** 30:4 76:11
**honest** 61:18
**honorable** 14:17
**hook** 68:15
**hope** 104:23
**Hopefully** 118:5
**hoping** 49:20
**hours** 55:7
**huh** 43:16 70:18
  87:12
**Hum** 130:16
**hundred** 27:15
  27:16 123:21
**hurting** 56:6

**I**

**idea** 14:15 32:21
  32:22 67:8
  112:16 132:4
**identification**
  7:1 10:2 13:7
  18:21 24:12
  26:12 29:5
  32:24 36:2
  39:23 44:22
  49:6 59:1
  67:23 77:5
  80:15 92:5
  95:9 118:17
**identify** 17:19
  47:2
**illegal** 16:4,10
**impact** 103:6
**implantation**
  45:8
**important** 19:12
  61:22
**imposed** 27:22
  117:14
**imposing** 79:20
**imposition**
  108:4 117:15
**impossible**

112:19
**improper** 41:14
**improving** 22:3
**inappropriate**
  86:6
**include** 47:24
  103:21
**included** 47:9
**income** 6:1 8:23
  9:21 16:4,10
  38:12 51:2
  54:7,11 65:11
  65:12 66:3
  71:2 80:18
  82:2 83:10
  84:1,2,3 87:24
  91:21 92:15,24
  102:18,21,23
  103:1,5,14
  104:3 105:6
  107:10 108:9
  108:12 109:9
  109:11,12,15
  109:23 122:8
  122:15 123:7
  130:1 133:4,11
  133:13,14,18
  134:4 135:17
  138:17,19
**incomplete**
  58:15 59:14,16
  73:13,20
**inconsistent**
  33:16
**incorrect** 67:2,4
  134:11,12
**increase** 109:22
  109:25
**increased**
  115:18
**index** 97:4
**indicate** 11:9
  72:15 76:10
  77:3
**indicated** 52:21
  70:14,22 71:12
  74:7 76:2,4,6
  76:17 81:1

103:13 106:17
  106:17 107:4
  107:18 111:23
  114:8 117:3,5
  117:7,11
  129:21
**indicates** 8:6,7
  11:17 109:21
**indicating** 79:24
  103:12
**indication** 11:18
  16:23 93:25
**information**
  3:23 6:11 7:9
  11:21 36:5
  42:9,12,24
  43:1,4,7,8,20
  46:1,20 47:12
  47:13,25 48:3
  62:5,11 70:4
  78:21 94:14
  97:14 98:3
  102:11 107:7
  108:11 109:2
  110:18 113:1
  113:14 128:23
  129:5,10,15
  132:5,18
**initial** 9:20
**input** 33:21
**inputting** 75:1
**insinuations**
  34:21
**Institute** 3:23
**instructed** 35:15
  35:17,19 36:22
  37:1 88:3
**instructions**
  49:17 93:11
  113:10
**intentionally**
  16:5,10 17:6
**interest** 107:4
  130:1
**interested**
  143:12
**interesting** 55:9
**Interestingly**

18:12,13
**Internal** 1:17
  5:16,21 13:3
  14:21 15:11
  16:18 19:11,13
  19:15,19 24:15
  85:12 100:12
  104:19 105:11
  118:9
**international**
  1:23 102:19
  145:1
**Internet** 119:13
  119:17 120:8
**interpretation**
  139:1,3
**intuition** 88:20
**investigate**
  32:17
**Investigations**
  12:17
**investment** 54:7
  54:9,11
**involved** 52:9
**involving** 114:1
**IRM** 13:14
  17:14 19:8,10
  98:2 127:7
**IRS** 13:4 14:23
  16:17,19 19:20
  20:10 61:1
  101:11 104:13
  110:16 112:17
  119:18 128:22
**issuance** 22:1
**issue** 21:12
  76:23 91:21
**issued** 8:5 9:19
  19:20
**issues** 17:19
  114:1
**issuing** 22:7
**items** 48:6,7
  56:1 82:2
**IV** 25:2

―――――――――
**J**
―――――――――
**January** 53:21

56:22 57:11,23
**Jerry** 1:22
  142:18 143:7
  143:20
**job** 5:15 17:21
  22:24 96:11
  139:8
**John** 111:2
**joint** 8:24
**Joseph** 1:23
  145:1
**judging** 12:21
**jump** 70:4
**June** 1:15 4:10
  15:12,17 79:7
  79:8,8,23,24
  80:7,8,8 81:4
  81:19,24
  101:25 137:15
  137:19 142:9
  142:12 143:13
  144:1 145:4
**Justice** 2:3
  145:5

―――――――――
**K**
―――――――――
**K-E-R-K-A-D...**
  5:11
**keep** 6:9 7:5
  10:19 12:3
  56:8 69:15
  97:21
**Kerkado** 1:13
  3:15 4:2 5:2,11
  11:7 142:9
  143:8 144:1,21
  145:23
**key** 18:1,2,5,7
**kids** 108:15,20
**Kim** 36:10
**kind** 6:11 12:21
  19:17 31:5
  53:13 54:21
  60:11 63:22
  97:4,6 106:5
  111:23 112:16
  114:1
**knew** 63:12

**know** 6:20,23
  10:5 11:13,19
  12:16,25 14:6
  16:22 17:24
  24:6,17 26:5
  31:10 33:7
  34:7,9,12,15
  34:19,24 37:4
  37:15,16,17
  38:2,19,20,21
  39:13 40:18
  41:17 42:18,25
  43:4,8 44:6
  45:4,20 46:13
  47:1,22 48:5
  48:15,16 50:3
  50:6,8 51:18
  53:22 54:4,23
  55:3,22 57:1
  57:20 58:5
  59:4 60:8,9,10
  60:18,19,19
  61:2,4,17,22
  62:25 63:7,10
  63:13,19,20
  64:24 65:20,22
  66:22 67:9,17
  67:20 69:8
  70:7,23 72:3
  74:10 76:19,20
  76:23 78:5,20
  79:4,11 83:6,7
  83:11,13 86:3
  89:5 90:5 91:2
  91:4 93:5,6,7,8
  93:16 94:5,12
  94:17 96:11,12
  96:13,13 97:3
  97:20,20 98:20
  99:21 101:14
  101:16,18,24
  104:15 105:11
  105:13 109:18
  110:4,5,7,20
  111:4,5 112:21
  113:13 114:4
  114:12,23
  115:3 116:8

117:9,10,19
  118:25 119:3
  120:21,25
  122:2,3 124:25
  125:13 126:10
  127:25 128:3,6
  128:8 129:25
  130:4,8,11,20
  131:17,24
  132:2,5,13,14
  132:18 134:18
  136:9 139:10
  139:17,18
  141:10
**knowing** 98:8
**knowledge** 9:3
  32:7 47:7
  112:20 113:20
**knowledgeable**
  38:9 52:2,6,14
  52:23 53:1
**known** 134:17
  135:3
**knows** 51:16
  99:22

―――――――――
**L**
―――――――――
**lack** 28:15,21
  106:6,11
**language** 13:10
  19:5 24:19
  26:15 29:24
  30:1 118:23
**late** 13:25
**law** 29:12
  105:12 126:12
  134:20
**laws** 133:5
**lawyer** 29:15,17
  30:17 61:19
  78:7 124:25
  133:7
**lead** 124:14,15
**learned** 76:24
**led** 65:13,13
**Lefler** 1:22
  142:18 143:7
  143:20

**left** 15:17 117:8
**leg** 72:22
**legal** 3:23 16:4,9
  25:21 29:15
**lesser** 88:8
**let's** 12:2 13:1
  18:17 21:11
  22:22 27:16
  30:21 32:22
  41:8 53:16
  56:8 57:16
  58:8 60:14
  68:6 70:3 74:3
  75:24 77:2,22
  78:25 80:13
  82:10 92:4
  95:6 100:8
  115:22 116:8
  118:18 119:6
  120:2 137:24
**letter** 3:10,16
  4:8,9,10 7:3,10
  8:2,5 21:13,13
  22:1,7 71:11
  75:24 76:1,2,5
  76:7,17 77:1,7
  79:24 80:1,5,8
  80:11,11 81:7
  81:19,24 82:2
  82:3,6,7,18
  90:1 91:12
  116:11,17,22
  120:3 137:12
  137:15,16,17
  137:19 138:11
  139:25
**letters** 90:5
**letting** 110:19
**Level** 25:2
**liabilities** 16:6
  16:11 17:6
**liability** 114:18
  116:13
**liable** 114:10
  115:6
**lieu** 22:7
**liked** 14:15
**limit** 91:10

**limits** 23:1
**line** 56:1 68:8
  77:12 112:25
  113:3 144:5
**link** 62:25
  120:12,14,15
  120:16
**list** 25:12
**listed** 89:22
  92:20
**litigation** 21:1
  129:4
**little** 43:6 51:24
  53:13 78:25
  93:10 105:24
  111:21 122:17
  133:16
**Lloyd** 38:24
  40:6,19,20,23
**log** 6:9,11,17
  10:19 11:9,10
  30:23 51:23
  70:17 73:17
  78:15 81:5
  95:1
**long** 30:5 34:11
  42:18 52:22
  128:3,13 129:1
**longest** 98:7
**look** 15:21 16:14
  18:7 25:16
  26:14 32:15
  40:4,9 41:20
  58:24 92:9
  94:19 121:4,4
  131:8 139:21
  140:8,9
**looked** 13:13,15
  60:7 115:11
  135:14 139:10
**looking** 6:7 8:16
  15:5 31:8 42:4
  45:25 46:14
  139:1
**looks** 29:11
  46:19 58:10
  71:5 75:6,8
  92:13 122:1

**lot** 31:10 34:25
  43:13 53:11
  55:7 60:10
  80:18 83:19
  90:10,11
  101:10 105:15
  105:20 108:15
  111:6
**lower** 65:16,18
  82:14,19,21,25
  102:6
**lying** 138:15

**M**

**Machine** 119:12
**mail** 74:8,15
**mailed** 74:10
**main** 99:6
**Maitland** 92:12
**major** 63:10
**maker** 48:23
**making** 14:15
  16:20,24 111:1
  126:15
**manager** 5:17
  32:2,4,5,6 36:7
  48:13 49:14,15
  49:16,21 50:15
  69:3 71:15,25
  72:3,5 85:22
  86:6,8 98:10
  100:17,18
  106:23 107:18
  123:24 125:8
  125:17
**manager's**
  32:17 72:9
**manner** 87:1
**manual** 13:4,14
  14:22 15:11
  19:11,15,19
  24:15 85:12,17
  105:12
**March** 4:3 44:9
  48:12,15 56:23
  57:12,17,24
**Marjorie** 1:13
  5:2,11 11:7

142:9 143:8
  144:1,21
  145:23
**mark** 3:14 4:2
  94:21,22,23
  118:13
**marked** 6:24 7:1
  10:1 13:3,7
  18:19,20 24:12
  26:11,12 29:5
  32:24 36:2
  39:23 44:22
  49:6 59:1
  67:23 77:5
  80:15 92:5
  95:9 118:17
**Mary** 2:2 26:16
  26:25 53:24
  60:7 145:5
**Mary.apostol...**
  2:5 145:7
**matter** 37:22,24
  88:12 105:12
  106:21
**matters** 132:3
**maximum** 23:19
  30:12 125:4
**mean** 5:23 6:6
  8:15 11:12
  13:21 21:4
  35:9,13 37:7
  42:16 49:2
  61:14 62:19
  65:19 70:5
  72:12 83:5
  90:8 91:24,25
  99:2 105:17,18
  129:24 132:23
  136:17 138:25
  141:10
**meaning** 71:18
**means** 12:15,16
  12:20 27:18
  35:2 50:2
  60:15 72:9
  87:18 96:12
  117:5 119:15
  127:21

**meant** 61:4
**meet** 51:25 53:7
**meeting** 52:22
**member** 17:4
**memorandum**
  32:1 97:24
  98:6
**memory** 118:6
**mentioned**
  74:19 99:22
**mentions** 127:19
**Michigan** 2:8
**Mid** 13:25
**middle** 1:1 25:6
  53:20
**million** 127:3,11
**mind** 41:10
  51:23 68:3
  69:6 117:8
  138:2
**mine** 12:1 45:13
  45:14
**minimum** 23:3
  125:5
**minute** 26:16
  76:11 77:10
  95:7
**minutes** 40:9
  94:20
**missing** 43:23
  47:10,11 48:9
  97:9
**mistaken** 55:25
  89:23 98:4
**misunderstood**
  33:19
**mitigation** 25:3
  87:14 127:5,9
**moment** 119:6
**money** 101:10
  110:19,21
  111:20 131:15
  131:24 134:5
**month** 57:2,13
  79:3,5,16
**months** 34:3
**morning** 42:10
  43:20

**move** 9:24 18:17
  24:9 26:8
  28:10 29:4
  30:18
**moved** 110:8
**multiple** 114:2

**N**

**N** 3:1
**name** 5:10 11:6
  12:21 36:11
  37:19 38:24
  40:23 81:3
  89:14 96:23
  100:13
**necessarily**
  100:13
**necessary** 23:15
  23:19 132:6
**need** 10:9,10
  12:4 18:15
  31:13 35:22
  39:21 46:23,25
  57:6 62:5 90:8
  94:24 95:3
  99:24 140:9
  141:11 145:13
**needed** 35:12
  48:4 56:2
  96:16
**needs** 7:15 57:13
  96:19
**negligence**
  66:14,20 67:10
**negotiation**
  110:17
**never** 25:7 29:19
  30:15 65:18
  66:1 68:3,22
  93:16,17 98:24
  117:21
**new** 43:16 61:1
  93:17 98:23
  99:1,1,24
  106:3 112:3,4
  127:20,21,22
  127:24 128:11
  128:15,19

129:13
**non-willful**
 50:11,22 71:17
 72:1,12,18,24
 73:4,19 99:20
 117:20
**Nope** 87:11,15
 117:25
**normal** 107:13
**Normally** 5:17
**Notary** 142:18
**note** 27:18 46:24
 46:25 71:6
 73:15 79:12
**notes** 143:9
**notice** 8:14 9:19
 16:14 18:23
 145:13
**November**
 41:11
**number** 9:25
 29:4 30:22,24
 30:25 31:1
 32:23 37:1
 44:21 54:3
 114:13,14
 115:7 116:8
 118:15 135:18
 137:18,21
 140:4
**numbers** 136:12

**O**
**oath** 3:7 5:4,12
 142:1
**OBDI** 83:13,14
 83:20 84:13
 86:5 99:1,2,3,4
 99:5,17 102:9
 102:10,25
 103:20 104:2,7
 104:14 106:20
 112:1,4 114:8
 114:18 115:5
 115:15 118:7,9
 121:16,24
 122:9,12,13,25
 123:5,13

129:23 130:2
**object** 7:14
 14:24 15:20
 16:12,25 18:22
 20:12 22:11
 24:5 25:19
 26:4 27:25
 28:1,14 29:14
 30:14 32:8,19
 41:13 48:21
 51:9 52:7
 64:14 66:24
 67:12 68:20
 72:3 87:2
 88:23 89:8
 119:23 122:16
 133:6 135:5
 138:3,21
**objecting** 28:20
**objection** 15:3
 136:7
**obvious** 109:7
**obviously** 69:25
 115:14
**occurred** 79:4
**occurs** 133:20
**October** 52:9
 101:21
**office** 12:18 80:4
 145:12
**Officer** 11:7
**Officer's** 3:17
 4:12 47:6
**official** 43:7,9
 42:11
**offshore** 38:10
 38:11,12,12,14
 50:24 52:19
 87:16 101:11
 107:5,10,10
 108:9,13,21
 110:22 111:17
 114:1 121:16
 123:8 127:24
 131:24
**Oh** 20:11 40:15
 57:9 58:7 65:5
 68:1,23 77:24

98:17 99:8
 132:23 139:17
**okay** 5:25 7:14
 7:17,25 8:13
 9:10,24 11:2
 11:24 12:2,5
 13:1,18 15:1,4
 15:8,14,15,25
 17:8,23 18:9
 18:15,18,25
 19:24 20:9,16
 20:17 21:6,9
 21:10,19,22
 22:18,19,20,25
 23:14,22 24:9
 24:11,22 25:5
 25:10,22 26:23
 27:1,9 28:22
 29:3 30:2,10
 30:18,19 31:1
 31:7,12 32:3
 32:11,14,16
 33:10,23 34:5
 34:8,10,11,17
 34:19 35:5,16
 35:22,25 36:15
 36:18,24 39:9
 39:15 40:15
 41:4,16,22,23
 42:7,22 43:4
 43:11,19 44:5
 44:15,19 45:11
 45:15,16,24
 46:5,24 47:18
 49:4,10,23
 50:7 51:21
 53:14,15,23
 55:21 56:6
 57:23 59:6,24
 60:5,9,22 61:4
 61:5,13,23
 62:2 63:3,10
 63:19 64:12
 65:5,21,24
 67:4,15,19
 68:13,14 69:9
 69:12,23 70:15
 71:4,8 72:21

73:5,11,15
 74:14,21 75:18
 76:1,22 77:11
 78:18,22 79:2
 79:12,15 80:3
 80:13 81:9
 82:1,7,11 83:4
 84:1,6,15,22
 84:24 85:5,25
 86:12,15 87:25
 89:4,25 90:3,7
 90:20 91:20
 92:17 93:22
 94:2,3,9,11,18
 95:13 96:11,17
 97:2,6,12
 98:11,23 99:22
 100:4,19 101:2
 101:13,16
 102:2,8 103:4
 103:10 104:5
 104:21,21,24
 105:14 106:22
 109:17 110:15
 111:21 114:6
 114:16,22
 115:12,17
 116:8,20,24
 117:19,22
 118:2,12 119:7
 119:18 120:9
 120:12,16,21
 121:14 122:6
 122:16 123:7
 123:16,20,23
 124:20 125:3,7
 125:17 127:19
 128:8,13
 129:19 131:21
 134:21,24
 135:9 136:3,14
 137:7 139:15
 140:2,6,12
**okayed** 52:22
**once** 66:6
 126:24 134:24
 145:15
**open** 32:6 34:2

38:5 90:21
 98:11 114:21
 130:25
**opened** 131:6
**Operating** 16:2
**opinion** 71:17
**opportunity**
 24:2 82:13
**opposed** 60:2,17
 60:20 66:19,20
 91:11 107:5,6
 107:23 140:3
**opposite** 86:16
 86:17
**option** 99:19
**order** 72:6 123:5
 141:9
**ordering** 145:15
 145:15
**ordinary** 12:20
**original** 107:6
 112:24 113:8
 131:19 145:14
**originally** 136:2
 136:3
**outcomes** 21:17
**outside** 16:13
 27:25 130:2
**oversight** 114:7
**overview** 15:9

**P**
**P** 142:18 143:7
 143:20
**p.m** 1:16 141:15
**P.O** 2:4 145:6
**package** 56:13
 56:16 57:10
**packages** 96:18
**page** 3:2 10:24
 11:6 14:21
 15:6,10,10,10
 17:12 27:17
 30:6 40:5,7,12
 40:16 53:16,20
 58:8 59:5
 69:17 119:5
 144:5

pages 46:22
  81:10
paid 54:8 137:1
pain 55:8
paper 126:6
papers 43:14
  75:3
paperwork
  37:13
paragraph 15:9
  15:25 17:16
  21:11,22 22:22
  23:23 25:12
  27:10 30:3,4,6
  30:11 59:12
  60:1 61:24
  63:3 65:3
  77:12 82:10
  91:8 137:24
paragraphs
  82:1
Parents 109:1
part 12:8,19
  13:14 14:11
  17:17 24:25
  40:15 49:12
  57:12 103:1
  110:25 117:10
  128:8
particular 93:23
  116:25 118:15
parties 143:10
  145:16
parties' 143:11
passed 128:9
passive 54:7,8
  54:11
pay 62:21
  100:25 101:4
  102:23 118:15
  134:4,7,23
  135:1 136:19
  136:20,24
payment 62:18
  63:8,14 78:8
  83:17 102:11
penalized 88:22
penalties 21:22

22:8 23:16,20
  25:7,14,17
  27:19,21 28:7
  28:12,25 39:7
  39:8,9 64:25
  65:7,17,19
  71:17 72:1,24
  73:4,20 85:13
  89:17 92:3
  102:14,17,20
  102:23 103:1,5
  103:22 104:3
  122:8,8,15
  123:3 124:1,22
  126:17 144:18
penalty 3:23
  21:14 22:3
  23:4,7 24:4
  26:3 30:7,12
  43:24 44:3,7
  50:11,23 60:2
  60:3,3,16,17
  60:18,21 66:7
  66:11,14,15,16
  66:23 67:10,11
  68:12 72:12,18
  73:23 79:20
  82:14,20,22,25
  83:22 84:9,13
  87:1 88:8 89:7
  90:16,18 91:10
  92:18,19,25
  96:4 100:15,22
  101:4 102:6
  103:6,13,14
  105:15 106:12
  107:20,23,23
  108:4 112:7,12
  114:10,16
  115:6,18
  117:15,20,24
  118:6 121:16
  121:21,24
  122:10,12
  123:8,9,13,16
  125:1,5,8
  126:25 127:2
  127:10 138:7

138:20 139:23
  140:3
penny 88:3
people 14:16,20
  16:9,18 17:5
  18:5 19:20
  36:9,10,18
  76:10 86:4
  87:23 88:4
  99:8,19,20
  106:20 111:6
  121:24 126:9
  127:11,25
  129:16,22,25
perceived 88:6
  106:11
percent 27:15
  27:16 43:25
  44:3 49:3 65:5
  90:24 114:15
  115:19 121:22
  123:21 124:12
period 45:18
  111:6 115:8
perjury 144:18
person 38:8
  100:12 135:2
  137:8
personal 101:4,7
  102:4
personally
  142:9
PFIC 133:16,17
  133:23,25
Philpot 38:24
  40:6,19,22
phone 69:18,20
  70:17
pick 18:14 66:7
picked 115:2
piece 45:23
PINELLAS
  142:5 143:5
place 1:17 31:7
  45:17 56:22
Plaintiff 1:4 2:6
Plan 57:18
plays 16:24

please 5:10
  53:21 121:12
  144:1 145:10
  145:11
plug 55:23
POA 42:10
  56:24,24 57:17
  57:18 80:8
point 27:19,22
  28:7,13,16
  29:1 35:6,16
  50:13,14 68:19
  82:13 96:9
  103:17 105:24
  106:7,9 125:14
policies 23:1
population 16:3
portion 19:8
  48:4 131:16,23
position 67:14
  109:6 126:3,6
  130:9 134:22
  134:22
possible 21:16
  34:16,17 136:4
potential 17:20
  18:11 116:13
potentially
  114:10 115:6
power 91:14
pre-plan 8:12
prefer 26:19
prep 55:11
preparation
  56:17
prepare 7:23
  10:23 11:10
  45:21 49:11
  56:13,15,20
  97:12 102:13
prepared 8:11
  16:15 49:13,17
  49:24 56:13
  62:11,12 71:15
  71:23 72:6,11
  73:12 80:7
  95:23 116:16
  131:25 135:2

preparing 21:1
  56:16 136:5
present 125:24
presume 6:7
  75:14 88:1
  124:22
previously
  107:11
primarily 12:24
  17:5 114:1
principles 88:21
printed 61:25
printout 29:12
prior 14:1 15:14
  20:2 27:3
  32:16 51:1
  72:20 133:15
  133:21 145:13
private 26:18
  108:16
Pro 55:4
probably 60:9
  82:19 115:2
  134:16
problem 38:3
problems
  112:16
process 107:13
Production@...
  145:18
professor
  134:20
proffer 10:8
  13:5,6 14:22
  15:22 17:14
  19:3 24:14
  30:9,11 36:5
  57:11 118:8
  119:11 120:5
  120:14
program 12:20
  14:3,7,12 16:1
  16:8 17:5 55:4
  55:11,22 62:21
  62:22,23 63:9
  64:1,2,7,13,22
  65:1,7,14
  83:13 84:13

99:8 102:9,10
102:25 103:20
104:2,8,11,14
112:1 114:9,18
115:5 118:7
121:24 122:12
122:13,25
123:5,9,14
130:2,7
**program's**
63:10
**promise** 91:1
**promises** 57:25
**promote** 21:23
**propose** 73:2,3
88:11
**proposed** 44:12
44:13 50:23
72:14,18 79:25
88:13 105:7
**proposing** 73:3
**prosecutions**
12:18
**protest** 91:25
**provide** 61:10
113:10 126:19
**provided** 42:9
54:13 62:25
**provides** 15:9
112:17 125:1
**provision** 15:18
**Pub** 75:12
**pulled** 13:2,4
14:22 15:17
**punish** 137:9,25
**punishing**
117:16
**punishment**
137:7
**puppets** 86:10
**purely** 9:21
**pursued** 50:12
72:13,13
**put** 6:12 12:2
14:18,20 45:19
46:1 50:3
54:10 60:25
61:4 62:5,12

69:10 74:8,15
75:6 77:18
88:10 93:15
108:12 109:2
110:20 126:6
**puts** 110:21
**putting** 14:16

**Q**
**Q12** 121:11
**qualifications**
135:8
**qualified** 64:13
122:9,14
**question** 17:9,11
20:14 25:24
28:6 31:8
41:15 52:11,12
89:1 100:15,20
103:19 105:16
118:15 121:2
121:20 122:22
129:8,9 138:22
**questioned** 5:4
**questioning**
68:8
**questions** 4:13
13:22 22:25
40:10,13 51:22
52:23 53:4,6,8
59:5 100:6
118:10 140:11
**quickly** 17:13
**quiet** 106:18,25
107:3,15,17,19
129:22,24
130:4,12,23
**quite** 75:6
**quote** 35:13
127:20 136:17

**R**
**R** 40:24
**RA** 52:22
**ran** 125:17
**RAR** 74:16,17
74:24
**reached** 116:21
**read** 3:10 12:7

13:9 18:13
19:4,25 20:2,4
24:20 27:10
30:1,4,5 31:11
40:15 50:19
53:21 58:8
59:3 62:9
67:25 70:12
75:24 77:23
82:10 83:6
85:12,16,17
118:14 121:12
121:15 122:19
139:12 141:13
144:19
**reading** 59:15
65:3 136:10
145:11
**reads** 28:4
**ready** 116:23
**real** 55:7
**realize** 139:14
**realized** 35:16
**really** 8:3 14:9
14:18,19 17:13
43:16 49:19
60:7,9 80:19
86:12 90:9
98:4 105:18
130:13 135:7
138:5
**reason** 11:25
14:10 56:19
57:7 58:21
66:18 72:15,19
81:6 97:12
107:22 128:19
144:5
**reasoning** 138:1
**reasons** 79:19
101:9
**recall** 20:4,4,6
20:20,22 21:3
29:20 34:25
45:21 92:8
106:16 119:4
140:1,18
**receipt** 145:13

**received** 10:4
45:8 58:11
59:12 60:6
73:10 74:4
78:16 79:23
80:8 81:24
92:11 145:15
**receiving** 58:15
59:16 69:20
80:1
**Recess** 26:20
31:14 47:3
81:14 118:21
**recognize** 7:21
7:22 10:22
11:10,15 13:9
19:5 24:19
26:15 29:9
36:12 39:25
49:8,10 59:7
77:7,20 80:24
92:9 95:18
118:23,24
**recognized**
127:12
**recollection** 8:3
22:16 41:9,14
41:19 62:10
78:13 117:9
121:23
**recommend**
125:9
**recommendat...**
48:24 50:16
124:5,7,9
125:7 126:9
137:6
**recommended**
68:21 69:3,5
117:15 127:10
**recommending**
125:15
**record** 3:17 4:5
4:12 5:10 6:16
10:18 33:6
44:16,17,24
45:10,12 46:2
46:5,7,16,18

47:2,6,22
61:25 73:9
76:12,14 81:1
95:6,8,20 97:9
97:10,13 99:25
100:8,9 143:9
**recorded** 79:14
**recordkeeping**
21:24
**records** 38:7
41:4 52:1
**Recross-Exa...**
3:6 140:13
**redacted** 11:22
40:17
**redaction** 11:20
**redactions** 40:8
**Redirect** 3:5
118:3
**Reese** 40:17,18
40:24,25
**refer** 12:3 30:23
31:2 84:3 97:3
119:22
**referred** 43:5
107:2 118:11
120:16 139:20
**referring** 9:19
36:22 37:12
38:12,14 52:24
57:20 60:18,23
61:2 62:22
63:7,25 70:16
120:6 124:21
127:5,13
130:13 131:14
139:22
**refers** 11:22
13:14 30:9
54:3 70:21
129:25
**refresh** 41:19
118:6
**refreshing** 41:14
**refused** 122:14
123:7
**regard** 117:16
**regarding** 42:10

82:7 127:24
**Regardless**
116:20
**regulation** 29:10
29:24
**related** 32:1
48:4 97:24
98:6
**relative** 143:10
143:11
**relevance** 14:25
25:20 28:1
32:20 52:8
119:24
**relevant** 26:6
29:25 47:8
48:6 87:3
131:5,7 140:23
**remember** 6:22
13:12 20:23
21:20 32:12,14
38:23 41:1,3
42:2,5,12,17
46:9 48:18
49:2 50:8,13
50:17,18 51:3
51:7,11,13
52:3,4,13
54:14,16,17
55:14 56:9,16
57:2,14 58:13
58:15,18 59:9
59:15,25 60:3
60:6,11 61:12
61:13,14 62:8
64:9,10 65:2,4
65:6,8 69:20
69:24 74:5,12
75:23,24 78:12
80:1,5,11
82:21 83:23
84:15,18,21,23
85:7,15,17
86:3 91:15,16
91:22 92:3,14
92:23 101:18
102:12 106:8
106:10 108:22

110:24 115:3
115:10 117:12
119:9 121:15
131:22 132:25
136:10 139:11
139:14,19,22
**reminder** 60:1
**remove** 68:4,6
76:24 94:4
117:10
**removed** 48:5
93:24 123:9
**rep** 52:1,1,21,22
**repatriated**
109:20
**repatriating**
111:14
**repatriation**
109:17
**repeat** 25:25
**report** 45:22
46:10,16 47:9
47:12,14 70:14
70:23,23 71:2
74:18 75:11,14
75:21 76:17
78:10 79:3,16
82:5 94:13,18
101:17,23
107:11 108:9
108:12 109:15
109:24 113:11
114:11 115:9
116:12,23,24
117:3,11,13
133:13 134:13
135:4 143:7
**reported** 108:14
108:19,20
109:11 110:1
133:17
**reporter** 3:7,8
9:25 26:10
39:20 142:1
143:1,7
**reporting** 1:23
21:24 113:11
145:1,17

**reports** 54:5
102:13
**represented**
138:12
**request** 3:24 7:9
11:21
**requested** 80:3
143:8
**requesting**
56:14 57:17
**require** 63:16
**required** 19:14
24:3 62:19
63:13,19,20,21
63:21,23 83:14
84:13,17,18,25
85:8 123:2
128:1 136:21
**requirements**
21:24 30:7
63:6,7,9,11
64:7 113:11
**requires** 122:12
**resolving** 27:19
27:22 28:8
**respect** 24:4
66:3 100:20,20
106:12 109:17
113:11 114:3
114:23 116:3
116:12,12
124:1 125:8
129:16 140:22
**respond** 145:13
**responded**
43:21 80:10
**responding** 78:3
80:11 82:3
**responds** 57:18
**response** 58:3
58:19 80:8,25
81:24 82:6,7
116:4
**responsibilities**
3:18 12:7
17:17 18:18
19:22 22:17
123:22

**responsibility**
17:18,19
**result** 22:3
**resulted** 33:12
**results** 64:20
**retaliate** 105:5
**retaliated**
104:24
**return** 7:12 9:20
54:6 57:12,22
63:8 82:3
107:6,7,12
109:24 112:23
112:24 113:7
113:13,15
131:13,14,19
131:25 133:12
133:18 134:25
135:2,15,20
136:6,25
140:25
**returned** 47:22
**returns** 6:2,7
33:9 51:2
56:14,15,17
57:1,11,14,25
58:6,11,15
59:13,16 61:11
61:15 63:17
73:10,13,20
74:8,11,15,22
102:12 107:3
107:14 130:1
**revenue** 1:17
5:16,17,18,21
12:7 13:4 14:4
14:5,22 15:11
16:18 19:11,13
19:15,19 24:15
50:24 51:1
75:13,20 79:2
85:12 100:12
104:19,22
105:11 118:9
**review** 4:6 49:11
71:15 72:6
73:12 81:21
143:8

**reviewed** 16:20
16:23 113:13
**reviewing** 31:16
**right** 5:16 11:5
11:18 14:16
22:10 23:13
29:13 34:6
36:21 37:9
49:21 50:1
53:4 55:17
60:25 61:4
63:21 69:4,25
70:9 72:2,8
73:19 75:5
77:18 78:17
83:14,17 90:25
91:17 92:22
95:4 97:8 99:6
101:2 102:1,3
102:4 103:8,12
103:15 104:4,7
104:13 105:9
106:5 107:18
107:21 108:1
110:5,21,25
111:5 112:5,9
112:21 113:20
113:25 114:15
114:24 115:18
115:22 116:4,5
116:6,7 118:16
118:20 119:14
122:10 129:1,3
130:2 131:5
132:11,25
133:5,19 134:1
134:17 135:1
135:17,18
136:17,18
140:8 141:2
**ring** 37:19 38:24
127:14
**Rogers'** 36:11
**role** 16:24 39:5
39:6
**roles** 12:6 17:16
18:18 123:21
**Ross** 51:5,14,20

101:12,13
110:6
roughly 64:21
row 75:8
RPR 1:22
142:18 143:20
rule 17:18
rules 24:7 61:9
61:10,12,13
64:6 106:4
Rum 1:6 4:8,9
4:10 7:11 20:2
42:11 44:1
48:19 50:16
51:1,14,18,20
53:7 67:9
68:19 69:19,20
70:19 71:10
81:20 91:13
99:1,17 100:21
100:23 101:4
101:20 102:5
103:4,13 104:1
104:7,14 105:3
105:5 106:7
107:15,19,22
109:10,14,19
110:7 111:11
112:22 113:20
114:9,16,23
115:5 116:5,12
117:5,16,23
122:7 125:25
135:14 136:16
137:9 139:19
141:3 144:2
145:8
Rum's 22:5 26:3
51:2 52:8
109:24 116:4
123:17 134:22
140:21
Running 74:18

S

S 3:13 4:1
S-A-P-A-R-A-...
96:25

Said's 134:3
Saparata 96:24
saw 20:22,25
21:5,6 27:3
36:13 38:7
44:8 49:2
62:11 98:1
saying 15:2 53:3
55:20 72:10
86:3 91:17
107:13 116:10
132:20
says 7:11 15:25
17:10,18,25
20:7 21:11
23:23 27:10,18
38:5 40:5,16
42:8 43:6,22
43:23 45:2,8
50:1,11,22
51:25 52:20
56:23 57:17
58:12 59:24
60:16,24 67:20
70:1,13 72:12
72:12,17,17,19
73:9 74:16
76:1,5,7,17
77:17 79:23
80:3 83:4 84:8
90:15 92:11
97:7 117:4,11
119:14 124:17
134:18 138:16
Schedule 107:4
108:12 113:1,3
113:21
school 108:16
134:21
scope 8:15 16:13
18:23 28:1
Scratch 6:8
19:12 68:3
seal 142:11
second 30:6 46:6
60:1 69:15
77:12,12
101:10 112:2

Secrecy 128:9
128:25
secretary 33:5
33:21
section 3:18,21
3:22 11:23
15:11 17:14
24:14 25:6
40:17 56:3
sections 30:8
securing 22:1
see 6:23 11:11
13:1 15:12
17:16,17 20:6
21:7 27:18
29:11 36:10
37:10 38:6
40:4 41:9
44:11 48:1,11
48:14 50:10
51:25 53:11
58:1 60:14
63:25 69:24
70:3 74:3,12
75:6 76:25
77:2,25 78:2,6
80:13 81:2
83:1,2,14
90:15 92:4,11
94:18 97:9
118:24 119:14
119:21 122:23
126:7,11
128:21,24
129:6 130:25
131:10 139:21
seeing 21:4 46:9
92:8,16 119:4
seeking 25:21
seen 10:10,15
20:21 24:23
25:4,8 26:21
27:1,3 29:7,19
30:15 33:2
59:8,9 78:14
86:18,23 92:7
92:14,22
113:24

segment 16:3
selected 14:6
sell 133:19
sells 55:23
send 31:21 32:1
57:18 58:22
61:8 73:21
75:11,22 76:3
76:17 79:16
117:13
sending 42:2
58:18 59:10
117:13
sends 32:4 96:19
sense 41:1 53:9
sent 7:3 51:20
56:14 58:5
59:13,22 61:3
73:12 75:18,19
75:20 77:10,17
79:2 108:10
116:12,17,22
117:6 120:4
sentence 70:12
78:6 82:12
91:8
SEP 3:18 13:13
13:13,15,19,19
13:23 14:1,5,6
14:11 15:25
16:8 17:4,17
18:15
Separata 96:2
separate 8:24
9:14,15,16
97:13 110:8
112:10
separately 9:18
September
52:21 115:20
service 1:17,23
5:21 16:18
27:10 45:9
100:13 104:19
130:9 145:1,17
services 45:9
settlement 67:13
shape 86:19

sharp 33:10
sheet 3:9 94:13
97:6 124:14,15
144:3 145:15
sheets 74:25
shortly 34:1
show 29:25
shows 15:17
89:24 114:4
sign 3:10 62:21
75:22 117:12
141:13
signature 7:18
7:20 32:17
81:2,3
signed 83:15
117:21 135:15
significant
17:20 18:10
110:13
signing 117:22
145:11
similar 119:5
site 29:12
six 60:11 61:20
61:21 90:23
114:25 115:7,8
115:16
skim 81:9
skip 68:8
small 16:1
131:16,23
SME 38:21,23
sneaky 130:14
software 54:21
55:1,3
somebody 35:12
35:16 86:10
93:15 97:13
100:17 106:3
126:15 134:3
137:9
somebody's
134:22
somewhat 133:4
sorry 13:21 15:7
15:10 17:12
20:16,18 30:4

32:4 49:19
53:24 59:4,13
63:4 68:2,23
69:15 70:25
79:6,8 80:24
91:1,5 92:19
95:18 96:8,22
98:17 99:13
115:24 118:9
124:15,18,25
131:14 136:23
sounds 71:11
Southfield 2:8
speak 26:18
speaking 8:4
  49:25
special 12:8,16
  12:19,21 16:1
specific 29:24
  70:3 82:2
specifically 27:6
  84:3 85:18
  89:5
speculate 14:8
  43:10 78:5
speculation
  64:15 89:9
  93:1 130:18
  136:8
spell 96:22
spend 25:11
  57:6
spent 6:13
Sports 37:19
  40:6
spurs 41:9
stamp 92:11
stand 72:22
standard 116:17
stands 33:7 38:2
  39:3 40:24
stapled 71:6
start 8:25
started 7:25 8:1
  8:10 13:12
  15:15
state 5:10 87:3
  142:3 143:3

stated 144:19
statement 51:20
  61:3,8,15
  101:12,13
  140:21
statements
  132:16
states 1:1,3
  30:11 111:15
  144:2 145:8
Status 50:10
statute 32:1
  97:24 98:6
  114:21 124:17
  124:18,21,24
  125:1
stay 123:5
steer 90:4
stem 117:16
stenographic
  143:9
stenographica...
  143:7
step 26:18,19
stop 39:21
streamline
  99:20
streamlined
  83:19
strike 137:8,9
string 4:4,7
stronger 109:6
stuff 31:11
  68:12 75:4
subject 37:22,24
submitted 58:12
  101:12,14,14
  101:23
substantial 16:4
  16:9 114:17
sudden 98:25
sufficient
  126:10,19,20
  126:25
suggested 86:19
suggesting
  139:7,9
Suite 1:23 2:8

145:1
Summary 50:11
summons 111:2
support 75:2
  82:5 108:4
supported
  107:25
supposed 19:21
  25:16 26:2
  27:21 28:7,12
  28:25 47:24
  133:13 134:4
  135:3
sure 11:13 14:15
  14:19 22:12
  25:3 38:22
  45:19 48:15
  60:10 63:13
  72:8 75:8
  94:25 96:13,14
  96:15,18
  116:10 123:20
Switzerland
  110:9,23
sworn 5:4
  142:10
system 27:11,14
  33:9,22 37:8
  55:4

——————
      T
——————
T 3:13 4:1
tab 55:25
tabs 55:25
tags 56:3
take 26:14 29:21
  31:10 41:20
  67:5,25 80:17
  81:12 82:12
  93:20 94:19
  118:18 120:23
  121:12 137:10
taken 1:14,21
  10:5 45:17
  48:4 144:1
takes 110:21
  130:9
talk 12:6 18:15

26:16 35:23
45:18 56:23
90:12 99:24
talked 73:3,22
  117:2 125:22
  125:24
talking 17:24
  38:17 42:13
  46:15 56:6
  57:21 67:7
  73:24 75:13
  106:22 112:3
talks 73:23
  121:20
Tampa 1:2,18
  1:24 145:2
tax 2:3 6:1,7
  7:12 8:14,23
  9:20,21 16:10
  17:6 18:5
  27:11,14,20,22
  28:8 38:12
  43:24 48:4
  51:2 54:6,6
  55:4,11 60:21
  65:11,12 66:4
  67:12,20 71:2
  80:18 82:2
  83:10 84:1,2,3
  91:21 92:15,24
  102:21,24
  103:1,5,14,21
  104:3 105:6
  112:23 122:8
  122:15 123:3,7
  133:4,18 134:7
  134:18,21
  135:1,2,4,6
  136:19,20,24
  137:1 138:17
  138:19 145:6
taxable 133:21
taxes 52:19 78:8
  132:6 133:11
  133:21 134:4
  134:23
taxpayer 8:5,7
  16:19 42:11

54:5,14 82:16
104:22 105:1
116:3,23
125:22 131:8
133:12
taxpayer's
  27:20
taxpayers 6:14
  27:12,13 75:12
  102:10 106:19
  111:2 112:6
  130:10,14
TC 56:23
teaches 134:21
Tech 45:9
technical 39:2,4
  45:8
Telephone
  56:25
tell 6:4,18 9:3,4
  10:11,17,25
  11:3 12:15
  20:15 26:15
  31:9,16,17,19
  31:21,22,23
  33:4,5 38:1
  43:12 50:19
  65:4 73:7
  76:16 84:23
  85:18 86:8
  93:19 104:13
  104:16 107:1
  111:9 121:5,21
  124:3 127:21
  130:24 135:20
  135:21 138:24
telling 37:3
  84:10 86:10
  125:15
tells 57:13 74:14
Ten 121:22
term 106:25
terms 28:14
  41:13 52:7
  109:11 110:13
  111:5 112:13
  112:18 113:25
territory 32:5,5

32:16 98:10
**Terry** 4:3 36:6
49:22,24 85:23
106:16,22,23
117:19 123:25
125:23,24
126:4 129:21
**testified** 5:4 24:6
26:5 30:15,16
48:22 72:5
101:20 123:24
131:12 136:16
137:6 140:15
**testify** 16:16
**testimony** 15:21
33:17 51:10
52:8 68:21
101:3 103:9
105:14 108:1
111:22 122:6
122:15 127:20
137:25
**thank** 10:13
17:2 26:8
28:10 29:3
30:18 37:18
41:23 42:8,21
51:21 53:9
54:1 137:22
145:17
**thing** 10:7 14:17
61:6 62:20
73:7 75:8
84:12 92:2,17
99:6,24 115:15
126:21,22
127:12 128:25
132:20 135:12
**things** 21:7,8
25:15 26:2
27:8 62:4
63:20 83:12
84:14 110:20
116:4,5,6,7
125:17,18
130:14 136:17
136:18
**think** 10:6 11:13

11:25 12:7
16:13 17:24
18:13 30:1
35:21 38:4,22
41:7 43:2,3
44:21,25 45:1
48:9,24 52:20
52:24 53:1
54:21 56:19
57:7 58:21
60:17,19 61:7
61:20,21 62:20
63:9 64:6,12
64:20,23,24
65:21,23 66:10
66:13 67:1
68:16,21 69:4
70:16 71:6
73:22 78:3
81:6 83:9
84:12 88:11,19
88:20,21 90:4
91:4 97:23
100:1,1 105:13
105:14 112:10
114:8 115:14
115:16 127:18
128:19 129:12
130:12,19
131:5,17,18,20
137:14 138:22
139:10 140:10
**thinking** 84:15
84:18,21
137:11 138:25
**thinks** 88:24
**thought** 64:11
66:19 72:1
90:9 98:1
99:12,14 101:9
106:14,21
109:14,14
125:5 134:23
136:1
**thoughts** 15:8
**thousand** 57:5
**three** 7:6 63:20
81:10

**throwback**
133:18
**ties** 75:17
**time** 1:16 6:13
8:16 9:5 15:19
17:15 20:20,22
20:23,24,25
21:3,4,8,15
22:5,13 23:18
24:8,16 25:11
26:6,14,20
28:11,24 29:22
30:5 31:10,13
31:14,22 32:10
34:11 36:8,19
39:16 42:18
47:3 50:13,14
53:13 54:23
55:24 57:6
67:25 72:10
73:16 75:21
76:16 80:17
81:14 84:16,16
90:5 91:12
97:21 98:7,24
100:15 105:15
106:7 109:19
110:7 111:6,11
111:14 116:16
117:9 118:21
121:12,23
123:25 125:24
128:3,13 129:1
136:5 138:25
**timeline** 30:21
31:7 40:14
103:11
**times** 90:23
**timing** 71:21
111:6 112:13
**title** 5:15 19:9
20:3 38:16,17
38:22 45:5
47:24 48:2,3
97:15 98:2,3
98:12,14,17,18
100:13 112:10
124:19,20

**titled** 25:6
**today** 5:13 41:5
43:8 92:23
**told** 10:19 51:7
85:2 88:7
97:13,18,19
106:1 108:15
125:18 130:22
135:25 136:2
**tomorrow** 57:19
74:15
**top** 11:6 15:10
15:17 50:1
58:9 119:14,21
127:12
**topics** 16:15
**total** 23:16
**town** 2:8 70:2
**tp** 50:23 52:21
**TPH** 69:18,18
**transaction** 38:7
**transactions**
18:1,4
**transcript**
141:11 143:8,8
144:4 145:10
145:14
**treat** 105:3
**treated** 104:21
**treaty** 37:23
128:20
**trial** 145:13
**tried** 60:7 64:12
83:7
**true** 86:16,17
131:4 143:9
144:19
**try** 65:8 122:22
130:14
**trying** 15:7
34:20,21 49:21
62:8 64:20
68:18,25 69:6
70:6 71:21
76:16 87:23
128:11 139:11
**turn** 30:3
**Turns** 52:1

**Twenty** 114:15
**two** 8:24 9:11,14
9:15,16 21:16
26:24 27:3
46:22 79:8
95:11 101:9
**two-day** 50:8
**type** 9:8 12:21
43:18 107:4
**types** 98:16

---
**U**
---
**U.S** 2:3 145:5
**UBS** 9:7 37:22
38:5 43:1
51:20 107:5
108:10 110:6
110:17,25
111:7,12 115:9
128:20 129:4
131:15 140:22
**Uh-huh** 12:10
15:13 20:8
31:24 33:3
39:11 40:3
54:12 66:5
72:19 78:9
101:6
**Uh-uh** 27:5
36:23 80:6
128:2
**ultimately** 44:14
65:13 67:9
91:22,24 94:15
135:14
**unable** 15:22
**unagreed** 84:1,2
91:21 138:17
138:19
**unclear** 117:8
**Uncoded** 11:19
**undersigned**
142:8
**understand** 5:12
8:13,22 9:12
11:14 20:13
21:16 22:6
23:3,8,11,18

24:1 25:15
26:1 28:11
29:16 30:13
34:20 38:8
42:18 49:19
52:18 66:2,18
77:21 86:24
87:5 90:9
101:3 103:8
105:18 124:16
124:24 128:11
129:11,24
137:11 139:7,8
**understandable**
42:20
**understanding**
9:12,13 22:24
73:6 96:20
125:9 128:12
133:11 134:3,5
**understands**
28:19
**understate** 16:5
16:10 17:6
**understood** 8:4
9:4 21:7 37:6
37:18 39:15
46:21 50:10,21
100:17 116:10
125:12 127:16
135:21,22,25
**unfairly** 104:22
105:3
**Unfortunately**
84:1 138:16
**United** 1:1,3
111:15 144:1
145:8
**unquote** 35:14
127:20 136:17
**upcoming** 135:8
**update** 57:17
**upper** 23:1
**URL** 118:11
119:21 121:4,5
**use** 22:24 28:7
98:2
**usually** 33:23

**V**

**v** 1:5 145:8
**value** 114:3
**varying** 23:1
**VENAR** 2:7
**Venar@ayarl...**
2:9
**verbal** 93:11
**verbally** 85:25
86:2
**verified** 136:25
**verify** 15:23
**version** 15:16
21:3 119:16
120:7,9
**view** 23:17
101:5,7 103:5
**vindictive** 137:8
**violation** 23:17
30:7 114:2
**violations** 20:3
25:2 32:18
**voluntarily** 62:4
**voluntary** 61:1,7
62:23 64:1,7
64:13,22,25
65:7 77:19
112:18 130:7,8
**VS** 144:2

**W**

**wait** 67:5 74:21
115:22
**waiver** 145:15
**walk** 31:6
**want** 10:6 11:15
12:6 21:6
26:14,17 31:5
31:5,13 34:15
40:4 41:8,9
43:6 44:20
45:18 47:5
50:25 51:23
53:11 56:23
58:8 64:11
65:3 69:14,24
70:12 77:9,22
80:19,21 82:10

91:20 94:19,25
95:11 100:2
101:4 110:20
118:5,14
121:10,11
122:21 123:20
129:8,21,24
137:10 139:21
139:21 140:15
**wanted** 37:2
83:9 109:5
113:14 116:5
**warning** 21:13
22:1,7 90:1,5
**Washington** 2:4
87:25 145:7
**wasn't** 9:9 14:10
37:3 43:12,13
45:18 61:18
62:14,16,17
65:14,14 86:14
99:2 100:16
103:17 109:22
111:25 114:5,7
117:8 124:3
140:16
**way** 13:13 21:2
24:17 32:9
37:14 39:17
66:1 78:22
86:19 99:15
103:18 119:12
130:6 134:13
137:9
**we'll** 30:18 36:1
46:23 58:24
61:24 65:24
78:20,21 140:8
**we're** 12:2,3
16:13 17:12
22:24 24:9
25:11 27:6
29:4 31:2,11
39:18,19 45:13
46:14 47:2,20
47:24 49:4,5
53:12,17 57:24
68:11 69:16

70:7,8 77:3
79:1,23 91:1
98:9 123:20
131:8 141:8
**wealth** 42:9
**web** 119:5
**website** 13:4
14:23 20:10
119:12,16,18
**week** 14:23
26:24 27:3
54:24 74:4
**welcome** 41:24
**went** 38:2 48:12
92:1 108:16
**weren't** 48:6
86:12 94:1
96:8 106:18,18
112:7,9
**West** 1:17
**whatnot** 108:18
**willful** 25:2 30:7
39:7 43:23
44:1,6,11
48:19 50:16
68:19 69:13
73:23 88:14
90:9,21 91:10
103:13 124:10
126:10,19,20
126:25 127:2
141:4
**willfulness**
110:13 111:19
113:18 114:3
**wish** 83:21
**wished** 141:13
**witness** 1:21
142:11
**word** 120:23
130:12 137:10
**words** 77:20,25
**work** 18:10
19:20 49:20
52:19 57:23
60:9 62:15
72:6 74:16
75:3,7,9 79:17

86:11 99:5
104:22 133:12
**worked** 6:12
79:22 99:9
111:22 112:4,7
118:6
**working** 6:13
7:10 9:5 14:3
34:3 35:4,5
75:3 85:13
86:9 112:13
**workload** 4:6
49:11,18 71:14
73:12
**works** 6:4 8:22
9:2,10 34:20
66:1
**worried** 82:4
**worry** 40:14
42:22 65:24,24
78:23
**wouldn't** 53:5,6
60:11 62:15
69:5 104:1
115:2
**wraps** 140:10
**write** 50:5 81:7
144:4
**write-up** 75:3
79:17 89:11,13
95:4 109:13,21
125:11
**writing** 41:1,3
52:3,4 86:1
88:5
**written** 41:11
61:15 81:23
86:18,23
**wrong** 14:19
42:22 60:25
61:5 68:2
77:18 134:5
**wrote** 71:11
83:1 91:12

**X**

**X** 3:1,13 4:1

**Y**

**yeah** 7:6 31:21
35:3 36:17
43:17 49:1
52:25 54:23
55:11 68:1,6
68:23 70:20
75:17 76:7,13
78:13 82:9
83:6 84:5
91:19,20 92:17
92:20 94:21,23
95:2 97:16,20
99:21 114:4
115:19 122:1
127:2 129:18
131:12 132:23
134:10 135:23
137:20
**year** 8:14 43:24
83:23 90:14,18
91:10,11 110:2
115:10,11
119:9 121:17
121:17,18
122:2,3,4
127:25 131:3,7
133:12,14,20
134:14,15,16
140:18 141:1
**years** 6:3 7:10
60:11 61:16,17
63:21 71:5
90:22 102:12
113:22 114:2
114:11,20,22
114:25 115:7,7
115:8 131:1
132:22,24
133:15,22
136:20 137:1
**York** 61:2

_____
**Z**

_____
**0**
**060732018mk**
144:21

_____
**1**

**1** 3:16,18 6:25
7:1,4 15:9,25
17:16 37:1
**1.2.20.1.1** 3:22
**1/25** 56:10,12,12
**1:15** 41:12
**10** 3:17 4:4
39:19,23 115:1
**100** 3:4
**100,000** 30:12
125:6
**1040** 8:14,16
59:23 109:9
**1040S** 59:20,22
**11** 4:5,10 44:21
44:22 115:1
**1101** 145:2
**118** 3:5 4:13
**11th** 80:7 81:4
81:19 137:19
**12** 4:6 49:5,6
69:15 71:14
118:15
**12:38** 1:16
141:15
**1291** 56:3
**13** 3:18 4:7
58:25 59:1
73:22 74:1
77:9,14 81:16
119:6,22 120:2
120:11,19
121:5
**1348** 95:4
**13th** 137:15
**14** 4:8 67:22,23
70:4,9,10
75:16 116:8
**140** 3:6
**14198** 2:4 145:6
**142** 3:7
**143** 3:8
**144** 3:9
**145** 3:10
**14th** 15:12
**15** 4:9 69:14
77:4,5,22
145:4

**15th** 119:15
**16** 4:7,10 80:14
80:15 81:17,19
137:21
**16th** 58:22 68:10
73:20 77:16
78:4
**17** 4:11 92:4,5
142:18
**18** 3:20 4:9,12
95:9
**19** 4:13 118:17
**1998** 109:20
113:23 114:17
**1st** 15:17 92:12

_____
**2**

**2** 3:17 9:25 10:1
30:11,22,25
31:1 47:6
53:16,17,18,20
69:16 71:9
79:1
**20** 4:3
**20%** 60:2,3,16
66:15,19 73:23
83:12,23 84:12
92:25 102:14
103:18 107:23
114:16 115:6
115:13 121:25
122:1,9,25
123:13 138:2,9
**20,000** 114:10
114:12
**20044** 2:4 145:7
**2005** 71:1
**2006** 140:20,23
**2007** 13:13,25
13:25 43:24
100:20 101:18
112:22 113:7
**2008** 7:12 8:14
8:16 9:20
50:23 52:10
101:15,19,22
111:10 131:3
140:21

**2009** 109:18,20
109:24 113:23
114:17 131:13
131:18 132:7
132:21 133:1
133:13 135:18
136:6
**2011** 3:16,17 8:1
15:12 41:12
**2011/2012** 5:18
**2012** 4:3,7,8,9
4:10 53:21
92:12 116:11
119:15
**2013** 44:9
**2018** 1:15 15:17
142:10,12
143:13 144:1
145:4
**2022** 142:18
**20th** 57:17,24
**2222** 2:8
**229-3332** 1:24
145:3,12
**23** 3:16,17
**23rd** 7:11 8:1
58:2 74:4,14
**24** 3:21
**24th** 74:16
**25th** 53:21 57:11
**26** 3:22 38:16,22
47:24 97:15
98:2
**27** 115:19
**29** 3:23

_____
**3**

**3** 3:18 13:3,7,11
14:21 15:10,10
21:11 25:12
**30** 65:5 145:13
**300** 90:23
**3000** 2:8
**303** 1:23 145:1
**31** 19:9 20:3
38:17 48:2,3
98:3,12,14,17
98:18 112:10

**124**:19,20
**32** 3:24
**33602** 1:24
145:2
**33607** 1:18
**34,000** 132:19
132:21
**3498** 75:12
**36** 4:3
**3800** 21:13
**3848** 1:17
**39** 4:4
**39,000** 110:1
**3rd** 69:23 70:13
70:17 71:10,22
79:8,24 80:8
81:24

_____
**4**

**4** 3:20 4:8 18:19
18:20 21:22
115:1,2
**4.16.1.1** 14:22
**4.16.1.2** 17:14
**4.25.16.4** 3:20
**4.26.16.4** 20:7
**4.6.16.4.7** 3:21
**4/16** 58:10
**4/2/2012** 34:9
**4/3** 69:17
**4/4** 50:4
**4/4-5/2012** 50:2
**4/5** 50:3
**40** 110:1
**40,000** 135:16
135:17,18
**400,000** 109:22
135:16 136:20
136:24
**416.1.1** 15:11
**44** 4:5
**44318** 97:4
**4549** 70:25
74:19,24
**48075** 2:8
**49** 4:6
**4th** 50:2 71:15
71:22,25 72:23

eightteen

73:2,19 75:11
75:18 79:1,2,6
79:7,16 116:11

**5**

**5** 3:3,21 22:22
24:10,12 115:1
115:3
**50** 43:25 44:3
49:3
**50%** 60:2,17,20
60:20,21 84:9
84:11,17,19
85:1,4,6,7,10
85:18 88:13
90:10,13,16,17
90:23 101:4
107:20,23,25
108:4 112:7,12
115:14 117:15
117:24 124:13
125:6,10,11
127:1,11
129:23 137:6
138:2,18,20
140:3
**59** 4:7
**5th** 50:3 56:23
79:7,8

**6**

**6** 3:22 26:9,12
115:1,3
**6/30** 101:19
**67** 4:8
**6th** 57:13

**7**

**7** 1:15 3:16,23
29:4,5 71:1
82:10 91:8
113:1,1,3
115:1 137:24
142:10
**7/22/2013** 97:2
**700,000** 88:22
**70s** 128:9 129:3
**75** 65:13
**75%** 65:10 66:7

66:8,11,15,18
68:11 123:17
**77** 4:9
**7th** 79:23 80:9
142:12 143:13
144:1

**8**

**8** 3:24 13:13
32:23,24 71:1
115:1
**8:17-cv-826-T...**
1:5
**80** 4:10
**813** 1:24 145:3
145:12
**8621** 54:3,5,10
54:14,18,20
55:12,14 56:1
56:13 62:6,9
62:12
**8621s** 55:16
**86a** 79:18 89:15
**870** 4:11
**872** 45:2,2
**886** 139:20,22
139:25 140:4
**886a** 79:19
89:16 95:4
**8th** 52:21

**9**

**9** 4:3 27:10 36:1
36:2 115:1
**9/27/2011** 51:25
**9:17** 1:16 142:10
**906** 83:14
**92** 4:11
**95** 4:12
**9th** 41:11