# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No.  8:17-cv-826-T26AEP |
| | ) | |
| **SAID RUM**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT SAID RUM'S SUPPLEMENTAL BRIEF

## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Defendant Said Rum, by and through his attorney, Venar R. Ayar of AYAR LAW, submits his Supplemental Brief in support of his Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56(c).

## INTRODUCTION

This brief is filed in response to the Court's request for supplemental briefing on Defendant Said Rum's Motion for Summary Disposition. The issue here is twofold: (1) whether or not this Court is required to limit its review to the administrative record as it existed at the time of the final agency action against Rum, and (2) whether or not it is permissible for this Court to look beyond the administrative record in making its decision. Specifically, this brief examines the relevance of the judgment rendered by United States Tax Court on April 6, 2017, in which the Tax Court reversed the agency's finding with respect to Rum's civil fraud penalty.

1

Rum acknowledges the general rule limiting judicial review of agency actions to a review of the administrative record. In the present matter, however, this Court is permitted to look outside of the administrative record for the following two reasons:

I.     Pursuant to the United States Supreme Court's decision in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U. S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), this Court is not required to limit its review to the administrative record when determining the validity of said determination because Rum has made "a strong showing of bad faith or improper behavior" on the part of the agency in making its FBAR penalty determination; and,

II.     Pursuant to the Supreme Court's interpretation of 5 U.S.C. 706(2)(F) in *Volpe* this Court may conduct a *de novo* review to determine whether the Secretary's decision was "unwarranted by the facts" because the action in this case is "adjudicatory in nature and the agency factfinding procedures are inadequate." Further, the "record rule" in a *de novo* review is inapplicable here, and this Court may look at all the relevant evidence in determining whether the Secretary erred in deciding the amount of the FBAR penalty.

## ARGUMENT

I.     **THERE IS A "STRONG SHOWING OF BAD FAITH OR IMPROPER BEHAVIOR" ON THE PART OF THE GOVERNMENT. THEREFORE, THIS COURT IS NOT REQUIRED TO LIMIT ITS REVIEW TO THE ADMINISTRATIVE RECORD.**

In *Volpe*, the Supreme Court established the "record rule." To ensure that courts do not engage in free roaming *de novo* review of agency decisions, the record rule leaves to expert agencies the difficult task of scientific and policy assessment.

Indeed, Section 706 of the Administrative Procedure Act requires a district court to review the administrative record. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The focal point for judicial review of an administrative agency's action should be the administrative record"). Yet, exceptions do exist. *Peach*, 87 F.3d at 1246 ("[C]ertain circumstances may justify going beyond the administrative record").

While the Eleventh Circuit has yet to specify what circumstances may justify going beyond the record, it has noted exceptions recognized by other circuits. *See Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs*, 87 F.3d 1242, at 1246, n. 1 (citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436-37 (9th Cir. 1988)). The D.C. Circuit recognizes at least four "accepted exceptions," permitting supplementation on a showing that the agency: (1) acted in bad faith in reaching its decision; (2) engaged in improper behavior in reaching its decision; (3) failed to examine all relevant factors; or (4) failed to adequately explain its grounds for decision. *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624, 327 U.S. App. D.C. 126 (D.C. Cir. 1997). The first exception applies here. ("[A] strong showing of bad faith or improper behavior may also provide occasion to order the supplementation of the administrative record"). Rum is thus entitled to the requested summary judgment motion on the grounds that there is at least a genuine issue as to the amount of the penalty.

To demonstrate bad faith, there must be a "reasonable factual basis for [such a] contention." *Apex Constr. Co. v. United States*, 719 F. Supp. 1144, 1147 (D. Mass. 1989). Indeed, "it is well established that naked assertions of bad faith will not suffice to open the door to discovery in an APA action." *New York v. Salazar*, 701 F. Supp. 2d 224, 240 (N.D.N.Y. 2010) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)). However, at the same time, "[w]hat constitutes a strong preliminary showing of bad faith or improper behavior . . . is a matter that the courts have been reluctant to define, preferring in the main simply to declare that on the facts of a given case, the showing has not, or occasionally has, been made." *Id.* at 241 (quoting *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 230 (E.D.N.Y. 2006)).

In *Saget v. Trump*, 2019 U.S. Dist. LEXIS 63773, the Court found that "allegations of bad faith must be based on hard facts.... Evidence, and not merely counsel's argument, must support

the showing." (quoting *Ali v. Pompeo*, 16-CV-3691, 2018 U.S. Dist. LEXIS 76891, 2018 WL 2058152, at *6 (E.D.N. Y. May 2, 2018)). Moreover, "Plaintiffs need not establish Defendants formulated the record itself in bad faith or as the result of improper behavior. Rather, Plaintiffs must make a strong showing that bad faith or improper behavior infected the agency's decision-making process." *Saget* (citing Tummino v. Torti, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) ("permitting review of extra-record evidence and finding bad faith because of "unreasonable delays, pressure emanating from the White House" and "significant departures" from past agency practices"); *see also Saget* (citing *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1357 (11th Cir. 1994) ("holding a plaintiff made a strong showing of bad faith in part because the plaintiff presented significant evidence the Navy's decision to award a contract to the plaintiff's competitor resulted from prejudicial violations of procurement regulations").

Here, Rum has submitted "significant evidence based on hard facts" strongly showing that the Government's decision was made in bad faith. The evidence strongly shows that the Government gravely mishandled this case and blatantly violated its own policies and procedures, both at the examination and appellate levels. Therefore, the Government's several transgressions in this case, when taken as a whole, constitute a "strong showing of bad faith or improper behavior." Consequently, this Court should hold that the "record rule" does not apply or limit the scope of its review to the administrative record as it existed at the time the FBAR penalty was assessed.

The following evidence points to some of the of transgressions suggesting the government undertook the entire process in bad faith and behaved improperly.

a. **After a final decision to impose a non-willful penalty had already been made, Group Manager Terry Davis ("Davis"), violated well-established policies and procedures by unilaterally deciding to change rum's penalty from non-willful to willful, which had been already approved by the Area Counsel.**

4

As discussed in Docket entry #58, Exhibit 1, Paragraphs 79-92, Davis improperly changed Rum's recommendation to a willful penalty.

Although Area Counsel's memorandum indicates that he would have approved Kerkado's determination even if she otherwise found that a willful penalty was appropriate, Davis is not justified in her interjection and unilateral decision to change the recommendation to a willful penalty. Dkt. Entry 58, Attachment 8 at Bates ADM 000366. To the contrary, this example emphasizes the arbitrary nature through which such cases are decided: Area Counsel was evidently willing to rubber-stamp any decision Kerkado decided to make. Furthermore, Davis already had a chance to provide her input regarding the proper determination: before the determination was sent to Area Counsel for his approval. After submitting the case to counsel, the only event that should have allowed the agency to change its determination is where counsel denies the determination. But that did not happen here. At that point, nobody else should have a role to play in the case other than Kerkado, whose job it was to issue the notice.

**b. Kerkado violated established IRS Policies and Procedures (statement 20-1(9)) by improperly requiring Rum to agree to the income tax examination so that he qualifies for an enhanced 20% FBAR penalty as a "bargaining point."**

Even though the government emphatically denies that any "bargaining" took place, there is ample evidence on the record to show that a negotiation did, in fact, take place between Kerkado and Rum, where she required him to agree to her the civil fraud penalty in the income tax examination as a condition to proposing a reduced FBAR penalty. Dkt. Entry 58, Attachment 1 at ¶¶24-34. In effect, Kerkado was using the FBAR penalties as a "bargaining point in resolving the [Rum's] other tax determinations," and thus acting in violation of IRS Policy Statement 20-1. *See* 1.2.20 Policy Statements for Penalties and Interest Activities (9.9.17) at Bates RUM0058, 1.2.20.1.1, at Ex. 15.

Indeed, two theories remain unresolved: (1) whether the penalty was dependent on Rum's agreement to the fraud penalty, and (2) whether Kerkado would have been permitted to fulfill her end of the bargain. However, it is undeniable that this negotiation did, in fact, take place. Kerkado's mere attempt to induce Rum into agreeing to the civil fraud penalty in this matter is a clear violation of well-established IRS policies. By definition, failing to follow important policies and procedures constitutes "improper behavior," especially given the egregious nature of the violations in this case. If it's not improper for IRS agents to disregard the rules, then what is the purpose of the rules?

The Government's now argues that Rum could have never actually received a 20% FBAR penalty, even if he agreed with Kerkado's findings in the income tax case. The mere existence of a fraud penalty proposal, the Government argues, did not vest in Kerkado the discretion to recommend any penalty less than the statutory maximum. But if this were true, then upon agreement to Kerkado's offer, Rum would have also agreed to the assessment of the civil fraud penalty, and he would have definitively and irreversibly waived his right to appeal that penalty, even though ultimately, he was vindicated by the United States Tax Court on this issue. Rum would have thus been stuck with the 50% FBAR penalty whether he agreed to Kerkado's bargain or not.

Even if the Court finds that Kerkado's attempt to negotiate with Rum was not intentionally calculated to wrongly induce him to waive his right to contest the civil fraud penalty, the Court should, at the very least, find that Kerkado recklessly disregarded the consequences of her actions. The Government only points to its allegation that Kerkado lacked discretion to determine the type and amount of the penalty at the time she made Rum's penalty assessment. But Kerkado should have been aware of the mitigation threshold conditions. Based on the Government's interpretation[1]

---

[1] The Government's interpretation is that even if examiners do not have discretion in cases where mitigation is denied, and even if Rum actually failed mitigation, then Kerkado clearly should have known better than to tell Rum that she can give him a 20% penalty assessment.

of the IRM, Kerkado not only should have known that she did not have the discretion to recommend a 20% penalty, but she also should not have bargained with Rum to agree to the income tax examination. Evidently, Kerkado recklessly ignored the consequences of using the penalties to bargain with Rum, which is, in and of itself, a clear violation of IRS policies. Dkt. Entry 58, Attachment 1 ¶¶35-38.

Kerkado's actions were especially egregious because Rum was ultimately fully vindicated from his civil fraud challenge in the United States Tax Court. The Government did not sustain a civil fraud penalty against Rum—although a civil fraud penalty was *proposed* by Kerkado, it was not ultimately *sustained* because the Tax Court issued a final order invalidating the imposition of the civil fraud penalty. The stipulated tax court judgment conclusively determined that Kerkado was mistaken about the fraud penalty all along. United States Tax Court Signed Decision (4.6.17) at Bates RUM00074, at Ex. 18; Wrightson Dep. 38:10-16, at Ex. 20. Therefore, Kerkado's misrepresentation alone should be enough to constitute "a strong showing of bad faith or improper behavior," and allow this Court to look outside the record in making its determination as to whether the FBAR penalty amount is improper and should be set aside under 5 U.S.C. §706(2).

### c. Kerkado violated established IRS Policies and Procedures (Statement 20-1(4)) by improperly failing to agree to "fully develop the penalty issue when the initial consideration indicates that the penalties should apply."

The Government failed to support its decision for the amount of the willful penalty, besides that Kerkado determined Rum did not qualify for discretion because he did not meet the threshold conditions to qualify for mitigation of the FBAR Penalty, and so she did not consider a lesser penalty percentage. Memorandum in Support of FBAR Penalty (undated) at Bates ADM000312, at Ex. 26; D.E. 30 Ex. 25 at Bates ADM000318. Given the magnitude of the implications of her

---

Further, even if the mitigation rules did not prevent her from having discretion, she still should not have bargained with Rum the way she did, because it is a direct violation of the policy statement, which constitutes improper behavior under *Volpe*, 401 U.S. 402.

determination, Kerkado's Examination Activity Log contains no entries between when she received Rum's case back from Area Counsel and when she re-issued her determination. Exam Activity Log (FBAR) (8.23.11), redacted, at Bates ADM000305, dates 11/28/2012 and 3/6/2013, at Ex. 30. This evidence shows she at least acted improperly by disregarding the policy statement requiring her to fully develop penalty issues.

This finding, which is now a central issue in this case, did not appear even once in Kerkado's nine-page memorandum supporting her position. The said memorandum is the only official explanation that was issued to Rum. There was no discussion as to why the penalty was applied at 50%, as opposed to some other number. *See also* Dkt. Entry 58, ¶¶102-105. The only evidence showing that Kerkado even knew about the mitigation threshold conditions, let alone considered them, is a brief note on the margins of her FBAR Examination Lead Sheets, and a single sentence in her one-page "summary" memorandum in support of the FBAR penalty, stating that the "mitigation guidelines have been considered and not applicable at this time due to a CFP being proposed and appealed." Dkt. Entry 58, Attachment 1, ¶¶72.

First, there is a genuine issue as to whether Rum actually failed to meet the fourth mitigation threshold condition. The plain language of the rule states that, to fail the fourth mitigation threshold condition, the civil fraud penalty must be "sustained." Dkt. Entry 58, ¶74. However, in Kerkado's summary memorandum, she states that the civil fraud penalty was "being proposed and appealed." Dkt. Entry 58, Attachment 24. That is not the same as being "sustained," per the actual language of the rule. Furthermore, in the FBAR Examination Lead Sheets—the only other place she ever mentions the mitigation conditions—Kerkado again refers to the civil fraud penalty as having been "proposed." Exhibit 1 at Bates ADM 000318. She then goes on to state that "if the penalty is assessed for year 2007 or 2008, the fourth mitigation threshold condition is failed, and mitigation penalty computation is not applicable." Exhibit 1 at Bates ADM 000318. In the

only two places where Kerkado mentions the mitigation threshold conditions, she still does not allege that the penalty was "sustained," as per the requirements of the IRM. Exhibit 1 at Bates ADM 000318; *see also* Dkt. Entry 58, Attachment 24. At the very least, a determination that the mitigation threshold conditions did not apply would require an inquiry as to what the requirements are. At best, the proper interpretation of the actual language of the IRM is unclear, and that is further supported by the very language Kerkado chose to use in her workpapers. Yet, there is no evidence that any attempt was made to flush out this issue and make a thoughtful determination as to what the IRM actually means.

In addition, there is a genuine issue as to the consequences of a taxpayer's failure to meet the mitigation threshold conditions. Rum argues that the intended purpose of the mitigation guidelines contained within the IRM is to provide for reduced maximum penalties if certain conditions are met. This argument is supported by the fact the IRM clearly states that "examiners are expected to exercise discretion, taking into account the facts and circumstances of each case, in determining whether penalties should be asserted and the total amount of penalties to be asserted." Dkt. Entry 31, Attachment 21 at Bates ADM 0003621, IRM Section 4.26.16.4(6). Nowhere in the IRM does it state that, if a taxpayer fails to meet the mitigation threshold conditions, then the examiner is required to assess a maximum penalty. In fact, the rules that relate to mitigation are in a separate section from the rules that relate to examiner discretion. Dkt. Entry 31, Attachment 21 at Bates ADM 0003629-33, IRM Section 4.26.16.4(6); *see also* Dkt. Entry 31, Attachment 21 at Bates ADM 0003633-34, IRM Section 4.26.16.4(7). The "examiner discretion" section clearly states that "the examiner may determine that a penalty under these guidelines is not appropriate or that a lesser penalty amount than the guidelines would otherwise provide is appropriate." Dkt. Entry 31, Attachment 21 at Bates ADM 0003633. The plain language of the

rule states that the examiner is allowed to exercise discretion independent of the rules contained in the section related to mitigation (including the threshold conditions).

Furthermore, in the examiner's "lead sheets," directly below Kerkado's written notes regarding the mitigation conditions, there is an explanation of the difference between the "**statutory** penalty ceiling under the Title 31 Code & Regulations, and **mitigated** penalty maximums under the IRM." (emphasis original). Exhibit 1 at Bates ADM 000318. This seems to suggest that the only significance of failing to meet the mitigation threshold conditions is that the taxpayer could potentially be subject to the "**statutory** penalty ceiling," as opposed to the "**mitigated** penalty maximum." Exhibit 1 at Bates ADM 000318. Nonetheless, Kerkado had discretion to charge less than the statutory maximum in either case.

Lastly, even Kerkado's "summary memorandum" does not make it clear that she concluded that she did not have any discretion. All it says is that the mitigation guidelines are not applicable. There is no explanation of her interpretation as to what that means. The question of whether Kerkado had discretion, even if Rum failed to meet the mitigation guidelines, is ambiguous at best. Yet, it is clear from the record that Kerkado did not make any attempt to "fully develop" the penalty issue. Dkt. Entry 58, Attachment 28.

### d. All IRS employees directly involved in this case improperly violated IRS Policy Statement 20-1(9)(a) because they effectively prevented Rum from having a "reasonable opportunity to present evidence that the penalty should not apply" by misleading him as to the reason for the amount of the penalty.

In a letter to Rum dated June 11, 2012, Kerkado made it a point to remind Rum of the 20% FBAR penalty offer had he only agreed with her civil fraud penalty findings. Dkt. Entry 58, Attachment 16, ¶7. In what appears to be a last-ditch effort to get Rum to change his mind and agree with her findings, Kerkado repeatedly told Rum that she wanted to meet with him to "discuss his options." *Id.* In response to Kerkado's letter, Rum called Kerkado three days later and agreed to all but her findings on the fraud penalty. Dkt. Entry 58, Attachment 28 Bates RUM0056, at Ex.

Then, on June 21– just seven days after Kerkado's last conversation with Rum, and 10 days after writing her letter–Kerkado prepared her "lead sheets" and noted that the penalty is now set at 50% because Rum did not meet the mitigation threshold conditions. Exhibit 1 at Bates ADM 000318.

Despite the irreconcilable difference between Kerkado's written explanation in her lead sheets and the one she offered in a letter that was sent to Rum just ten days prior, the Government did not attempt to correct the misrepresentations that Kerkado made to Rum. Kerkado could have, for instance, notified Rum or his attorney via telephone or e-mail she was never in fact able to offer him a 20% FBAR penalty. Rather, Kerkado watched Rum move to appeals under the mistaken belief that he did not get the 20% penalty because he exercised his constitutional right to challenge Kerkado's findings with respect to the fraud penalty.

Even at the appellate level, the Government failed to inform Rum as to the reason for the amount of the penalty. Dkt. Entry 58, Attachment 1, ¶¶106-122. At his appeals conference, on or about April 3, 2014, Rum's primary argument was that Kerkado originally proposed a 20% penalty, before improperly increasing it to 50%. He claimed that his evidence of such proposal was a letter sent by the examiner admitting to the 20% offer. Dkt. Entry 58, Attachment 38, Rum Decl. ¶¶55-56, 62.

At the conference, Appeals Officer Svetlana Wrightson indicated that she agreed with Rum's position—that Kerkado improperly increased the penalty to 50% after originally proposing a 20% penalty—and she stated that if Rum could produce a copy of the letter, and it contained a proposal of a 20% penalty, she would give him the same deal. Dkt. Entry 58, Attachment 38, Rum Decl. ¶¶55-56, 62. Unfortunately, Rum was not in possession of Kerkado's June 11 letter at the conference, so he could not prove that Kerkado improperly bargained with him over the penalties. Dkt. Entry 58, Attachment 38, Rum Decl. ¶¶55-56, 62. Rum left the meeting on a mission to find

a copy of Kerkado's letter, but regrettably, he did not see it prior to the commencement of discovery here.

On April 30, 2015—more than one year after the initial conference—Wrightson's manager, Kristi A. Schanks, sent a letter to Rum, containing bare, conclusory statements, and sustaining the penalties in full. The only mention in the letter regarding to the amount of the penalty was that "Exam assessed a 50% penalty only for the tax year 2007. The penalty was computed by Exam based on 50% of the account balance ..." Dkt. Entry 58, Attachment 38, Bates ADM000215.

From a review of the record, it is clear that at Rum's April 3 appeals conference, Wrightson neither knew about the mitigation threshold conditions, nor did she believe that Rum allegedly failed to meet them. Wrightson did not know about the mitigation at the time of the hearing because the only references to mitigation in the file at the time were in places that would not have been obvious to her. It is thus completely reasonable to think that she did not know about it. Wrightson admits the following in her activity log:

> Conducted conference with the TP and POA.  Obtained additional information. Researched the issue raised by the TP/POA re: examiner's penalty proposal of 20% that later became 50%.  TP stated that he received a letter from the examiner with 20% penalty proposal before the penalty was increased.  Discussed the case with IC.  Found sufficient documentation in the case file explaining that the examiner considered lowering the penalty to 20% if ALL issues, including additional tax, fraud penalty and FBAR penalty are agreed on.  Since the TP did not agree with the penalties, the FBAR penalty increased to 50% for willful failure to file FBAR forms and report income. Prepared SOA.  Started ACM.

> Dkt. Entry 58, Attachment 33, Bates ADM000239.

A review of the above entry clearly shows that even Wrightson—the person making the decision in the case—was not fully briefed and educated on Rum's case on the day the Government expected him to argue for a lower penalty. Rum was thus deprived of a fair and meaningful opportunity to argue his case because he did not have any way of knowing what he was supposed to argue for. Again, appeals did not inform Rum, in writing or otherwise, of the reason why they

assessed the penalty at 50% of the account balance, as opposed to some lower number. Dkt. Entry 58, Attachment 38, ¶¶58-59, 62. In fact, Wrightson admitted that Plaintiffs never sent Rum anything to explain IRS Appeals' position, giving him an opportunity to refute their claims. Dkt. Entry 58, Attachment 22.

Two months later, Wrightson states in her activity log that "after addressing other priority cases in FIFO order, she had returned to working on Appeals Case Memorandum ("ACM"). Dkt. Entry 58, Attachment 33, ADM000239. Indeed, Wrightson did not receive a copy of Kerkado's letter to Rum since Rum's appeals conference, to which Rum kept referring during the interview. Wrightson then logged that she "[w]orked on reviewing the ACM guidance received from the IC." On June 11, 2014, one week later, Wrightson began writing her (ACM) to support her position. Dkt. Entry 58, Attachment 33, ADM000239. It is thus clear from Wrightson's activity log entries that even at the time she made her decision and began drafting her explanation, she still neither knew about the mitigation threshold conditions, nor did she believe that Rum allegedly failed to meet them. In fact, the mitigation guidelines are completely absent from Wrightson's activity log. Dkt. Entry 58, Attachment 33. The only place where Wrightson mentions the mitigation guidelines is in her ACM, which went through multiple rounds of revisions, and was not finalized until April 30, 2015—more than one year after Rum's face-to-face appeals conference. *Id.* Accordingly, based on the evidence in the record, it is safe to assert that Wrightson did not learn about the mitigation guidelines until sometime between June 4, 2014, and April 30, 2015—long after Rum had his so-called "reasonable opportunity to present evidence that the penalty should not apply." *Id.*

It is also important to note that at no time during the IRS' final action against Rum in assessing the penalties was Rum ever informed as to the reason for the amount of the 50% penalty. Exhibit 1, ¶¶102-122. Wrightson's ACM, as well as Kerkado's Lead Sheets and Summary Memorandum, are all *internal* IRS documents that were not provided to Rum at any point during

the pendency of the examination or the appeal. In fact, it was not until June 2018, when the Government produced a copy of the Administrative File in the instant action, that Rum knew of the government's explanation for the amount of the penalty. For more than six years, Rum agonized over the lost opportunity that was wrongfully represented in Kerkado's offer, which led him to believe that he could have gotten the 20% penalty assessment had he agreed to Kerkado's offer. Little did Rum know that, if he would have agreed to the fraud penalty, it would have all but sealed his fate on both the issue of the fraud penalty, and on the issue of the amount of the FBAR penalty. Winning the fraud case was his *only* chance at ever getting the penalty reduced.

e. **Appeals Officer Svetlana Wrightson improperly violated IRS Policy Statement 8-2 by raising a new issue at the appellate level.**

In her ACM, Wrightson alleges that Rum failed to meet the mitigation threshold conditions for two reason: (1) Rum failed to cooperate during the examination of his return, and (2) a fraud penalty was proposed to Rum. Dkt. Entry 59, Attachment 5, Bates ADM000203. Kerkado only cites to one reason in her workpapers as to why Rum failed to qualify for mitigation: because of the fraud penalty. Dkt. Entry 58, Attachment 28, at Ex. 1. The mere fact that Kerkado did not allege that Rum failed to cooperate is enough to establish that Wrightson improperly violated the IRS' official policy by raising the issue of cooperation for the very first time at the appellate level. The very purpose of the Appeals Judicial Approach and Culture (AJAC) rules is to prevent IRS appeals officers from engaging in a factfinding mission or taking it upon themselves to further investigate or develop an issue. Dkt. Entry 58, Attachment 1, ¶¶123-132. Appeals' officers' review is supposed to be limited to the record that is before them, unless the taxpayer chooses to raise a new issue—much like how the "record rule" operates in the judicial setting. Contrary to Wrightson's testimony at her deposition, the idea that Rum failed to qualify for mitigation because he did not cooperate during the exam is very much an "issue." AJAC rules define a "new issue" as "a matter not raised during Compliance's consideration. Any issue not raised by Compliance in

the report (e.g. 30-day Letter) or rebuttal and disputed by the taxpayer is a new issue." Dkt. Entry 58, Attachment 1, ¶¶123-132. This broad definition was drafted to encompass a wide range of meanings.

Furthermore, not only was the issue of cooperation not raised during the course of the examination, Kerkado specifically stated on numerous occasions that Rum cooperated during the exam. Dkt. Entry 58, Attachment 1, ¶¶126-128. In fact, after the conclusion of the examination, Kerkado stated that "Mr. Rum did fully cooperate with the examination process and did provide all requested information." Dkt. Entry 58, Attachment 1, ¶128. Interestingly, Wrightson used the same language in her ACM and alleged that Rum "was not fully cooperative," even though the word "fully" does not appear anywhere in the rules. Dkt. Entry 58, Attachment 1, ¶¶129. Based on Wrightson's word choice, it is evident that she was aware of Kerkado's remarks on Rum's cooperation; nonetheless, Wrightson took it upon herself to make the exact opposite finding of a material fact in her ACM. Wrightson did not raise a "new issue" that may have been overlooked by Kerkado—she fabricated it. Not only did she make up facts, and then used those facts as a basis for ruling against him—she did so in a manner calculated to prevent him from ever finding out what happened. Wrightson thus evidently acted in bad faith.

Any one of the above examples, in and of itself, should be enough to constitute a "strong showing of bad faith or improper behavior" by the Government in the handling of Rum's case. Taken together, the above examples can lead to no other conclusion other than that, at the very least, the government behaved improperly, and therefore, the "record rule" does not apply in this case. However, when taking the evidence as a whole—from Davis's decision to change the penalty to willful, to Kerkado's testimony that "[w]ith these cases … we can't close the case … unless Headquarters is in agreement that we have done everything we can do to get every last dollar,"

Dkt. Entry 58, attachment 6, at 87;15-21, to Wrightson's decision to fabricate the notion that Rum

failed to cooperate—it is more appropriate to conclude that the Government acted in bad faith.

**II.      IN      REVIEWING      THE      GOVERNMENT'S      PENALTY      AMOUNT
DETERMINATION, THIS COURT SHOULD REVIEW THE RECORD *DE NOVO*
SO THAT IT MAY CONSIDER ANY OUTSIDE BUT RELEVANT EVIDENCE
BROUGHT BEFORE IT. THEREFORE, THIS COURT MAY LOOK BEYOND
THE ADMINISTRATIVE RECORD IN MAKING ITS DECISION.**

Pursuant to the Supreme Court's interpretation of 5 U.S.C. 706(2)(F) in *Volpe,* this Court

may conduct a *de novo* review to determine whether the Secretary's decision was "unwarranted

by the facts" because the action in this case is "adjudicatory in nature and the agency factfinding

procedures are inadequate." Further, the "record rule" in a *de novo* review is inapplicable here,

and this Court may look at all the relevant evidence in determining whether the Secretary erred in

deciding the amount of the FBAR penalty.

In *Porter v. Califano*, 592 F.2d 770, the Fifth Circuit[2] found that appellant "has a statutory

right to a full evidentiary hearing in district court under 5 U.S.C. § 706(2)(F)." The Court further

noted that 5 U.S.C.S. § 706(2)(F) "authorizes the court to conduct a *de novo* review of agency

findings and conclusions which are based on inadequate fact-finding by the agency." *Id.* at 772. In

making its determination, the Court refused to solely review the "initial investigation," reasoning

that it was "overly influenced by biased superiors and a superficial review investigation." Rather,

the Court found the process inadequate "because the biased or otherwise inadequate initial fact-

finding process was not cured by a subsequent impartial and full review in the agency."

Here, the Government's fact-finding process is inadequate for two reasons: (1) the issue as

to the amount of the penalty was not fully developed, i.e., the investigation was incomplete, and

(2) the Government failed to provide Rum with a meaningful opportunity to challenge Kerkado's

lack of discretion, which led to the imposition of a 50% penalty.

---

[2] Although this case is from the Fifth Circuit and we are in the Eleventh Circuit, this decision was made before the
Eleventh Circuit was created.

   **a.  The Government's fact-finding process is inadequate because Kerkado failed to "fully develop" issue of the amount of the penalty.**

   As discussed above in Argument I, Section (c), the records shows that Kerkado's examination failed to

fully develop the amount of the penalty. Kerkado's said failure not only constitutes a violation of

IRS policies, rendering it an "improper behavior," but it also intrinsically deems the fact-finding

process insufficient.

   Indeed, Kerkado failed to consider several genuine issues prior to determining that she

lacked discretion to make a penalty assessment as a result of Rum's failure to meet the mitigation

conditions. *Supra* at 8. It is thus clear that Kerkado did not even slightly consider any of the

aforementioned issues in making her penalty determination. *Id.* Consequently, the Government

failed to engage in a good-faith analysis of issues that are now central to the dispute at hand,

specifically of whether Kerkado was required to exercise her own discretion in determining the

appropriate amount of the FBAR penalty. *Id.*

   Further, the IRS had ample opportunity to cure the deficiencies in the examination process

by simply conducting an "impartial and full review" at the appellate level. However, Rum's

appeals conference with Wrightson does not constitute an "impartial and full review in the

agency." How could it have, considering that Wrightson lacked knowledge of the pertinent issues

on the day of the appeals conference? Absent from Wrightson's activity log any indication to show

that she conducted any independent research on whether Kerkado was required to exercise her

discretion.

   Wrightson, perhaps, if she has conducted such analysis, would have prudently determined

that Kerkado erred in failing to exercise her discretion, and remanded the case back to Kerkado in

time to properly exercise her discretion in determining the penalty assessment. The appeals

conference offered the agency an opportunity to review Kerkado's decision de novo and correct

any shortcomings that might have existed in the examination process, but by turning a blind eye to issues that are determinative in this case, the agency blew its chance to conduct a good-faith and proper review of the process. Because Appeals failed to correct the inadequacies that were apparent in the examination process, this Court should hold that a *de novo* review is appropriate under 5 USC § 706(2)(F).

### b. The Government's fact-finding process is inadequate because the Government denied Rum a meaningful opportunity and a fundamental right to rebut the agency's findings.

Even if the Court finds that the issues were "fully developed" and that the fact-finding process was not inadequate on those grounds, this Court should still find that the fact-finding processes were inadequate because Rum was denied an opportunity to present his case and argue that Kerkado was required to exercise her discretion pursuant to the rules laid in the IRM.

At no time during the appeals process was Rum ever informed as to the reason for the amount of the FBAR penalty, effectively denying him a meaningful opportunity to argue his case. Dkt. 58, Attachment 1, ¶¶106-122. Presenting Rum with no opportunity to rebut Kerkado's lack of discretion renders the administrative record on which the Government depends unreliable. Accordingly, this Court is not required to give the administrative record due deference to the agency's inadequate findings of fact, thereby necessitating a *de novo* review under 5 U.S.C §706(2)(F).

The inadequacy of the agency's fact-finding process in preparation for the appeals conference deprived Rum of an opportunity to argue that the fraud penalty should not apply: Rum was not aware of the government's position on Kerkado's discretion; he was not aware of conditions that he should have met before Kerkado could exercise her discretion; he did not know that the existence of a mere proposal of a fraud penalty was enough to cause him to fail to meet the mitigation threshold conditions, nor was he aware that where a taxpayer fails to meet these

conditions, the examiners would not have discretion. Dkt. 58, Attachment 1, ¶¶102-122. These facts highlight the agency's inadequate fact-finding process, which shielded Rum from being able to consider and argue central issues to his case and resulted in Kerkado's lack of discretion. *Id.*

Appeals thus did not inform Rum, in writing or otherwise, of the reason why they assessed the penalty at 50% of the account balance, as opposed to some lower number. Dkt. 58, Attachment 38. The only explanation given to Rum at that point was that he was being charged 50% as what was, in effect, a punishment for refusing to agree with the fraud penalty. In effect, the Government misled Rum into believing that but for his denial of Kerkado's fraud penalty offer, he would have been assessed a 20% penalty.

While it is true that the appeals hearing was a joint conference, encompassing the income tax and the FBAR cases, and that Rum did, in fact, have an opportunity to argue that the fraud penalty should not apply at appeals conference, Rum nonetheless lacked knowledge as to the significance of the fraud issue. In other words, Rum did not know that the determination regarding the fraud penalty was central to his FBAR case. Had he known that, Rum would have considered and prepared an argument against the fraud allegations. Up until that day, Rum believed that the amount at stake in the FBAR case was roughly tenfold the amount at stake in the fraud case. Further, Rum had no reason to believe that the appeals conference was the only available avenue during which he could convince the IRS that he is not responsible for the fraud penalty (for which he was ultimately vindicated), thereby rendering him unfit to meet the mitigation threshold conditions. Given the limited availability of the information presented to him at the time of the appeals conference, and in light of the magnitude of the FBAR case, Rum reasonably dedicated more time to the FBAR than the fraud case.

In addition, had Rum been given proper notice of the Government's position Kerkado's lack of discretion, then he would have had an opportunity to argue that Kerkado misinterpreted the

IRM, and that she did, in fact, have discretion. As indicated previously, a justification for this inquiry is far from clear. It is quite possible that the drafters of the IRM never intended for a mere proposal of a fraud penalty to prevent a taxpayer from meeting the mitigation threshold conditions. Or, perhaps, the proper interpretation of the IRM is that the examiner always has discretion, even in cases where the taxpayer fails to meet the mitigation threshold conditions. These are real questions, to which there are no clear answer. Unfortunately, the Government did not present Rum with an opportunity to convince it of these things.

In view of the evidence examined above, there is ample proof to highlight the Government's gravely inadequate procedure, a *de novo* review is warranted under 5 U.S.C.S. § 706(2)(F) and interpreted by *Volpe*.

Under the *de novo* standard of review, the "record rule" does not apply, and the Court is free to look at any relevant evidence that is properly before it.

## CONCLUSION

For the reasons stated above, Defendant Said Rum respectfully requests this Court to deny Plaintiff's motion for summary judgment.

Respectfully submitted,

Dated June 7, 2019                    /s/ Venar R. Ayar____

Venar R. Ayar
30095 Northwestern Highway, Suite 102
Farmington Hills, MI 48334
Phone: (248) 262-3400
Fax: (248) 436-8117
venar@ayarlawgroup.com
COUNSEL FOR DEFENDANT

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Said Rum's Supplemental Authority in Opposition to the United States' Motion for Summary Judgment was electronically filed with the Clerk of the Court and counsel for all parties who have answered through the Court's CM/ECF filing system on June 7, 2019.


<u>/s/ Venar Ayar</u>

Ayar Law
Legal Assistant
clinique@ayarlaw.com