UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                             Case No. 8:17-cv-826-T-35AEP

SAID RUM,

          Defendant.

_____/

## REPORT AND RECOMMENDATION

      The Government brought this action against Said Rum ("Rum") to collect outstanding civil penalties assessed against Rum under 31 U.S.C. § 5321(a)(5)(C) for willful failure to report an interest in a foreign bank account for tax year 2007 (Doc. 1). Each party moved for summary judgment and filed responses thereto (Docs. 30, 31, 55, 58, 60, 61, 66, 67). A hearing was conducted on the matter on May 28, 2019. For the reasons that follow, it is recommended that the Government's Motion for Summary Judgment (Doc. 31) be granted and Rum's Motion for Summary Judgment (Doc. 30) be denied.[1]

## I. BACKGROUND

      Rum has been a naturalized citizen of the United States since 1982 (Doc. 31, Declaration of Said Rum ("Rum Dep."), at 11). Rum can read, write, and comprehend English (Doc. 58-5). After college, Rum owned and operated several businesses, including a delicatessen, a pet supply store, and a convenience store (Rum Dep., at 17-19). In 1998, Rum opened his first foreign bank account ("UBS account") by depositing $1.1 million from his personal checking

---

[1] The district judge referred the matter for issuance of a Report and Recommendation (Doc. 62). *See* 28 U.S.C. § 636; M.D. Fla. R. 6.01.

account at Chase Manhattan Bank in New York (10/30/08 closing slip at Ex. 6, Bates UBS00050; Rum Dep., at 20-22). The box checked at the top of Rum's UBS AG account opening document shows that he owned a "numbered account" rather than a "name account" (Rum Dep., at 24; UBS Account Opening at Ex. 6, Bates UBS00044-45). Further, the UBS bank records show that Rum elected to have his mail held at UBS, rather than sent to his U.S. address (Kerkado Decl., at ¶8). Rum was charged a fee for UBS AG to retain his mail and all retained mail was deemed to have been duly received by him (UBS Account Opening at Ex. 6, Bates UBS0044-45). Further, the UBS AG Change of Domicile form memorializing Rum's change of address in 2004 provided that "[r]etained mail service remains in force" (Change of Domicile Form at Ex. 6, Bates UBS00049). Agent Marjorie Kerkado ("Kerkado"), the IRS agent assigned to conduct Rum's examination, declared that withholding mail helps avoid disclosure of foreign bank accounts to the IRS (Kerkado Decl., at ¶9). Rum opened the UBS account to conceal money from potential judgment creditors (Rum Dep., at 42). Interestingly, in the Appeals Case Memorandum written by Appeals Officer Svetlana Wrightson ("Wrightson"), as well as in Kerkado's Declaration, it is noted that Rum provided two inconsistent versions concerning the lawsuit judgment creditors he was attempting to conceal the money at issue from (Doc. 30-29; Kerkado Decl., at ¶10). For instance, Wrightson noted that, "[p]er one version of the Taxpayer's story, in 1998 he was in a car accident and was sued by the victim of the accident. Per a second version, the Taxpayer was sued by his customer who slipped and fallen inside his business store." (Doc. 30-29).

To that effect, Rum alleged that his lawyer advised him to place the money in a foreign bank account for concealment purposes (Rum Dep., at 45-47). Rum gave inconsistent statements on why he failed to return the money to the U.S. earlier. For example, Rum declared that he was afraid of being penalized with a fee for closing the foreign bank account, but then

also declared that he was satisfied with returns on investment, and thus decided to leave the funds in the foreign bank account (Doc. 58-30, Kerkado's Response to Rum's Protest Letter). Rum admitted that "he was very active with communicating investment strategies to UBS" because "he wanted to ensure he was getting the best return on his investment with UBS" (Doc. 31-11, Petition for Determination of Notice of Deficiency).

From 2002 to 2008, UBS sent bank statements to Rum that included the following notice on the cover:

> The information contained herein is intended to provide you with information which may assist you in preparing your US federal income tax return. It is for information purposes only and is not intended as formal satisfaction of any government reporting requirements.

(Income Statements USA at Exhibit 6, Bates UBS00378-44). Further, in 2004, Rum signed a document in Switzerland titled "Supplement for New Account US Status" (Supplement at Ex. 6, Bates UBS00048). The signed document contains the following statement: "In accordance with the regulations applicable under US law relating to withholding tax, I declare, as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person." *Id.* In 2007, Rum was the owner of a foreign bank account at UBS AG in Switzerland and had exclusive signature authority on the account (Rum Dep., at 20-35). Rum's UBS AG account balance exceeded $10,000 in 2007 (Kerkado Decl., at ¶4; Monthly balance at Ex. 6, Bates UBS00010; UBS Bank Statements at Ex. 6, Bates UBS00378 – 444). Rum's UBS account earned income each year, except for 2006 (UBS bank statements at Ex. 6, Bates UBS00011 and UBS00378-444; Kerkado Decl., at ¶11; Rum Dep., at 66). Rum owned the UBS account until October 26,

2008, when he closed it to transfer $1.4 million to Arab Bank, another bank located in Switzerland.[2] *Id.*

Rum alleged that he used a tax preparer to complete his returns; nevertheless, Rum's 2007 tax return is one of several tax returns that is marked as "Self-Prepared" on the tax preparer's signature line (2007 Forms 1040 at Ex. 2; Rum Dep., at 97-98).[3] Rum signed the 2007 tax return on February 27, 2008; this signature is found on Form 1040 immediately below the following standard provision: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." (2007 Form 1040 at Ex. 2; Rum Dep., at 97). Further, Rum alleged that he provided his tax preparer with the documents necessary to prepare the returns (Rum Dep., at 78-79). Nonetheless, Rum admits that he never told the tax preparer about his foreign bank account and claims that the tax preparer never asked him about the existence of a foreign bank account (Rum Dep., at 79). Line 7a of Schedule B of the 2007 Form 1040 tax return contains the following question: "At any time during 2007, did you have an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities, or other financial account? See instructions for exceptions and filing requirements for Form TD F 90-22.1 [FBAR]." (Kerkado Decl., at ¶7; 2007 Form 1040 at Ex. 2). Due to ownership of the UBS account, Rum was required to file the FBAR on or before June 30, 2008, for tax year 2007 (Kerkado Decl., at ¶4). Instead, Schedule B of Rum's 2007 tax

---

[2] During a 2008 IRS examination, Rum did not disclose the foreign bank account he maintained at Arab Bank, after closing the UBS account for financial reasons (Kerkado Decl., at ¶20).

[3] Rum claimed in his answers to interrogatories and during his deposition that George Hershkowicz prepared his returns from 1999 to 2007, a man who is now deceased (Rum Interrogatory Response No. 10 at Ex. 9; Rum Dep., at 74). However, Rum claimed in his Petition to the Tax Court that Steve Mermel Stein prepared his tax returns, a man who owned the firm where George Hershkowicz worked (Doc. 31-11, Petition for Determination of Notice of Deficiency).

return is one of several tax returns that represented that Rum did not have an interest in a foreign financial account; specifically, a "no" was marked on Question 7(a) of Schedule B (2007 Form 1040 at Ex. 2; Rum Dep., at 97-98). Rum failed to file an FBAR repeatedly prior to tax year 2007; in fact, Rum only filed an FBAR for tax year 2008 (Kerkado Decl., at ¶¶6-7). Specifically, on October 6, 2009, UBS sent a written notice to Rum stating, in relevant part, that Rum's account with UBS appears to be within the scope of the IRS Treaty Request (10/6/2009 Letter at Ex. 13; Rum Dep., at 53-54). Nine days later, Rum filed his first FBAR form, on October 15, 2009, for tax year 2008 (2008 FBAR at Ex. 17; Kerkado Decl., at ¶6). Further, Rum admitted that while he did not disclose the UBS account on his tax returns or the Free Application for Federal Student Aid ("FAFSA"), he disclosed the account on his mortgage application to demonstrate his strong financial position (Kerkado Decl., at ¶12).

Upon an initial review by the IRS of Rum's case, Kerkado proposed a non-willful FBAR penalty against Rum (Doc. 58, Deposition of Terry Davis ("Davis Dep."), at 15-16). Terry Davis, her supervisor, approved the proposal, subject to the approval of area counsel (Davis Dep., at 19). Davis then sent it to area counsel for approval (Davis Dep., at 15-16). Kerkado and Davis initially proposed a non-willful penalty instead of a willful penalty based on the prior inaction of New York IRS agents, who had failed to raise an FBAR penalty in Rum's case. Specifically, Davis testified that this was not a close call in terms of willfulness; instead, both him and Kerkado "were initially bothered by the fact that the FBAR penalty wasn't raised initially by the service." (Davis Dep., at 79). Kerkado similarly testified that they did not feel they had "a leg to stand on" (Kerkado Dep., at 72-73). However, area counsel's approval of the non-willful penalty was accompanied by the following language:

> It is our understanding that the revenue agent did not propose a
> willful penalty in this case because the prior revenue agent failed
> to raise the issue of filing FBAR forms in the earlier examination.
> In the absence of additional facts not stated in this memorandum,

> this office believes that there is sufficient evidence to impose the willful penalty should the Commissioner make that determination. Any evidence that the prior revenue agent failed to raise the FBAR issue should be inadmissible in a court proceeding as not relevant to determining the taxpayer's intent at the time the violations were committed.

(Doc. 58-8, Office of Chief Counsel Internal Revenue Service Memorandum). As such, the memorandum's language invited the agents to reconsider Rum's case (Doc. 58-8, Office of Chief Counsel Internal Revenue Service Memorandum). Once Kerkado and Davis ultimately realized, through the memorandum's language, that their initial reasoning was based on an irrelevant "factor when it comes to willful definition," Rum's case was reconsidered and a willful penalty was proposed (Davis Dep., at 79). Then, both Davis and area counsel approved Kerkado's proposal for a willful penalty (Davis Dep., at 77-84). Kerkado never recommended anything lower than 50% of the account balance at the time of the violation for a willful penalty (Davis Dep., at 82-83). Both Davis and area counsel agreed that Rum was ineligible for mitigation because of the proposed civil tax fraud penalty (Davis Dep., at 95). Notably, the Internal Revenue Manual ("I.R.M.") provides that, if the maximum balance of the account exceeds a million dollars at the time of the violation, the *FBAR statutory maximum applies*. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. §4.26.16-2. Here, it is undisputed that the account exceeded a million dollars during tax year 2007 (10/30/08 closing slip at Ex. 6, Bates UBS00050; Rum Dep., at 20-22; Rum Dep., at 11:15-22 at Ex. 5; 20:24-21:21, 35:7-12 at Ex. 5; Kerkado Decl. ¶4 at Ex. 7; Monthly balance at Ex. 6, Bates UBS00010; UBS Bank Statements at Ex. 6, Bates UBS00378 – 444; Stip. Facts ¶¶1-3; Doc. 58-5). However, the I.R.M. also provides for an exception, that is, the statutory maximum *could* be reduced if a taxpayer meets four mitigating factors. Here, the only mitigation factor at issue is the civil tax fraud

penalty.[4] The I.R.M. provides that, if the IRS determines or sustains a fraud penalty, then mitigation of the maximum statutory penalty cannot apply. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. § 4.26.16-2; IRM 4.26.16.4.6.1(2)(d) (July 1, 2008).[5]

Here, Davis testified that the facts and circumstances of this case did not warrant a downward departure from the maximum statutory amount and the case was appropriately handled (Davis Dep., at 83, 98). Kerkado, on the other hand, testified that she did not feel she had the discretion to recommend anything lower than the maximum statutory penalty and could not recall consulting the I.R.M. (Doc. 58, Deposition of Marjorie Kerkado ("Kerkado Dep."), at 22-26, 85, 88). Nonetheless, Davis declared that Kerkado was overall a good agent that was thorough, knowledgeable, and followed the I.R.M. (Davis Dep., at 7, 71). Kerkado testified that she ultimately proposed the willful penalty sometime in March of 2013, but that it ultimately was not her decision, and that she could not recall when she put all the facts together and convinced herself that Rum was willful (Kerkado Dep., at 44, 69). While Kerkado did find Rum to be willful, she felt imposing the maximum statutory penalty "was a lot" (Kerkado Dep., at 90). Kerkado further testified that Davis and area counsel would be the best people to know if there were sufficient facts to support a willful penalty; she was simply in charge of gathering the facts and asking if they were sufficient for a certain penalty (Kerkado Dep., at 126). Further, Kerkado submitted a Summary Memo detailing the basis for why a willful penalty was

---

[4] During the hearing before the undersigned on May 28, 2019, the parties conceded that the only mitigating factor at issue is the civil tax fraud penalty.

[5] A relevant portion of the I.R.M. requires that the "*IRS did not determine* a fraud penalty against the person for an underpayment of income tax for the year in question due to the failure to report income related to any amount in a foreign account." IRM Exhibit 4.26.16-2 (July 1, 2008) (emphasis added). Another relevant portion provides that the "*Service did not sustain* a civil fraud penalty against the person for an underpayment for the year in question due to the failure to report income related to any amount in a foreign account." IRM 4.26.16.4.6.1(2)(d) (July 1, 2008) (emphasis added).

resubmitted instead of the non-willful penalty, in which she specifically noted that the mitigation guidelines were considered and not applicable due to a civil fraud penalty being proposed and appealed (Doc. 30-24, Kerkado's Summary Memorandum in Support of FBAR Penalty). Further, Kerkado's FBAR Examination Lead Sheets also reveal a notation demonstrating that she considered the I.R.M. mitigation guidelines in Rum's exam (Doc. 67-1).

On June 3, 2013, at the conclusion of Rum's IRS examination, the IRS sent Rum Letter 3709 stating that it was "proposing a penalty" for willful failure to file the FBAR; the letter cited the amended statute that provided for the maximum penalty of 50% of the account at the time of violation (Doc. 59, at Ex. 1, "Letter 3709"). Previously, on June 11, 2012, Kerkado sent Rum a letter informing him that, since an agreement could not be reached pursuant to her offer of a reduced FBAR penalty (20% of the balance of his account) in exchange for agreeing to the civil fraud penalty, the maximum statutory penalty would apply for tax year 2007 (Doc. 58-16, Kerkado Letter to Rum). Further, Rum posits that Wrightson offered him the same deal afterwards (Doc. 58-38, Declaration of Said Rum, at 9). Specifically, Rum alleges that Wrightson said she would give him the same offer Kerkado had if he would provide proof for such offer. *Id.* However, Rum failed to provide such proof to Wrightson. *Id.* The June 3, 2019 Letter 3709 further explained that Rum would have to accept the penalty, appeal the decision, or the IRS would assess the penalty and begin collection procedures if Rum elected to do nothing. *Id.* Along with the Letter 3709, Rum was provided with Form 886-a Explanation of Items (Doc. 58-5). The Form set forth the detailed basis upon which the IRS proposed the willful penalty against Rum. *Id.* While Agent Kerkado had the authority to recommend the assessment of the willful FBAR penalty against Rum for several tax years, she exercised her

discretion to recommend the imposition solely for tax year 2007 (Kerkado Decl., at ¶24; Doc. 30-29, "Appeals Memorandum").

Pursuant to Letter 3709, on July 2, 2013, Rum elected to appeal the proposed willful penalty by stating that he sought the "discretionary Assessment whereby the Penalty cannot exceed $10,000" (Doc. 58, Ex. 27).[6] Wrightson was the Appeals Officer who issued the Appeals Memorandum that sustained the willful FBAR penalty against Rum, including the civil fraud penalty (Doc. 30-29, "Appeals Memorandum"; Doc. 58-22, Deposition of Svetlana N. Wrightson, at 114).[7] Wrightson testified that the reason for sustaining the maximum willful FBAR penalty was because the facts, circumstances, and tax law all supported it (Doc. 58-22, Deposition of Svetlana N. Wrightson, at 14). In her opinion, based on the I.R.M. language, the mitigation factors were properly applied and Rum was disqualified from mitigation based on the civil fraud penalty[8]. *Id.* Rum also filed a formal protest opposing the fraud penalty on April 16, 2013, to which Kerkado responded with a detailed letter that set forth her reasoning (Doc. 58-30, Kerkado's Response to Rum's Protest Letter, "Kerkado Response"). Rum then proceeded to file a petition with the Tax Court, challenging the IRS's fraud penalty determination under 26 U.S.C. § 6663 (Doc. 31-11, Petition for Determination of Notice of Deficiency). The Tax Court ultimately entered a stipulated order whereby Rum would not be subject to a civil fraud penalty (Doc. 58-20). The Government then brought this action against Rum to collect outstanding civil penalties under 31 U.S.C. § 5321(a)(5)(C) for willful failure

---

[6] The amended statute's limit for non-willful violations is $10,000. 31 U.S.C. § 5321(a)(5)(B). The IRS checked the second box on Letter 3709, proposing a willful violation, rather than checking the box which provided for a non-willful violation.

[7] Wrightson further noted in the Appeals Memorandum that Rum indeed failed to qualify for relief under the mitigation guidelines; Rum received the IRS Appeals Office notice on April 30, 2015 (Doc. 30-29, "Appeals Memorandum").

[8] Wrightson noted in the Appeals Memorandum that Rum failed to meet the mitigation threshold conditions because of both the fraud penalty and his failure to cooperate (Doc. 30-29).

to report an interest in a foreign bank account for calendar year 2007 (Doc. 1). The parties' cross-motions for summary judgment are before the undersigned for consideration.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). The substantive law applicable to the claims will identify which facts are material. *Id.* at 248. In reviewing the motion, courts must view the evidence and make all factual inferences in a light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant. *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 483 F.3d 1265, 1268 (11th Cir. 2007) (citation omitted).

## III. DISCUSSION

The parties' pleadings pose three questions before the Court: (1) whether, upon amendment, 31 U.S.C. § 5321 superseded or invalidated 31 C.F.R. § 1010.820(g)(2); (2) whether there is a genuine issue of material fact over willfulness; and finally, (3) whether the IRS acted with bad faith or arbitrarily and capriciously.

### A. Interplay of statutory and regulatory law

As an initial matter, a question before the Court is whether the maximum penalty for a willful violation of 31 U.S.C. § 5321 superseded 31 C.F.R. § 1010.820(g)(2). Each year,

taxpayers must report to the IRS any financial interests held in a foreign bank by completing a form commonly known as the FBAR. 31 U.S.C. § 5314(a). If a taxpayer fails to file the FBAR timely, the Secretary of the Treasury ("Secretary") can impose a civil money penalty. 31 U.S.C. 5321(a)(5)(A). In 2004, Congress amended 31 U.S.C. § 5321 to reflect an increased penalty for willful FBAR violations to either the greater of $100,000 or 50% of the balance of the account at the time of the violation. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1428, 1586 (2004) (codified at 31 U.S.C.A. § 5321 (a)(5)). Specifically, the amended statute provides that

> 5) Foreign financial agency transaction violation.--
> (A) Penalty authorized.--*The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.*
> . . .
> (B) Amount of penalty.--
> (C) Willful violations.--In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314--
> (i) the maximum penalty under subparagraph (B)(i) *shall be increased* to the greater of--
> (I) $100,000, or
> (II) 50 percent of the amount determined under subparagraph (D)
> . . .

31 U.S.C. § 5321 (emphasis added).[9] To this date, the Secretary has not promulgated an updated regulation that reflects these amendments. 31 C.F.R. § 1010.820(g)(2). Specifically, the regulation continues to provide that

> (**g**) For any willful violation committed after October 27, 1986, of any requirement of § 1010.350, § 1010.360, or § 1010.420, the Secretary may assess upon any person, a civil penalty:
> . . .
> (**2**) In the case of a violation of §1010.350 or §1010.420 involving a failure to report the existence of an account or any identifying information required to be provided with respect to such account, *a civil penalty not to exceed the greater of the*

---

[9] The amended statute also added a penalty for non-willful violations limited to $10,000. 31 U.S.C. § 5321(a)(5)(B).

> *amount (not to exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000.*

31 C.F.R. § 1010.820(g)(2) (emphasis added). While the parties agree that the applicable *statute* on reporting foreign bank accounts is the amended version of 31 U.S.C. § 5321, Rum argues that the IRS acted arbitrarily and capriciously because the regulation still applies.  On the other hand, the Government argues that 31 C.F.R. § 1010.820(g)(2) is *inconsistent* with the 2004 amendments to 31 U.S.C. § 5321, and as such, the regulation was implicitly superseded or invalidated by the statute.

Under 5 U.S.C. § 706(2), "a court must hold unlawful and set aside agency actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Rum argues that the IRS's action was "not in accordance with law" because the regulation was not followed when the IRS assessed the FBAR penalty for tax year 2007, and as such the court must hold the action "unlawful" and set it aside. Rum relies on two cases, *United States v. Colliot*[10] and *United States v. Wahdan*[11], which held that, despite the statutory amendment, the regulation is still in force.[12] Initially, *Colliot* held that 31 C.F.R. § 1010.820(g)(2) is consistent with 31 U.S.C.A. § 5321 as amended, and as such, was not superseded or invalidated; *Wahdan* then issued a congruous decision based on *Colliot*. 2018 WL 2271381; 325 F. Supp. 3d 1136. *Colliot* reasoned that the statute did not supersede or invalidate the regulation because they could be applied consistent with each other. *Id.* at 2-3. To that effect, *Colliot* noted that the amended statute vested the Treasury with the discretion to determine the amount of the willful penalty, as long as it did not exceed the ceiling set, i.e.,

---

[10] No. AU-16-CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018).

[11] 325 F. Supp. 3d 1136 (D. Colo. 2018).

[12] The only guidance on this issue from the courts originates solely from opinions issued by district courts and federal claims courts.

$100,000 or 50% of the account at the time of the violation, and the Treasury *cabined* that discretion at $100,000 by *not* amending the regulation. *Id. Wahdan* held similarly by essentially noting that the amended statute "does not mandate imposition of the maximum penalty" and instead left the discretion with the Treasury, who failed to amend the regulation after fourteen years. 325 F. Supp. 3d at 1139.

Nevertheless, the undersigned finds persuasive the reasoning of a recent string of cases that rejected *Colliot* and *Wahdan* and found that the statute superseded the regulation, namely, *United States v. Jung Joo Park, et al.*[13], *Norman v. United States*[14], *Kimble v. United States*[15], *United States v. Horowitz*[16], and *United States v. Garrity*[17]. Upon review of these cases, the undersigned concludes that, while the amended statute provides that the "Treasury *may* impose a civil money penalty . . .", Congress provided that the amount of the penalty for willful violations "*shall* be increased . . . ." 31 U.S.C. § 5321 (emphasis added). The regulation is no longer valid because it is inconsistent with the amended statute which "*mandates* that the maximum penalty be set to the greater of $100,000 or 50 percent of the balance of the account." *Norman*, 138 Fed. Cl. 189, 195-96 (July 31, 2018) (emphasis added). While the Treasury was vested with discretion in determining the penalty amounts, Congress nevertheless "used the imperative 'shall,' rather than the permissive, 'may.'" *Id.* at 196. In other words, had Congress intended to leave the discretion with the Treasury regarding the *amount* of the penalties, it could have easily used the word "may" again, as it did in directing who had the authority to *impose* the penalties. Thus, the amendment "did not merely allow for a higher 'ceiling' on penalties while allowing the Treasury Secretary to regulate under that ceiling at his discretion; rather,

---

[13] No. 16 C 10787, 2019 WL 2248544 (N.D. Ill. May 24, 2019).
[14] 138 Fed. Cl. 189 (July 31, 2018).
[15] 141 Fed. Cl. 373 (2018).
[16] 361 F. Supp. 3d 511 (D. Md. 2019).
[17] No. 3:15-CV-243(MPS), 2019 WL 1004584 (D. Conn. Feb. 28, 2019).

Congress raised the ceiling itself, and in so doing, removed the Treasury Secretary's discretion to regulate any other maximum." *Id.; see also Jung Joo Park, et al.*, 2019 WL 2248544, at *8 (rejecting *Colliot* and *Wahdan*'s reasoning by noting that, "[w]hile Congress did not establish specific reporting requirements in the BSA, leaving that to the Secretary, it *did* establish, in § 5321, specific parameters for civil penalties, providing what the maximum penalty for willful violations "shall" be"). As such, the regulation is no longer consistent with the amended statute as the maximum penalty remained set at $100,000 rather than to the greater of $100,000 or 50% of the balance of the account. *Norman*, 138 Fed. Cl. at 196. Thus, the regulation is no longer valid. *Id.* (citing *United States v. Larionoff*, 431 U.S. 864, 873, 97 S. Ct. 2150, 53 L. Ed. 2d 48 (1977)).

More so, the Treasury's inaction fails to support Rum's position that the regulation's continued existence translates to its validity in the face of the amended statute. While the regulation was not amended to reflect the statutory maximum, the IRS issued an Internal Revenue Manual ("I.R.M.") section addressing such inaction by noting that while "[a]t the time of this writing, the regulations at [31 C.F.R. § 1010.820] have not been revised to reflect the change in the willfulness penalty ceiling," the amended statute "is self-executing and the new penalty ceilings apply." I.R.M. § 4.26.16.4.5.1. *Kimble*, 141 Fed. Cl. 373, 388 (2018) (rejecting *Colliot* and *Wahdan* by finding that the statute superseded or invalidated the regulation); *Horowitz*, 361 F. Supp. 3d 511, 515 (D. Md. 2019) (agreeing with *Kimble* in light of a recent I.R.M. provision which states that, as long as a violation occurred after October 22, 2004, "the statutory ceiling is the greater of $100,000 or 50% of the balance in the account at the time of the violation." I.R.M. § 4.26.16.6.5(3) (Nov. 6, 2015)).[18] In fact, when the statute was amended

---

[18] While the I.R.M. lacks the force of law, courts have used it "on a limited basis, to provide guidance in interpreting terms in regulations." *Horowitz*, 361 F. Supp. 3d at 515.

in 2004, "Congress specified that the higher penalties for willful FBAR violations would take effect immediately once the amendments were enacted," as evidenced by the language in the public law: "[t]he amendment made by this section *shall apply* to violations occurring after the date of the enactment of this Act." *Garrity*, 2019 WL 1004584, at *3. In *Garrity*, the court specifically found that the "Secretary could not override Congress's clear directive to raise the maximum willful FBAR penalty by declining to act and relying on a regulation parroting an obsolete version of the statute." *Id.* Further, the court in *Garrity* held that the Secretary need not take "some formal regulatory action before the *penalty provisions* of the BSA acquire the force of law," because the plain language of the amended statute fails to "suggest that additional regulations are necessary before the civil penalties can take effect." *Id.* The higher penalty requirements for willful FBAR violations took place immediately after the amendment. *Id.* Consequently, the undersigned finds that the regulation is inconsistent with the amended statute. As such, the IRS properly applied 31 U.S.C. § 5321 instead of 31 C.F.R. § 1010.820(g)(2) when assessing the willful penalty against Rum for 50% of the balance of his account.

    a. **Willfulness**

        Upon finding that the IRS properly applied 31 U.S.C. § 5321, the Court must now analyze whether the record establishes that Rum meets all the elements for a *willful* penalty assessed under this statute. To be subject to a willful FBAR penalty under 31 U.S.C. § 5321, the following elements must be met: (1) the person is a U.S. citizen; (2) the person had an interest in or authority over a foreign financial account; (3) the financial account had a balance that exceeded $10,000 at some point during the reporting period; and (4) the person willfully failed to disclose the account and file an FBAR form for the account. 31 U.S.C. § 5314. It is undisputed that Rum is a U.S. citizen who had interest in UBS AG, a bank account located in Switzerland, and that the account had a balance exceeding $10,000 during the reporting period

(Rum Dep., at 11:15-22 at Ex. 5; 20:24-21:21, 35:7-12 at Ex. 5; Kerkado Decl., at ¶4; Monthly balance at Ex. 6, Bates UBS00010; UBS Bank Statements at Ex. 6, Bates UBS00378 – 444; Stip. Facts ¶¶1-3). As such, the Court shall focus its analysis on the sole element in dispute: willfulness.

While willfulness is not specifically defined under the statute, the Bank Secrecy Act defines the penalties as "civil money penalties." 31 U.S.C. § 5321(a)(5)(A). In the context of civil money penalties, willfulness "is generally taken [ ] to cover not only knowing violation of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L.Ed.2d 1045 (2007) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L.Ed.2d 115).[19] In the FBAR context, willfulness "may be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information,' and it 'can be inferred from a conscious effort to avoid learning about reporting requirements.'" *Williams*, 489 Fed. App'x at 658 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)); *see, e.g.*, *Bedrosian v. United States*, No. 2:15-cv-5853, 2017 WL 4946433 at *3, 2017 U.S. Dist. LEXIS 154625 at *3 (E.D. Pa. 2017) (holding that recklessness establishes a willful FBAR violation and that "every federal court to have considered the issue has found the correct standard to be the one used in other civil contexts"); *United States v. Bohanec*, 263 F. Supp. 3d 881, 888-89 (C.D. Cal. 2016) (holding that willfulness under §5321 can be shown through "reckless disregard of a statutory duty"). Further, circumstantial evidence and inferences drawn by a court based on the record suffice as

---

[19] Rum's reliance on *Cheek v. United States*, 498 U.S. 192, 201 (1991) is misplaced. *Cheek*'s narrower standard for willfulness, namely, "a voluntary, intentional violation of a known legal duty" has been applied in a *criminal*, rather than a civil context. *United States v. Sturman*, 951 F.2d 1466, 1477 (6th Cir. 1991).

"persons who fail to file an FBAR are not likely to admit they knew of the filing requirement and chose not to comply with it." *McBride*, 908 F. Supp. 2d at 1204.

Rum's contention that there is a genuine issue of material fact as to willfulness is unavailing. A taxpayer's failure to review their tax returns for accuracy despite repeatedly signing them, along with "falsely representing under penalty of perjury" that they do not have a foreign bank account (by answering "no" to question 7(a) on Line 7a of Schedule B of a 1040 tax return) *in and of itself* supports a finding of "reckless disregard" to report under the FBAR. *Kimble v. United States*, 141 Fed. Cl. 373, 376 (2018). Once a taxpayer signs a tax return, they are "put on inquiry notice of the FBAR requirement" and, as such, "charged with constructive knowledge" of the contents of the tax return in question. *Id.* at 385-86. *See also United States v. Williams*, 489 F. App'x 655, 659 (4th Cir. 2012) (holding that Williams wilfully violated the FBAR requirement because "William's signature is prima facie evidence that he knew the contents of the return . . . and at a minimum line 7a's directions to '[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1' put Williams on inquiry notice of the FBAR requirement" *and* that failing to read his returns demonstrates a "conscious effort to avoid learning about reporting requirements  . . . and his false answers on  . . . his federal tax return evidence conduct that was 'meant to conceal or mislead sources of income or other financial information'""); *United States v. Doherty*, 233 F.3d 1275, 1282 (11th Cir. 2000) (noting that a defendant can be charged with knowledge of the contents of a tax return by signing a fraudulent form); *Norman v. United States*, 138 Fed. Cl. 189, 194-95 (Fed. Cl. 2018) (holding that "[a]t a minimum, Norman was 'put on inquiry notice of the FBAR requirement' when she signed her tax return for 2007, but chose not to seek further information about the reporting requirements . . . [a]lthough one of the consistent pieces of Ms. Norman's testimony was that she did not read her tax return . . . simply not reading the return does not shield Ms. Norman

from the implications of its contents"); *Jarnagin v. United States*, 134 Fed. Cl. 368, 378 (2017) (holding that "any individual exercising ordinary business care and prudence" would read the information specified by the government in the tax returns and then "would have made inquiry of their account about the FBAR filing requirements after having identified the clear error in the response provided to question 7a"); *United States v. McBride*, 908 F. Supp. 2d 1186, 1206 (D. Utah 2012) (noting that "[i]t is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS").

Here, it is undisputed that Rum signed the 2007 tax return on February 27, 2008, along with other tax returns, charging him with constructive knowledge of the FBAR requirement (Doc. 31-2, at Ex. 2; Rum Dep., at 97). Form 1040 included a plain instruction: "[y]ou *must* complete this part *if* you (a) had over $1,500 of taxable interest or ordinary dividends; *or (b) had a foreign account . . .*" (Doc. 31-2, at Ex. 2) (emphasis added). The instruction clarified that this applies to a person with a foreign bank account. As such, it was irrelevant whether Rum actually believed that his income was not taxable—the question simply asked if such account *existed*. It is undisputed that Rum knew that such account existed (Rum Dep., at 20-21, 35). Schedule B then proceeds with a plain question, question 7(a): "At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 [FBAR]" (Doc. 31-2, at Ex. 2). Based on the record, either Rum or his tax accountant *repeatedly* typed an "X" for "No" in the relevant box (Doc. 31-2, at Ex. 2; Kerkado Decl., at ¶¶6-7).[20] Yet again, it is undisputed that

---

[20] Even if a tax accountant prepared Rum's tax returns, his reliance "upon advice that [he] never solicited nor received" may not be used as a "shield reliance" and excuse. *Jarnagin v. United States*, 134 Fed. Cl. 368, 378 (2017) (holding that the Jarnagins cannot use their reliance on

Rum had an interest in a foreign bank account in 2007 (Rum Dep., at 20-21, 35). As such, Rum's pattern of signing his tax returns without reviewing them, along with falsely answering "no" to question 7(a) suffices to support a finding of willfulness to report under the FBAR.

Further, the record includes more evidence that, while *not* necessary to establish willfulness, supports this finding by showing a pattern of conscious efforts to conceal and avoid learning about the FBAR reporting requirement. For instance, Rum admitted that the only reason for opening the UBS account was to conceal the money from potential judgment creditors (Rum Dep., at 42). Rum also owned a "numbered" rather than a "name account" and elected to have his UBS mail withheld abroad (Rum Dep., at 24; UBS Account Opening at Ex. 6, Bates UBS00044-45; Kerkado Decl., at ¶8). Additionally, UBS sent bank statements to Rum for numerous years explicitly noting that those statements could assist Rum in preparing his US tax returns, and that they do not satisfy government reporting requirements in and of themselves (Income Statements USA at Exhibit 6, Bates UBS00378-44). Rum also admitted that he disclosed the UBS account on his mortgage application to assist him financially (Kerkado Decl., at ¶12). These circumstances, along with others,[21] allow the Court to find that Rum meant to conceal his foreign accounts and avoid learning about the FBAR filing requirement. *McBride*, 908 F. Supp. 2d at 1204. Consequently, because Rum is a U.S. citizen, who had an interest in a foreign bank account with a balance exceeding $10,000 during the reporting period, and willfully failed to report such account, the IRS appropriately proposed a willful FBAR penalty against Rum under 31 U.S.C. §5321.

---

their tax accountant as a shield when they never asked about the reporting requirements on their foreign bank account, nor received such advice). Similarly, Rum admits that he never told the tax preparer about his foreign bank account and claims that the tax preparer never asked him about the existence of a foreign bank account (Rum Dep., at 79).

[21] The Court shall address in full these facts and circumstances in the forthcoming section.

**B. Administrative Procedure Act**

Upon finding that the IRS appropriately applied 31 U.S.C. § 5321 when assessing a willful penalty against Rum, the only question remaining before the Court is whether the IRS acted arbitrarily and capriciously when assessing the maximum statutory penalty, i.e., 50% of the balance of Rum's account. Under the Administrative Procedure Act ("APA"), a court must hold unlawful and set aside agency actions, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).[22] Specifically,

> An agency['s] [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The arbitrary and capricious standard "is *exceedingly* deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996) (emphasis added). A reviewing court may not overrule the agency's determination simply because the court would have reached a different result. *Id.* at 542 (noting that "[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.") (alterations in original). Indeed, a court shall only review the record before it to ensure that the agency engaged in reasoned decision-making and

---

[22] There is no binding caselaw addressing the standard that applies to the judicial review of the assessment of FBAR penalties. Nevertheless, the APA provides guidance towards conducting the judicial review of an agency's decision. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (noting that judicial review of final agency actions is presumed under the APA). Further, the parties concede that the assessment of the FBAR penalty is reviewable under the APA (Docs. 31, 58).

there was a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (*quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)); *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir. 1996). If a court finds that an agency acted arbitrarily and capriciously, the proper course "is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985). An agency's *selection of a penalty* is within its discretion, "to be reviewed only for abuse under an arbitrary and capricious standard of review." *Ekanem v. Internal Revenue Service,* 1998 WL 773614, at *1 (D. Md. 1998); *United States v. Williams*, No. 1:09-CV-00437, 2014 WL 3746497, at *1 (E.D. Va. June 26, 2014) (holding that the APA standard applies when reviewing an FBAR penalty amount); *but see United States v. McBride,* 908 F. Supp. 2d, 1186, 1214 (D. Utah Nov. 8, 2012) (giving great deference to the judgment of the agency and holding that the FBAR penalties were within the range authorized by Congress, while not specifically identifying a standard of review).

### a. Arbitrary and Capricious

As such, the Court must determine whether there is a rational basis between the facts and the IRS's final decision to impose a 50% willful penalty against Rum. In other words, under this "exceedingly deferential" standard, did the IRS engage in reasoned decision-making, rather than act arbitrarily and capriciously? As an initial matter[23], the I.R.M. states that, if the maximum balance of the account exceeds a million dollars at the time of the violation, the *FBAR statutory maximum applies*. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. §4.26.16-2. Here, it is undisputed that the account exceeded a million dollars during tax year 2007

---

[23] A full discussion in the willfulness section details how the record properly established a rational link between the facts and willfulness finding.

(10/30/08 closing slip at Ex. 6, Bates UBS00050; Rum Dep., at 20-22; Rum Dep., at 11:15-22 at Ex. 5; 20:24-21:21, 35:7-12 at Ex. 5; Kerkado Decl. ¶4 at Ex. 7; Monthly balance at Ex. 6, Bates UBS00010; UBS Bank Statements at Ex. 6, Bates UBS00378 – 444; Stip. Facts ¶¶1-3; Doc. 58-5). The IRS assessed a penalty of 50% of the balance in the account penalty, as it was greater than $100,000 in Rum's case. Nevertheless, the I.R.M. provides for the following exception: the statutory maximum *could* be reduced if a taxpayer meets four mitigation factors. As noted previously, the only mitigation factor at issue is the civil tax fraud penalty. The two pertinent I.R.M. sections provide that the IRS *must not have determined* or *sustained* a fraud penalty to qualify for mitigation. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. § 4.26.16-2; IRM 4.26.16.4.6.1(2)(d) (July 1, 2008). As such, the Court must conduct a review, under the arbitrary and capricious standard, establishing whether the IRS had a rational basis for assessing the civil fraud penalty.

### 1. Civil Fraud Penalty

When imposing a civil fraud tax penalty, the IRS has the burden, by clear and convincing evidence[24], to show that an underpayment of tax exists and that some portion of that underpayment is due to fraud. 26 U.S.C. §6663; 7454(a); Rule 142(b); *Clayton v. Commissioner*, 102 T.C. 632, 646 (1994). The taxpayer's actions and conduct may be sufficient in establishing intent. *Otsuki v. Commissioner*, 53 T.C. 96, 1 05-1 06 (1969). The IRS can rely on circumstantial evidence and reasonable inferences drawn from the facts in the taxpayer's record, as direct proof of intent is rarely available. *Rowlee v. Commissioner*, 80 T.C. 1111, 1123 (1983); *Stone v. Commissioner*, 56 T.C. 213, 223-224 (1971). When considering whether the civil fraud penalty should be applied, the IRS looks to the existence of "badges of fraud." 26

---

[24] However, as previously noted, the Court must use an arbitrary and capricious standard here.

U.S.C. §6663. Depending on the record, one or more badges of fraud may be sufficient to prove fraudulent intent. *Bertoli v. Commissioner*, 103 T.C. 501, 518 (1994). Courts have used the following "badges of fraud" as factors in determining the applicability of the civil fraud penalty: (1) understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. *Spies v. United States*, 317 U.S. 492, 499 (1943); *Douge v. Commissioner*, 899 F.2d 164, 168 (2d Cir. 1990); *Bradford v. Commissioner*, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988). The IRS uses several other indicators of fraud in determining a fraud penalty, such as false statements about material facts pertaining to an examination, failure to make full disclosures of relevant facts to an accountant, attorney, or return preparer, pattern of consistent failure over several years to report income fully, transferring assets for concealment purposes, and concealing bank accounts. 25.1.2 - *Recognizing and Developing Fraud*, 2007 WL 9246743.

Here, the record contains a plethora of implausible and inconsistent explanations of behavior, which altogether lead to a lack of credibility of Rum's testimony. As an initial matter, the record fails to establish that Rum does not have sufficient education, experience, and diligence to fulfill his U.S. tax obligations. For instance, Mr. Rum can read and write in English and has been proven to comprehend English (Doc. 58-5, "Form"). After college, Rum owned and operated several businesses, including a delicatessen, a pet supply store, and a convenience store (Rum Dep., at 17-19). Further, Rum admitted in his petition to the Tax Court that "he was very active with communicating investment strategies to UBS" and read financial papers

because "he wanted to ensure he was getting the best return on his investment with UBS" (Doc. 31-11, Petition for Determination of Notice of Deficiency). As such, the overall record paints the picture of a person who can readily understand the plain language used in tax form instructions, along with the ordinary prudence to handle his duties and affairs. For instance, the tax forms clearly instructed Rum in plain English to declare whether he *owned* a foreign bank account (Doc. 31-2, at Ex. 2). For numerous years, Rum undisputedly knew he did own a foreign bank account, yet repeatedly declared to the IRS that no such account existed (Rum Dep., at 20-21, 35).

Further, Rum declared that he opened the initial foreign bank account to conceal the money from potential judgment creditors[25] (Rum Dep., at 42). Nevertheless, the record reflects that he made inconsistent statements regarding which lawsuit judgment creditors he was trying to conceal his money from: a car accident or a slip and fall injury (Doc. 30-29; Kerkado Decl., at ¶10). Further, Rum gave inconsistent statements on why he did not bring the money back to the United States once that was no longer a concern: Rum declared that he was afraid of being penalized with a fee for closing the foreign bank account, but then also claimed that he was satisfied with the returns on investment, and thus decided to leave the funds in the foreign bank account (Doc. 58-30, Kerkado's Response to Rum's Protest Letter).

While Rum alleges that he used a tax preparer to complete his tax returns, Rum's relevant tax returns are marked as "Self-Prepared" on the tax preparer's signature line (2007 Forms 1040 at Ex. 2; Rum Dep., at 97-98). Rum failed to provide any evidence supporting the allegation that he sought the advice of an accountant or advisor to prepare his tax returns (Doc. 58-30, Kerkado's Response to Rum's Protest Letter). Even assuming that such tax preparer existed, Rum further provided inconsistent statements about the identity of such tax preparer:

---

[25] Rum did not provide evidence supporting this allegation.

Rum claimed in his answers to interrogatories and during his deposition that George Hershkowicz prepared his returns from 1999 to 2007, a man who is now deceased, but then also claimed in his Tax Court petition that Steve Mermel Stein prepared his tax returns, a man who owned the firm where George Hershkowicz worked (Rum Interrogatory Response No. 10 at Ex. 9; Rum Dep., at 74; Doc. 31-11, Petition for Determination of Notice of Deficiency).

In addition, the record reflects a pattern of behavior that allows the Court to infer an intent to mislead and conceal. For instance, Rum's very reason for creating a foreign bank account was to unlawfully conceal his money from potential judgment creditors (Rum Dep., at 42). When opening the account, he *elected* to own a "numbered account" rather than a "name account," along with paying to have his mail withheld at UBS, rather than sent to the U.S. (Rum Dep., at 24; UBS Account Opening at Ex. 6, Bates UBS00044-45; Kerkado Decl., at ¶8; Change of Domicile Form at Ex. 6, Bates UBS00049). Rum also admits that he never told the tax preparer, if one existed, about his foreign bank account (Rum Dep., at 79). Further, while Rum failed to list his foreign bank account on the relevant tax returns, he did list the account on a mortgage application to benefit financially (Kerkado Decl., at ¶12). Then, while UBS advised Rum of the QI deemed sales, and the record reflects that Rum understood his obligations once briefed, Rum failed to provide a W-9 form, effectively concealing his funds from his offshore account from the IRS (Docs. 30-29, 58-5). Though Rum alleges that he held the belief that his income was not taxable, a belief unsupported by evidence as well, as Kerkado noted, if he truly held that belief, he would not have objected to UBS reporting his income to the IRS (Doc. 58-30, Kerkado's Response to Rum's Protest Letter). Quite the contrary, the record supports that Rum was repeatedly made aware of his U.S. tax obligations and that Rum avoided fulfilling these obligations. For instance, UBS sent bank statements to Rum from 2002 to 2008 that contained the following notice on the first page:

> The information contained herein is intended to provide you with information which may assist you in preparing your US federal income tax return. It is for information purposes only and is not intended as formal satisfaction of any government reporting requirements.

(Income Statements USA at Exhibit 6, Bates UBS00378-44). Further, in 2004, Rum signed a document in Switzerland titled "Supplement for New Account US Status" (Supplement at Ex. 6, Bates UBS00048). The signed document contains the following statement: "In accordance with the regulations applicable under US law relating to withholding tax, I declare, as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person." *Id.* Then, while Rum alleges that he never read his tax returns, he repeatedly signed under perjury declaring otherwise (2007 Form 1040 at Ex. 2; Rum Dep., at 97). Simply put, as Kerkado asserted, there is no evidence of misunderstandings (Doc. 58-30, Kerkado's Response to Rum's Protest Letter). Even based on Rum's allegations of good faith misunderstandings, specifically that the money would not have to be reported until brought back to the U.S., the record shows that, even in *2009*, he did not report the total income earned offshore. *Id.*

Additionally, during the audit for the 2006 tax return, Rum and his representative concealed the fact that the funds at UBS were transferred to another offshore bank account; to that effect, the IRS noted that Rum disclosed "only the account of which he thought the IRS was already aware" (Doc. 30-29; Doc. 58-5). Rum disclosed both offshore accounts only for tax year *2008* (Kerkado Decl., at ¶¶6-7). Moreover, as Kerkado noted, Rum secured a federal tax attorney to assist him with the 2006 IRS audit; nevertheless, when Offshore Voluntary Disclosure Initiative (OVDI) was open to UBS customers, the taxpayer opted instead for a quiet disclosure (Doc. 58-30, Kerkado's Response to Rum's Protest Letter). As Kerkado further noted, had Rum entered in the OVDI program, he could have avoided any fraud penalties. *Id.* Rum instead chose to continue his concealment *until* UBS sent him a letter indicating that his

account had been disclosed to the IRS. *Id.* The UBS income was not reported on the tax returns until UBS notified the taxpayer of the disclosure to the IRS. *Id.* The offshore income was not reported correctly until IRS made contact with the taxpayer specifically about the offshore account. *Id.* Ultimately, as Kerkado concluded in her letter in response to Rum's protest, Rum secured a tax attorney two and a half years *prior* to the IRS making contact regarding the UBS account, and yet, not one accurate return was filed showing the correct income earned offshore. *Id.* If his intent was to comply, he would have by then, but the record fails to establish that. *Id.*

Finally, the record supports that all the behavior detailed above constitutes a *pattern* of consistent failure over numerous years to report income fully, and involved a substantial amount of money. Specifically, Rum opened the first foreign bank account at UBS in 1998, and the second foreign bank account at Arab Bank in 2008, but only disclosed both of them a decade later, in his 2008 tax return (10/30/08 closing slip at Ex. 6, Bates UBS00050; Rum Dep., at 20-22; Rum Dep., at 24; UBS Account Opening at Ex. 6, Bates UBS00044-45; Kerkado Decl., at ¶¶6-7). Further, Rum's foreign bank account ranged from approximately $1.1 million in 1998 to approximately $1.4 million in 2008. *Id.* Consequently, based on the entirety of the record and Rum's behavior, the undersigned finds the numerous badges of fraud sufficient to show that the IRS had a rational basis upon which to impose the maximum statutory penalty. As such, because the IRS had a rational, reasoned basis for subjecting Rum to the maximum statutory penalty, i.e., 50% of the balance of his account, the IRS did not act arbitrarily and capriciously during the administrative process.

### b. Bad Faith

Nevertheless, Rum contends that this Court should go beyond the record and review the IRS's decision under the *de novo* standard instead. "In applying [the arbitrary and capricious standard], the focal point for judicial review should be the administrative record already in

existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). As such, a court cannot consider events that transpired after the IRS made its final determination of a penalty. While Rum acknowledges that precedent has established the "record rule" detailed above, exceptions exist. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U. S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971). Though the Eleventh Circuit has not specified what exceptions would apply in this context, it has noted exceptions recognized by other courts, such as the D.C. Circuit in *IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C. Cir. 1997). Specifically, Rum contends that the following exception applies in this case: a strong showing of agency bad faith or improper behavior. *Id.* at 624 (holding that the plaintiff failed to make a "'strong showing of bad faith or improper behavior' required to justify supplementing the record.") When raising this exception, a claimant must make a strong showing, based on hard facts and significant evidence, that bad faith or improper behavior "infected the agency's decisionmaking process." *Saget v. Trump*, 2019 U.S. Dist. LEXIS 63773 (E.D.N.Y Apr. 11, 2019) (citing *Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009)).

As an initial matter, Rum contends that the IRS's resubmission and approval of a willful penalty once a non-willful penalty was proposed and approved demonstrates bad faith. The Court finds Rum's argument unavailing. Kerkado and Davis initially proposed a non-willful penalty instead of a willful penalty based on the prior inaction of the New York agents, who had failed to previously raise an FBAR penalty in Rum's case. Indeed, Davis testified that this was not a close call in terms of willfulness; instead, both him and Kerkado "were initially bothered by the fact that the FBAR penalty wasn't raised initially by the service." (Davis Dep., at 79). Kerkado similarly testified that they did not feel they had "a leg to stand on" for a willful

penalty *prior to the area counsel memorandum* (Kerkado Dep., at 72-73). However, while the I.R.M. provides that, once a penalty proposal is approved, the examiner will transmit Letter 3709 to the taxpayer, area counsel approved the non-willful penalty *while also noting the following*:

> It is our understanding that the revenue agent did not propose a willful penalty in this case because the prior revenue agent failed to raise the issue of filing FBAR forms in the earlier examination. In the absence of additional facts not stated in this memorandum, this office believes that there is sufficient evidence to impose the willful penalty should the Commissioner make that determination. Any evidence that the prior revenue agent failed to raise the FBAR issue should be inadmissible in a court proceeding as not relevant to determining the taxpayer's intent at the time the violations were committed.

(Doc. 58-8, Office of Chief Counsel Internal Revenue Service Memorandum; IRM 4.26.17.4.3). The memorandum further set forth, in detail, specific factual reasons and caselaw that would support a willful penalty against Rum. *Id.* For instance, the memorandum highlighted that Rum's fraudulent motive for opening the foreign bank account, lying on his returns about the existence of the account, and alleging that a preparer had completed the returns when only Rum had signed them all support a finding of willfulness (Doc. 58-8, Office of Chief Counsel Internal Revenue Service Memorandum). Notably, the memorandum cited *United States v. Williams* in support of a willfulness finding.[26] As such, the memorandum's language invited the agents to reconsider Rum's case (Doc. 58-8, Office of Chief Counsel Internal Revenue Service Memorandum). Once Kerkado and Davis ultimately realized, through the memorandum's language, that their initial reasoning was based on an irrelevant "factor when it comes to willful definition," Rum's case was reconsidered and a willful penalty was proposed (Davis Dep., at 79). Then, both Davis and area counsel approved Kerkado's proposal for a

---

[26] A fuller discussion on *United States v. Williams* and its applicability here can be found in the willfulness section.

willful penalty (Davis Dep., at 77-84). As such, Davis and Kerkado did not arbitrarily or in bad faith reconsider Rum's penalty: the memorandum invited them to do so despite approving the initial penalty. While Rum contends that Davis improperly interjected with this process, Kerkado herself testified that Davis and area counsel would be in the best position to know whether sufficient facts supported a willful penalty, as her recommendation was subject to their approval and she was in charge of gathering the facts and making a proposal (Kerkado Dep., at 126). Rum declared that he bases the fact that Davis controlled Kerkado's decision and was tougher on taxpayers on his *intuition* (Doc. 58-38, Declaration of Said Rum, at 7). "Intuition" does not amount to hard facts and significant evidence. As noted previously, the fact that Kerkado and Davis submitted an initial non-willful penalty shows that they did not act in bad faith, as they could have proposed the highest penalty available from the beginning. Further, Rum has failed to provide, and this Court's review of the record and I.R.M. has failed to reveal any, policy or rule in the I.R.M. prohibiting the IRS from reconsidering and further developing a case in such circumstances.[27] As such, the record fails to support Rum's contention of bad faith in this respect.

Further, Rum argues that the IRS failed to fully develop and support its willful penalty decision. To reiterate, Rum's file was fully developed based on the language of the area counsel's memorandum that gave supporting facts and caselaw for a willful determination. In fact, Kerkado's Summary Memorandum in Support of the FBAR penalty notes that the memorandum provides a basis for why a willful penalty was resubmitted for approval after the initial non-willful penalty was made and approved by counsel (Doc. 30-24, Kerkado's Summary Memorandum in Support of FBAR Penalty). Among other things, Kerkado cites the

---

[27] The fact that Rum's case was reevaluated upon receiving the Area counsel memo does not mean that the I.R.M. was not followed (Davis Dep., at 33).

same caselaw that area counsel's memorandum had provided. *Id.* Further, Rum was provided with a Form 886-a Explanation of Items that set forth, in great detail, the basis for why the IRS ultimately proposed a willful penalty against Rum (Doc. 58-5). In proposing this penalty, Kerkado exercised her discretion to subject Rum to a penalty for one year, rather than numerous penalties for numerous years. I.R.M. 4.26.16.4.7. In addition, an examiner's workpapers must only document the circumstances that make mitigation of the penalty under the guidelines *appropriate*. Exhibit 4.26.16-2 (07-01-2008). As such, the I.R.M. does not mandate that agents fully document the circumstances when mitigation is *inappropriate*, as found here. There are several instances in the record that demonstrate that Kerkado considered the mitigation guidelines: Kerkado's Summary Memorandum in Support of FBAR Penalty, FBAR Examination Lead Sheets, and the Appeals Memorandum all support that Kerkado considered the mitigation guidelines and found them inapplicable because of the civil fraud penalty (Doc. 67-1; Doc. 30-24, Kerkado's Summary Memorandum in Support of FBAR Penalty; Doc. 30-29, "Appeals Memorandum")[28].

Rum further argues that the mitigation guidelines should have applied when assessing the penalty as the IRS merely *proposed* a civil fraud penalty, rather than *determined* or *sustained* one as the I.R.M. requires. IRM 4.26.16.4.6.1(2)(d) (July 1, 2008); IRM Exhibit 4.26.16-2 (July 1, 2008). Nonetheless, the fraud penalty proposed by Kerkado was sustained by the I.R.S. by

---

[28] Rum also contends that the record shows that Wrightson acted with bad faith. Nevertheless, Wrightson testified that she sustained the 50% penalty because the facts, circumstances, and law supported it (Doc. 58-22, Deposition of Svetlana N. Wrightson, at 14). Indeed, based on the I.R.M. language, Wrightson found that Rum was properly disqualified from mitigation (Doc. 58-22, Deposition of Svetlana N. Wrightson, at 45, 112). Even though Wrightson raised the cooperation issue when Kerkado had not, the process was not tainted by that "new issue" as Wrightson sustained the penalty based on the examination which only focused on the civil fraud penalty. Finally, the only basis for Rum's allegation that Wrightson offered him the same deal as Kerkado if he supplied proof, which he failed to, is *his own declaration* (Doc. 58-38, Declaration of Said Rum, at 9).

both the appeals process, *and* Davis and area counsel (Davis Dep., at 62, 91, 77-84; Doc. 30-29, "Appeals Memorandum"; Doc. 58-22, Deposition of Svetlana N. Wrightson, at 114). Notably, the I.R.M. also uses the term "*determined*" for violations occurring in this timeframe. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. § 4.26.16-2 (emphasis added). Regardless, both provisions speak in terms of the *I.R.S.* doing something. Anything that occurred subsequently is irrelevant within the I.R.S. context, such as the Tax Court order—indeed, if anything beyond the I.R.S. examination and appeals process would prove pertinent, it would render the very mitigation guidelines moot as the I.R.S. would be unable to consider them when deciding a penalty. Rum failed to present evidence to the contrary. Even assuming *arguendo* that the mitigation factors could have applied to Rum, he was not *entitled* to a reduction of the maximum statutory penalty. The IRM explicitly provides that a person "*may* be subject to less than the maximum FBAR penalty *depending on the amounts in the person's accounts*" *if* the mitigation factors are met. IRM 4.26.16.4.6.1(1) (July 1, 2008) at ADM003629 (available at Doc. 31-21 at 20) (emphasis added). Because Rum's account exceeded $1 million, his violation is classified by the I.R.M. as a Level IV, which carries the maximum statutory penalty. Exhibit 4.26.16-2. *Normal FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004*, 2A I.R.M. Abr. & Ann. §4.26.16-2.  As such, the I.R.S.'s development and computation of Rum's case and penalty fails to demonstrate a strong showing of bad faith or improper conduct as well.

Rum additionally contends that Kerkado's bargaining and offer of a deal for a reduction of the willful FBAR penalty (20% of the balance of his account at the time of the violation) in exchange for Rum agreeing to the civil fraud penalty is a strong showing of bad faith and improper conduct on the I.R.S.'s part. The I.R.M. provides that penalties should be applied in

a fair and consistent matter; to that effect, "[p]enalties are not to be applied as a 'bargaining chip' or because the taxpayer was uncooperative during the examination process. The decision to assert penalties must have a legal basis." 4.10.6.4 I.R.M. Even if bargaining took place precisely as Rum alleged, it would only be relevant to the bad faith contention if the penalty itself was imposed ultimately based on the bargaining. As previously stated, the record has thoroughly established through numerous memorandums, depositions, and caselaw that the willful FBAR penalty had a legal basis. Further, as established by the record and Rum himself, Kerkado tried to help Rum throughout this entire process[29], rather than punish him or act in bad faith. Kerkado let Rum know that many taxpayers in his position received the maximum statutory penalty under the FBAR (Doc. 58-38, Declaration of Said Rum, at 6). Because they could not reach an agreement otherwise, Kerkado had to impose what was appropriate under the statute and I.R.M. That is not the result of bad faith or punishment—instead, it is the result of the statute and I.R.M. Even in that context, Kerkado still tried to help Rum further when, in the letter informing him that regrettably they could not reach an agreement, she would still limit the willful penalty to one year, instead of multiple years (Doc. 58-16, Kerkado Letter to Rum). As such, Rum yet again failed to establish that the I.R.S.'s actions constituted bad faith here. Because the only exception raised by Rum fails to apply to the IRS's final decision regarding Rum's penalty, the Court's analysis under the arbitrary and capricious standard stands.

### c. Brief Statement

The only consideration that remains before the Court is whether Rum received proper notice of this penalty. Because the IRS is not bound by any codified procedures towards assessing FBAR penalties, "only the requirements of the Due Process Clause and §555 of the

---

[29] Rum admitted that Kerkado was nice to him during the course of the examination (Doc. 58-38, Declaration of Said Rum, at 6).

APA apply." *Moore v. United States*, No. C13-2063RAJ, 2015 WL 1510007, at *8 (W.D. Wash. Apr. 1, 2015).[30] As *Moore* noted, *the only relevant portion to Rum* "is the requirement that an agency must give '[p]rompt notice ... of the denial in whole or in part of a written application, petition, or other request ... made in connection with any agency proceeding." 5 U.S.C. §555(e). *Id.* Specifically, 5 U.S.C. §555(e) requires that "[e]xcept in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a *brief statement* of the grounds for denial." *Id.* (emphasis added). Here, this requirement was satisfied because the IRS issued Rum, on June 3, 2013, both a Letter 3709, and a Form 886-a Explanation of Items (Doc. 59, at Ex. 1, "Letter 3709"; Doc. 58-5). The Letter and Form noted that the IRS was proposing a penalty for *knowingly and willfully* failing to file the FBAR, what options he had after this proposal, and a detailed memorandum setting forth the reasoning of the IRS in reaching this decision.[31] *Id.* Unlike in *Moore*, Rum was given a notice accompanied by an explanation as to why the IRS proposed this penalty; further, the record before the Court contains a plethora of explanations for why this penalty was imposed. 2015 WL 1510007, at *8 (holding that the record was mostly "devoid of any explanation of the IRS's reasons for imposing the maximum penalty" and that the notice sent to Moore said "nothing at all about why it . . . [chose] a $40,000 maximum penalty as opposed to a smaller amount.") For example, the Letter, Form, Appeals Memorandum, and Kerkado's response to Rum's letter of protest to the fraud penalty all provide detailed explanations on how the IRS selected this penalty (Doc.

---

[30] While the IRS can elect not to comply with non-legislative rules such as IRM rules, "without an explanation for a change in interpretation of an agency practice, the court may find the 'interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S. Ct. 2688, 162 L.Ed.2d 820 (2005).

[31] Form 886-a Explanation of Items consists of nine pages setting forth specific facts, caselaw, statutory authority, factual inconsistences, and lack of evidence supporting Rum's allegations to support the selection of the penalty.

59, at Ex. 1; Doc. 58-5; Doc. 30-29; Doc. 58-16); *Moore*, 2015 WL 1510007, at *10 (noting that a court could rely on an Appeals Memorandum, though not disclosed during the decision-making process, as evidence for a reasoned decision that was not arbitrary and capricious). Accordingly, the undersigned finds that the IRS properly assessed the maximum penalty under 31 U.S.C. § 5321(a)(5)(C) for willful failure to report an interest in a foreign bank account for tax year 2007.

For the foregoing reasons, it is hereby

RECOMMENDED:

1. Government's Motion for Summary Judgment (Doc. 31) be GRANTED.

2. Rum's Motion for Summary Judgment (Doc. 30) be DENIED.

IT IS SO REPORTED in Tampa, Florida, on this 2nd day of August, 2019.

ANTHONY E. PORCELLI
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.


cc:    Hon. Mary S. Scriven
       Counsel of Record